# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and effective as of July 1, 2019 ("Effective Date") by and between a Business Entity known as VLAND INC., having its principal place of business at _Vland Inc._ ("Company") and _Yang, Ke_ with a mailing address of _1999 S Bascom Ave., Suite 753,_ City of _Campbell_ , State of California ("Employee").

WHEREAS, Company intends to hire Employee for the position of Manager and Employee desires to provide their services on the conditions set forth.

IN CONSIDERATION of promises and other good and valuable consideration the parties agree to the following:

## I.      Title and Employment.

Employee's title will be Manager ("Position"). This Agreement shall **not include** partial ownership in the business operations of Company.

Employee agrees that they will act in accordance with this Agreement and with the best interests of Company in mind, which may or may not require them to present the best of their skills, experience, and talents, to perform all the duties required of the position. In carrying out the duties and responsibilities of their position, Employee agrees to adhere to any and all policies, procedures, rules, regulations, as administered by Company. In addition, Employee agrees to abide by all local, county, State, and Federal laws while employed by Company.

## II.      Responsibilities.

Employee's job duty involves company operational management, excluding financial issues.

Employee shall be expected to work **full-time.**

## III.      Employment Period.

The Start Date of employment is September 15th, 2019. The first three consecutive months is probation period ("Probation Period") with monthly payment of $3,500. The Company may confirm the employment after assessment of Employee's job performance during or right after the probation period. Starting November 15th,2019, if the employment is confirmed, Employee shall receive monthly salary in the amount of $3,750. This Agreement may be terminated by either Employee or Company, at any time, with or without cause. Upon the termination of

000635

Employee's employment with Company for any reason, neither party hereto will have any further obligation or liability under this Agreement to the other party, except as set forth in Sections VII of this Agreement below.

### IV.   Compensation.

   a. Base Salary.  For the term of this Agreement, Employee will be paid a monthly base salary ("Base Salary") at $3,750 per month, subject to applicable withholding, in accordance with Company's normal payroll procedures. Employee's Base Salary will be subject to an annual review and adjustment by Company, if appropriate, based on the then current market conditions and local cost of living

   b. Performance Bonus. Following the end of each fiscal year, Employee shall be entitled to receive a performance bonus up to $15,000 per year as set by the Board based upon performance criteria to be set by the Board.

   c. Profit Bonus: Following the end of each fiscal year and subject to the approval of the Board, the Employee shall be eligible to receive a discretionary profit bonus. The payment of the profit bonus will be conditioned on the Company's achievement of corporate performance objectives approved by the Board.

### V.   Employee Benefits.

During the Term of the employment and subject to applicable eligibility requirements of position, tenure, salary, age, health and other qualifications, and/or pursuant to the terms of the applicable benefit provider or other policies, Employee may participate in such benefit plans or programs as are available to all of Company's other employees, including without limitation medical, dental, disability, and 401K Plan. Other than certain benefits prescribed by law, Employee will not be eligible for Benefits, Vacation Time, or Personal Leave during the Probation Period.

   a. Vacation day: Employee will be entitled to ten (10) days paid vacation, including sick and personal days, per year. Unused days will not carry over to the next calendar year. Employee must provide at least three days' prior notice for the use of 1 Vacation Day and one month **prior** notice for the use of consecutive Vacation Days. Employee is eligible for this Benefit after the 3-month/90-day probation period. Employee will **not** begin accruing paid Vacation Day during the Probation Period.

b.  Employee will also be entitled to the following paid holidays within the Calendar Year:

| New Year's Day | January 1st (if 1/1 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
|---|---|
| Memorial Day | (date depends on year) |
| Independence Day | July 4th (if 7/4 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
| Labor Day | (date depends on year) |
| Thanksgiving | (date depends on year) |
| Friday immediately following Thanksgiving | (date depends on year) |
| Christmas | December 25th (if 12/25 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
| Christmas Eve Day **or** Day immediately following Christmas | Regardless of whether 12/24 or 12/26 falls on a weekend, you may have a paid holiday in addition to Christmas on 12/25. Essentially, two paid holidays during the week of Christmas |

*Any paid holiday that falls on a Saturday or Sunday will be observed on the preceding Friday or proceeding Monday, respectively.

## VI.   Employee's Representations and Warranties.

Employee represents and warrants to Company as follows:

a.  Employee's academic credentials and other information provided to Company are true and accurate in all material respects;

b.  Employee is validly authorized to work in the United States, and neither Employee's entry into this Agreement, nor Employee's performance of his or her obligations hereunder, will result in a violation of any law or order applicable to Employee; and

000637

c. Employee's entry into this Agreement and performance of his or her obligations hereunder will not conflict with or result in a breach of the terms, conditions, or provisions of any other agreement or obligation, current or pending, to which Employee is a party or will be a party, or by which Employee is bound or will be bound, including any non-competition or confidentiality agreements.

Employee will be held liable for any damages caused by his or her breach of any of the representations or warranties made under this Section VI.

## VII.   Non-Compete.

For all periods that Employee is employed pursuant to this Agreement, Employee shall not directly or indirectly:

a. Engage in any business in the State of California without prior written consent of Company which could or would result in a breach of Sections VIII and/or IX below, including but not limited to activities, whether direct or indirect, as proprietor, partner, shareholder, principal, agent, or employee.

b. In any manner induce, attempt to induce, or assist others to induce or attempt to induce any employee, partner, independent contractor, or agent of Company to terminate its, his/her association with Company, or do anything to interfere with the relationship between Company and any executive or management level employee of Company.

c. The parties hereto intend that the covenants and agreements contained in this Section VII shall be deemed to be a series of separate covenants and agreements, one for each and every county, state, city and other jurisdiction in California with respect to which Company's business has been or is hereafter carried on. If any of the foregoing is determined by any court of competent jurisdiction to be invalid or unenforceable by reason of such agreement extending for too great a period of time or over too great a geographical area, or by reason of its being too extensive in any other respect, such agreement shall be interpreted to extend only over the maximum period of time and geographical area and to the maximum extend enforceable, all as determined by such court in such action. Any determination that any provision hereof is invalid or unenforceable, in whole or in part, shall have no effect on the validity or enforceability of any remaining provision hereof.

000638

d.   Notwithstanding the foregoing, nothing herein shall prevent Employee, following the termination of his/her employment, whichever is later, from being associated with any person or entity engaged in any activities or matters which constitute a primary line of business of Company at the time of such termination so long as such association does not result in a violation of Sections VIII and/or IX below. Employee represents and warrants that he/she is not restricted or prohibited in any way from entering into this Agreement or performing services hereunder at any time, whether by non-competition, covenant, or otherwise, and shall indemnify, defend and hold Company harmless from and against any damages, claims, costs (including attorney's fees) or liabilities as a result of the incorrectness of such representation and warranty.

VIII.   **Trade Secrets.**

Employee has not disclosed to Company, and Employee has been advised that Company will not accept at any time during the course of Employee's employment at Company, the disclosure of any trade secret (as that term is defined in California Civil Code Section 3426 et. seq.) by Employee which would constitute a breach by Employee of any obligation to any third party, including any former employers. Employee represents and warrants he/she has informed Company of the existence of any and all agreements between Employee and third parties which may in any way relate to, impact, or prevent Employee's employment at Company. Employee represents and warrants he/she has not taken any act prior to signing this Agreement that constitutes a breach of any agreement which may in any way relate to, impact, or prevent Employee's employment at Company.

IX.   **Confidential and Proprietary Information.**

Employee recognizes that he will occupy a position of trust with respect to business information of a confidential or proprietary nature which is the property of Company and which has been and will be imparted to him/her from time to time in the course of the performance of his/her duties under this Agreement. All agreements, documents, studies, analyses, data, statistics, marketing materials, leads and lead lists developed or prepared by Employee during the term of this Agreement (excluding only personal day planners maintained by Employee) shall be and remain confidential and shall be the sole property of Company. Employee hereby acknowledges that Company develops and utilizes valuable procedures, confidential information and copyrighted materials, including but not limited to names of clients, names of potential clients, name of third party professionals, leads and lead lists, all of which constitute a valuable part of Company's assets built up by Company's ingenuity, time, labor and expense over a period of many years and all of which constitute Company trade secrets. Employee agrees that:

    a.  He shall not at any time, whether during the Term or thereafter, use, divulge or disclose directly or indirectly any confidential or proprietary information of the Companies to any person, except that he may use and disclose to other Company personnel such confidential and proprietary information in the course of the performance of his duties hereunder or when legally required to do so in connection with any pending litigation or administrative inquiry; and

    b.  He shall return promptly upon the termination of this Agreement or otherwise upon the request of Company any and all copies of any documentation or materials containing any confidential or proprietary information of Company.

For purposes of this Agreement, the term "Confidential or Proprietary Information" of Company shall include all information which is owned by Company and which is not at the time publicly available or generally known to persons engaged in businesses similar to that of Company, including practices, procedures and methods and other facts relating to the business of Company; practices, procedures and methods and other facts related to marketing, advertising, financial matters, clients, client lists of Company and similar information of a confidential and proprietary nature. Employee agrees that his breach of this Section IX will cause irreparable harm to Company. Employee agrees that the remedy at law for any breach of this Section IX will be inadequate and, in addition to any other remedy available to Company, Company shall be entitled to injunctive relief for any actual or threatened breach of this Section IX without proof that any actual damages have been caused by such breach.

**X.**     **Early Termination.**

Either Company or Employee may terminate this Agreement at any time, with or without cause, by delivering written notice of its election to the other. Termination of this Agreement pursuant to this Section X shall not relieve Employee of his obligations to comply with Sections VIII and/or IX hereof, which provisions shall survive the termination of this Agreement.

**XI.**     **Return of Property**.

Employee shall return any and all property of Company upon the termination of employment. This includes, but is not limited to, equipment, electronics, records, access, notes, data, tests, vehicles, reports, models, or any property that is requested by Company.

**XII.**     **Alternative Dispute Resolution.**

000640

a. <u>Arbitrable Claims</u>. Company and Employee mutually consent to the resolution by final and binding arbitration of any and all disputes, controversies or claims related in any way to Employee's employment with Company, including, but not limited to, any dispute, controversy or claim of alleged discrimination, harassment or retaliation (including, but not limited to, claims based on race, sex, sexual preference, religion, national origin, age, marital or family status, medical condition, handicap or disability), any claim arising out of or relating to this Agreement or the breach thereof, and any dispute as to the arbitrability of a matter under this provision (collectively, "Claims"). Notwithstanding the foregoing, this arbitration provision will not apply to any disputes or claims relating to or arising out of the misuse or misappropriation of trade secrets or proprietary information, or of any claim or charge which, by law, cannot be the subject of a compulsory arbitration agreement. Company and Employee expressly acknowledge that they waive the right to litigate Claims in a judicial forum before a judge or jury, except as provided in Section XII(g) below.

b. <u>Claim Initiation/Time Limits</u>. A party must notify the other party in of a request to arbitrate Claims within the same statute of limitations applicable to the legal claim asserted. The written request for arbitration must specify: (i) the factual basis on which Claims are made; (ii) the statutory provision or legal theory under which Claims are made; and (iii) the nature and extent of any relief or remedy sought.

c. <u>Procedures</u>. The arbitration will be administered in accordance with the Employment Arbitration Rules and Mediation Procedures then in effect ("Rules") of the American Arbitration Association ("AAA"), a copy of which is available upon request to Company, in Santa Clara County, California, before a panel of three arbitrators, experienced in employment law and licensed to practice law in that jurisdiction, who have been selected in accordance with such Rules.

d. <u>Expenses</u>. With respect to any Claims, Company and Employee shall pay their own legal fees (including counsel fees), accounting fees and related expenses incurred by them in obtaining or defending any right or benefit under such Claims, including without limitation all court costs, transcript costs, fees of experts, witness fees, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenditures of the types customarily incurred in connection with prosecuting, defending or investigating any arbitration, action or suit irrespective of the outcome of such arbitration, action, or suit; provided, however, that, irrespective of the outcome of any arbitration, Company will pay any filing costs, arbitrator fees or expenses for any arbitration proceeding.

e. <u>Responsibilities of Arbitrator; Award; Judgment</u>. The arbitration panel will act as the impartial decision maker of any Claims that come within the scope of this

000641

arbitration provision. The arbitration panel will have the powers and authorities provided by Rules. The arbitration panel will have the authority to issue a summary disposition if there are no material factual issues in dispute requiring a hearing and Company or Employee is clearly entitled to an award in its or his favor. The arbitration panel will not have the power or authority to add to, detract from or modify any provision of this Agreement, or any related agreements or plans, including but not limited to any equity awards. The arbitration panel, in rendering an award in any arbitration conducted pursuant to this provision, shall issue a reasoned award stating the findings of fact and conclusions of law on which it is based, and the arbitrators shall be required to follow the law of the state designated by the parties herein. Any judgment on or enforcement of any award, including an award providing for interim or permanent injunctive relief, rendered by the arbitration panel may be entered, enforced or appealed from in any court having jurisdiction thereof. Any arbitration proceedings, decision or award rendered hereunder, and the validity, effect and interpretation of this arbitration provision, shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

f.  Confidentiality. It is part of the essence of this Agreement that any Claims hereunder shall be resolved expeditiously and as confidentially as possible. Accordingly, Company and Employee agree that all proceedings in any arbitration shall be conducted under seal and kept strictly confidential. In that regard, no party shall use, disclose or permit the disclosure of any information, evidence or documents produced by any other party in the arbitration proceedings or about the existence, contents or results of the proceedings except as necessary and appropriate for the preparation and conduct of the arbitration proceedings, or as necessary and appropriate for submission in any regulatory investigation or to defend any Claims resolved in the arbitration, or as may be required by any legal process, or as required in an action in aid of arbitration or for enforcement of or appeal from an arbitral award. Before making any disclosure permitted by the preceding sentence, the party intending to make such disclosure shall give the other party reasonable written notice of the intended disclosure and afford such other party a reasonable opportunity to protect its interests.

g.  Injunctive Relief. Notwithstanding the foregoing, each party shall be entitled to seek injunctive or other equitable relief from any court of competent jurisdiction in Santa Clara County, California without the need to resort to arbitration, and each party hereto hereby consents to the jurisdiction in any such court and unconditionally waives any defense of forum non convenience, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.

000642

h. <u>Decision of Arbitrator</u>. The Arbitrator shall issue a single judgment at the close of the proceeding, which shall dispose of all of the claims of the parties that are the subject of the arbitration. Any decision rendered by the Arbitrator shall be final, binding and conclusive and judgment shall be entered pursuant to Section 644 of the Code of Civil Procedure in any court in the State of California having jurisdiction.

i. <u>Appeal</u>. The judgment entered upon the decision of the Arbitrator shall be subject to all post-trial procedures and to appeal in the same manner as an appeal from any order or judgment in a civil action.

## XIII.   **Miscellaneous.**

a. Independent Legal Advice. Employee acknowledges that Company has advised Employee of his or her right to obtain independent legal counsel, has provided Employee with a reasonable opportunity to obtain independent legal advice with respect to this Agreement, and that Employee has either (i) had such independent legal advice prior to executing this Agreement; or (ii) willingly chosen not to obtain such advice and to execute this Agreement without having obtained such advice.

b. Assignment. This Agreement is for the unique personal services of Employee and may not be assigned by Employee without the express written consent of Company and its affiliates.

c. Compliance. Employee agrees to adhere to all sections of this Agreement in addition to any rules, regulations, handbook or policies of Company including obeying all local and federal laws.

d. Amendments. This Agreement may be modified or amended under the condition that any such amendment is attached and authorized by all parties.

e. Severability. Each provision, sub-provision or term of this Agreement is intended to be severable and shall continue in full force and effect although other provisions herein may be determined invalid or void for any reason.

f. Waiver of Contractual Right. If Company fails to enforce a provision or a section of this Agreement, it shall not be determined as a waiver or limitation. Either party

000643



shall remain the right to enforce and compel the compliance of this Agreement to its fullest extent.

g. **Attorneys' Fees and Costs.** Subject to Section XII hereof, in the event suit is brought to enforce the terms of this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees, including without limitation those costs and fees incurred upon any appeal, as awarded by the court.

h. **Entire Agreement; Amendments.** This Agreement replaces and supersedes in their entirety any and all prior agreements, express or implied, written or oral, performed or unperformed, pertaining to the employment of Employee and the compensation to be paid to him therefore, and all such prior agreements and understandings are hereby terminated and shall be of no further force or effect.

i. **Counterparts and Electronic Signatures.** This Agreement and any ancillary agreements may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement or any ancillary agreement transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement or such ancillary agreement for all purposes.

j. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**THE EMPLOYEE:**

Employee's Initials - _____      Page
10

000644

By:

Date   September 13, 2019

**THE COMPANY:**

VLAND INC.
a California corporation

By:  Chun Wang

Its: September 13, 2019

President

Date: _____

Employee's Initials - _____      Page
11

000645

Please insert the Letterhead

# Vland Inc. Offer Letter

[Ke Yang]
Address:_____                                              [09/01/2019]

_____

_____

### Re: Position of **Manager**

Dear [Ke Yang],

VLAND INC. is pleased to offer you the position of <u>Manager</u>, reporting to the [Vland Inc. CEO], [Chun Wang]. This is a [full-time],[exempt] position, 40 hours per week. The wage is [USD.45,000.00, included performance bonus up to $15,000] per year. Your start date will be <u>September 1st,</u> 2019. You will be eligible for our company's standard benefit including vacation days after an initial 90-day probationary employment period.

Please note that this letter and your response are not meant to constitute a contract of employment for a specific term.    Upon acceptance of this offer, both you and VLAND INC. retain the right to terminate your employment at any time, with or without cause.

You agree not to use on behalf of VLAND INC. or its affiliates, or disclose to VLAND INC. or its affiliates, any information known to you which any of your prior employers may reasonably assert to be confidential and proprietary to that employer.

This offer will remain valid until  <u>September 10,</u> 2019. You may indicate your agreement with the terms and accept this offer by signing and dating this offer letter returning them to me. Your employment and start date are also contingent upon successful completion of the background check process. We are enthusiastic about the prospect of your joining VLAND INC. We believe that your qualifications will enable you to make a significant contribution to the future and we look forward to our association with you.

Very Truly Yours,
VLAND INC.

_____
CEO:   Chun Wang

I have read and understood this offer letter and hereby acknowledge, accept, and agree to the terms as set forth above and further acknowledge that no other commitments were made to me as part of my employment offer except as specifically set forth herein.

_____                    Date signed:  <u>09/01/2019</u>
[Ke Yang]

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made and effective as of July 1, 2019 ("Effective Date") by and between a Business Entity known as VLAND INC., having its principal place of business at _Vland Inc._ ("Company") and _Yang, Ke_ with a mailing address of _1999 S Bascom Ave., Suite 753,_ City of _Campbell_ , State of California ("Employee").

WHEREAS, Company intends to hire Employee for the position of Secretary and Employee desires to provide their services on the conditions set forth.

IN CONSIDERATION of promises and other good and valuable consideration the parties agree to the following:

### I.     Title and Employment.

Employee's title will be Secretary ("Position"). This Agreement shall **not include** partial ownership in the business operations of Company.

Employee agrees that they will act in accordance with this Agreement and with the best interests of Company in mind, which may or may not require them to present the best of their skills, experience, and talents, to perform all the duties required of the position. In carrying out the duties and responsibilities of their position, Employee agrees to adhere to any and all policies, procedures, rules, regulations, as administered by Company. In addition, Employee agrees to abide by all local, county, State, and Federal laws while employed by Company.

### II.     Responsibilities.

Employee's job duty involves administrative support for company operation, excluding financial issues.

Employee shall be expected to work **full-time.**

### III.     Employment Period.

Employee's Initials - _Ke_     Page 1

000647

The Start Date of employment is July 1, 2019. This Agreement will become effective on July 1, 2019. This Agreement may be terminated by either Employee or Company, at any time, with or without cause. Upon the termination of Employee's employment with Company for any reason, neither party hereto will have any further obligation or liability under this Agreement to the other party, except as set forth in Sections VII of this Agreement below.

IV.   **Compensation**.

    **a.** Base Salary.  For the term of this Agreement, Employee will be paid a monthly base salary ("Base Salary") of $3,000 per month, subject to applicable withholding, in accordance with Company's normal payroll procedures. Employee's Base Salary will be subject to an annual review and adjustment by Company, if appropriate, based on the then current market conditions and local cost of living.

    b. Performance Bonus: Following the end of each fiscal year and subject to the approval of the Board, the Employee shall be eligible to receive a discretionary performance bonus. The payment of the performance bonus will be conditioned on the Company's achievement of corporate performance objectives approved by the Board.

V.   **Employee Benefits**.

During the Term of the employment and subject to applicable eligibility requirements of position, tenure, salary, age, health and other qualifications, and/or pursuant to the terms of the applicable benefit provider or other policies, Employee may participate in such benefit plans or programs as are available to all of Company's other employees, including without limitation medical, dental, disability, and 401K Plan. Other than certain benefits prescribed by law, Employee will not be eligible for Benefits, Vacation Time, or Personal Leave until after the first 60 days of employment ("Trial Period"). In addition, Employee will not be eligible for vacation time, sick leave, or any time off that would be paid or unpaid.

    a. Vacation day: Employee will be entitled to ten (10) days paid vacation, including sick and personal days, per year. Unused days will not carry over to the next calendar year. Employee must provide at least three days' prior notice for the use of 1 Vacation Day and one month **prior** notice for the use of consecutive Vacation Days. Employee is eligible for this Benefit after the 2-month/60-day customary probation period. Employee will **not** begin accruing paid Vacation Day during the probation period.

000648

b. Employee will also be entitled to the following paid holidays within the Calendar Year:

| New Year's Day | January 1st (if 1/1 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
|---|---|
| Memorial Day | (date depends on year) |
| Independence Day | July 4th (if 7/4 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
| Labor Day | (date depends on year) |
| Thanksgiving | (date depends on year) |
| Friday immediately following Thanksgiving | (date depends on year) |
| Christmas | December 25th (if 12/25 falls on a Saturday or Sunday, the paid holiday will be on the closer of the corresponding Friday or Monday) |
| Christmas Eve Day **or** Day immediately following Christmas | Regardless of whether 12/24 or 12/26 falls on a weekend, you may have a paid holiday in addition to Christmas on 12/25. Essentially, two paid holidays during the week of Christmas |

*Any paid holiday that falls on a Saturday or Sunday will be observed on the preceding Friday or proceeding Monday, respectively.

VI.   **Employee's Representations and Warranties.**

Employee represents and warrants to Company as follows:

a. Employee's academic credentials and other information provided to Company are true and accurate in all material respects;

b. Employee is validly authorized to work in the United States, and neither Employee's entry into this Agreement, nor Employee's performance of his or her

Employee's Initials - _____   Page 3

000649

obligations hereunder, will result in a violation of any law or order applicable to Employee; and

c.  Employee's entry into this Agreement and performance of his or her obligations hereunder will not conflict with or result in a breach of the terms, conditions, or provisions of any other agreement or obligation, current or pending, to which Employee is a party or will be a party, or by which Employee is bound or will be bound, including any non-competition or confidentiality agreements.

Employee will be held liable for any damages caused by his or her breach of any of the representations or warranties made under this Section VI.

## VII.    Non-Compete.

For all periods that Employee is employed pursuant to this Agreement, Employee shall not directly or indirectly:

a.  Engage in any business in the State of California without prior written consent of Company which could or would result in a breach of Sections VIII and/or IX below, including but not limited to activities, whether direct or indirect, as proprietor, partner, shareholder, principal, agent, or employee.

b.  In any manner induce, attempt to induce, or assist others to induce or attempt to induce any employee, partner, independent contractor, or agent of Company to terminate its, his/her association with Company, or do anything to interfere with the relationship between Company and any executive or management level employee of Company.

c.  The parties hereto intend that the covenants and agreements contained in this Section VII shall be deemed to be a series of separate covenants and agreements, one for each and every county, state, city and other jurisdiction in California with respect to which Company's business has been or is hereafter carried on. If any of the foregoing is determined by any court of competent jurisdiction to be invalid or unenforceable by reason of such agreement extending for too great a period of time or over too great a geographical area, or by reason of its being too extensive in any other respect, such agreement shall be interpreted to extend only over the maximum period of time and geographical area and to the maximum extend enforceable, all as determined by such court in such action. Any determination that

Employee's Initials - *YK*        Page 4

000650

any provision hereof is invalid or unenforceable, in whole or in part, shall have no effect on the validity or enforceability of any remaining provision hereof.

d.  Notwithstanding the foregoing, nothing herein shall prevent Employee, following the termination of his/her employment, whichever is later, from being associated with any person or entity engaged in any activities or matters which constitute a primary line of business of Company at the time of such termination so long as such association does not result in a violation of Sections VIII and/or IX below. Employee represents and warrants that he/she is not restricted or prohibited in any way from entering into this Agreement or performing services hereunder at any time, whether by non-competition, covenant, or otherwise, and shall indemnify, defend and hold Company harmless from and against any damages, claims, costs (including attorney's fees) or liabilities as a result of the incorrectness of such representation and warranty.

## VIII.   Trade Secrets.

Employee has not disclosed to Company, and Employee has been advised that Company will not accept at any time during the course of Employee's employment at Company, the disclosure of any trade secret (as that term is defined in California Civil Code Section 3426 et. seq.) by Employee which would constitute a breach by Employee of any obligation to any third party, including any former employers. Employee represents and warrants he/she has informed Company of the existence of any and all agreements between Employee and third parties which may in any way relate to, impact, or prevent Employee's employment at Company. Employee represents and warrants he/she has not taken any act prior to signing this Agreement that constitutes a breach of any agreement which may in any way relate to, impact, or prevent Employee's employment at Company.

## IX.   Confidential and Proprietary Information.

Employee recognizes that he will occupy a position of trust with respect to business information of a confidential or proprietary nature which is the property of Company and which has been and will be imparted to him/her from time to time in the course of the performance of his/her duties under this Agreement. All agreements, documents, studies, analyses, data, statistics, marketing materials, leads and lead lists developed or prepared by Employee during the term of this Agreement (excluding only personal day planners maintained by Employee) shall be and remain confidential and shall be the sole property of Company. Employee hereby acknowledges that Company develops and utilizes valuable procedures, confidential information and copyrighted materials, including but not limited to names of clients, names of potential clients, name of third party professionals, leads and lead lists, all of which constitute a valuable part of Company's

Employee's Initials - _Yr_        Page 5

000651

assets built up by Company's ingenuity, time, labor and expense over a period of many years and all of which constitute Company trade secrets. Employee agrees that:

    a.  He shall not at any time, whether during the Term or thereafter, use, divulge or disclose directly or indirectly any confidential or proprietary information of the Companies to any person, except that he may use and disclose to other Company personnel such confidential and proprietary information in the course of the performance of his duties hereunder or when legally required to do so in connection with any pending litigation or administrative inquiry; and

    b.  He shall return promptly upon the termination of this Agreement or otherwise upon the request of Company any and all copies of any documentation or materials containing any confidential or proprietary information of Company.

For purposes of this Agreement, the term "Confidential or Proprietary Information" of Company shall include all information which is owned by Company and which is not at the time publicly available or generally known to persons engaged in businesses similar to that of Company, including practices, procedures and methods and other facts relating to the business of Company; practices, procedures and methods and other facts related to marketing, advertising, financial matters, clients, client lists of Company and similar information of a confidential and proprietary nature. Employee agrees that his breach of this Section IX will cause irreparable harm to Company. Employee agrees that the remedy at law for any breach of this Section IX will be inadequate and, in addition to any other remedy available to Company, Company shall be entitled to injunctive relief for any actual or threatened breach of this Section IX without proof that any actual damages have been caused by such breach.

## X.    Early Termination.

Either Company or Employee may terminate this Agreement at any time, with or without cause, by delivering written notice of its election to the other. Termination of this Agreement pursuant to this Section X shall not relieve Employee of his obligations to comply with Sections VIII and/or IX hereof, which provisions shall survive the termination of this Agreement.

## XI.    Return of Property.

Employee shall return any and all property of Company upon the termination of employment. This includes, but is not limited to, equipment, electronics, records, access, notes, data, tests, vehicles, reports, models, or any property that is requested by Company.

Employee's Initials - _YK_        Page 6

000652

**XII.**   **Alternative Dispute Resolution.**

a.   <u>Arbitrable Claims</u>. Company and Employee mutually consent to the resolution by final and binding arbitration of any and all disputes, controversies or claims related in any way to Employee's employment with Company, including, but not limited to, any dispute, controversy or claim of alleged discrimination, harassment or retaliation (including, but not limited to, claims based on race, sex, sexual preference, religion, national origin, age, marital or family status, medical condition, handicap or disability), any claim arising out of or relating to this Agreement or the breach thereof, and any dispute as to the arbitrability of a matter under this provision (collectively, "Claims"). Notwithstanding the foregoing, this arbitration provision will not apply to any disputes or claims relating to or arising out of the misuse or misappropriation of trade secrets or proprietary information, or of any claim or charge which, by law, cannot be the subject of a compulsory arbitration agreement. Company and Employee expressly acknowledge that they waive the right to litigate Claims in a judicial forum before a judge or jury, except as provided in Section XII(g) below.

b.   <u>Claim Initiation/Time Limits</u>. A party must notify the other party in of a request to arbitrate Claims within the same statute of limitations applicable to the legal claim asserted. The written request for arbitration must specify: (i) the factual basis on which Claims are made; (ii) the statutory provision or legal theory under which Claims are made; and (iii) the nature and extent of any relief or remedy sought.

c.   <u>Procedures</u>. The arbitration will be administered in accordance with the Employment Arbitration Rules and Mediation Procedures then in effect ("Rules") of the American Arbitration Association ("AAA"), a copy of which is available upon request to Company, in Los Angeles County, California, before a panel of three arbitrators, experienced in employment law and licensed to practice law in that jurisdiction, who have been selected in accordance with such Rules.

d.   <u>Expenses</u>. With respect to any Claims, Company and Employee shall pay their own legal fees (including counsel fees), accounting fees and related expenses incurred by them in obtaining or defending any right or benefit under such Claims, including without limitation all court costs, transcript costs, fees of experts, witness fees, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenditures of the types customarily incurred in connection with prosecuting, defending or investigating any arbitration, action or suit irrespective of the outcome of such arbitration, action, or suit; provided, however, that, irrespective of the outcome of any arbitration,

000653

Company will pay any filing costs, arbitrator fees or expenses for any arbitration proceeding.

e.  <u>Responsibilities of Arbitrator; Award; Judgment</u>. The arbitration panel will act as the impartial decision maker of any Claims that come within the scope of this arbitration provision. The arbitration panel will have the powers and authorities provided by Rules. The arbitration panel will have the authority to issue a summary disposition if there are no material factual issues in dispute requiring a hearing and Company or Employee is clearly entitled to an award in its or his favor. The arbitration panel will not have the power or authority to add to, detract from or modify any provision of this Agreement, or any related agreements or plans, including but not limited to any equity awards. The arbitration panel, in rendering an award in any arbitration conducted pursuant to this provision, shall issue a reasoned award stating the findings of fact and conclusions of law on which it is based, and the arbitrators shall be required to follow the law of the state designated by the parties herein. Any judgment on or enforcement of any award, including an award providing for interim or permanent injunctive relief, rendered by the arbitration panel may be entered, enforced or appealed from in any court having jurisdiction thereof. Any arbitration proceedings, decision or award rendered hereunder, and the validity, effect and interpretation of this arbitration provision, shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

f.  <u>Confidentiality</u>. It is part of the essence of this Agreement that any Claims hereunder shall be resolved expeditiously and as confidentially as possible. Accordingly, Company and Employee agree that all proceedings in any arbitration shall be conducted under seal and kept strictly confidential. In that regard, no party shall use, disclose or permit the disclosure of any information, evidence or documents produced by any other party in the arbitration proceedings or about the existence, contents or results of the proceedings except as necessary and appropriate for the preparation and conduct of the arbitration proceedings, or as necessary and appropriate for submission in any regulatory investigation or to defend any Claims resolved in the arbitration, or as may be required by any legal process, or as required in an action in aid of arbitration or for enforcement of or appeal from an arbitral award. Before making any disclosure permitted by the preceding sentence, the party intending to make such disclosure shall give the other party reasonable written notice of the intended disclosure and afford such other party a reasonable opportunity to protect its interests.

g.  <u>Injunctive Relief</u>. Notwithstanding the foregoing, each party shall be entitled to seek injunctive or other equitable relief from any court of competent jurisdiction in Los Angeles County, California without the need to resort to arbitration, and each party hereto hereby consents to the jurisdiction in any such court and unconditionally waives any defense of forum non convenience, and irrevocably

Employee's Initials - _E/K_       Page 8

000654

agrees to be bound by any judgment rendered thereby in connection with this Agreement.

h. <u>Decision of Arbitrator</u>. The Arbitrator shall issue a single judgment at the close of the proceeding, which shall dispose of all of the claims of the parties that are the subject of the arbitration. Any decision rendered by the Arbitrator shall be final, binding and conclusive and judgment shall be entered pursuant to Section 644 of the Code of Civil Procedure in any court in the State of California having jurisdiction.

i. <u>Appeal</u>. The judgment entered upon the decision of the Arbitrator shall be subject to all post-trial procedures and to appeal in the same manner as an appeal from any order or judgment in a civil action.

XIII.  **Miscellaneous.**

a. Independent Legal Advice. Employee acknowledges that Company has advised Employee of his or her right to obtain independent legal counsel, has provided Employee with a reasonable opportunity to obtain independent legal advice with respect to this Agreement, and that Employee has either (i) had such independent legal advice prior to executing this Agreement; or (ii) willingly chosen not to obtain such advice and to execute this Agreement without having obtained such advice.

b. Assignment. This Agreement is for the unique personal services of Employee and may not be assigned by Employee without the express written consent of Company and its affiliates.

c. Compliance. Employee agrees to adhere to all sections of this Agreement in addition to any rules, regulations, handbook or policies of Company including obeying all local and federal laws.

d. Amendments. This Agreement may be modified or amended under the condition that any such amendment is attached and authorized by all parties.

e. Severability. Each provision, sub-provision or term of this Agreement is intended to be severable and shall continue in full force and effect although other provisions herein may be determined invalid or void for any reason.

Employee's Initials - _YK_          Page 9

f.  Waiver of Contractual Right. If Company fails to enforce a provision or a section of this Agreement, it shall not be determined as a waiver or limitation. Either party shall remain the right to enforce and compel the compliance of this Agreement to its fullest extent.

g.  Attorneys' Fees and Costs. Subject to Section XII hereof, in the event suit is brought to enforce the terms of this Agreement, the prevailing party shall be entitled to costs and reasonable attorney's fees, including without limitation those costs and fees incurred upon any appeal, as awarded by the court.

h.  Entire Agreement; Amendments. This Agreement replaces and supersedes in their entirety any and all prior agreements, express or implied, written or oral, performed or unperformed, pertaining to the employment of Employee and the compensation to be paid to him therefore, and all such prior agreements and understandings are hereby terminated and shall be of no further force or effect.

i.  Counterparts and Electronic Signatures. This Agreement and any ancillary agreements may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement or any ancillary agreement transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement or such ancillary agreement for all purposes.

j.  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**THE EMPLOYEE:**

Employee's Initials - _YK_     Page 10

000656

By: 杨诗 yangke

Date   July 01,2019

**THE COMPANY:**

VLAND INC.
a California corporation

By: Chun Wang

Its: July 01,2019

President

Date: _____

Employee's Initials - YK   Page
11

000657

Please insert the Letterhead

# Vland Inc. Offer Letter

[KeYang]
Address:_____                                         [05/23/2019]
_____
_____

### Re: Position of  Secretary

Dear [KeYang],

VLAND INC. is pleased to offer you the position of  Secretary  , reporting to the [Vland Inc. CEO], [Chun Wang]. This is a [full-time] [exempt] position, 40 hours per week.   The wage is [USD.3000.00] per [month]. Your start date will be June 1st, 2019. You will be eligible for our company's standard benefit including vacation days after an initial 90-day probationary employment period.

Please note that this letter and your response are not meant to constitute a contract of employment for a specific term.   Upon acceptance of this offer, both you and VLAND INC. retain the right to terminate your employment at any time, with or without cause.

You agree not to use on behalf of VLAND INC. or its affiliates, or disclose to VLAND INC. or its affiliates, any information known to you which any of your prior employers may reasonably assert to be confidential and proprietary to that employer.

This offer will remain valid until June 1st , 2019. You may indicate your agreement with the terms and accept this offer by signing and dating this offer letter returning them to me. Your employment and start date are also contingent upon successful completion of the background check process. We are enthusiastic about the prospect of your joining VLAND INC. We believe that your qualifications will enable you to make a significant contribution to the future and we look forward to our association with you.

Very Truly Yours,
VLAND INC. CEO
_____
Chun Wang

I have read and understood this offer letter and hereby acknowledge, accept, and agree to the terms as set forth above and further acknowledge that no other commitments were made to me as part of my employment offer except as specifically set forth herein.

Please insert the Letterhead

Yang Ke 杨子明
_____

[Ke Yang]

Date signed: 05/31/2019
_____

000659

CONTINUED UNDER

PART 1 OF 2

01/06/2021

(DATE)

DO NOT PLACE ANY MATERIAL
ON THIS FILE AFTER ABOVE
DATE

Form M-134
(7-15-59)

DOJ-1981-09

000660

# DUPLICATE SET

## for

## PIMS DATA ENTRY

## at

# KENTUCKY CONSULAR CENTER

000661



# Notice of Entry of Appearance
## as Attorney or Accredited Representative

**Department of Homeland Security**

**DHS**
**Form G-28**
OMB No. 1615-0105
Expires 05/31/2021

---

## Part 1. Information About Attorney or Accredited Representative

**1.** USCIS Online Account Number (if any)

▶ [_____]

### Name of Attorney or Accredited Representative

**2.a.** Family Name (Last Name)  |  Chu

**2.b.** Given Name (First Name)  |  Peter

**2.c.** Middle Name  |  D.

### Address of Attorney or Accredited Representative

**3.a.** Street Number and Name  |  4615 Convoy St.

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.  |  [_____]

**3.c.** City or Town  |  San Diego

**3.d.** State  |  CA    **3.e.** ZIP Code  |  92111

**3.f.** Province  |  [_____]

**3.g.** Postal Code  |  [_____]

**3.h.** Country  |  USA

### Contact Information of Attorney or Accredited Representative

**4.** Daytime Telephone Number
8582688823

**5.** Mobile Telephone Number (if any)
[_____]

**6.** Email Address (if any)
response@peterchu.com

**7.** Fax Number (if any)
8582689229

---

## Part 2. Eligibility Information for Attorney or Accredited Representative

Select **all applicable** items.

**1.a.** ☒ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest courts of the following states, possessions, territories, commonwealths, or the District of Columbia. If you need extra space to complete this section, use the space provided in **Part 6. Additional Information.**

Licensing Authority
CA

**1.b.** Bar Number (if applicable)
98935

**1.c.** I (select **only one** box) ☒ am not ☐ am subject to any order suspending, enjoining, restraining, disbarring, or otherwise restricting me in the practice of law. If you are subject to any orders, use the space provided in **Part 6. Additional Information** to provide an explanation.

**1.d.** Name of Law Firm or Organization (if applicable)
Law Offices of Peter Chu

**2.a.** ☐ I am an accredited representative of the following qualified nonprofit religious, charitable, social service, or similar organization established in the United States and recognized by the Department of Justice in accordance with 8 CFR part 1292.

**2.b.** Name of Recognized Organization
[_____]

**2.c.** Date of Accreditation (mm/dd/yyyy)
[_____]

**3.** ☐ I am associated with
[_____],
the attorney or accredited representative of record who previously filed Form G-28 in this case, and my appearance as an attorney or accredited representative for a limited purpose is at his or her request.

**4.a.** ☐ I am a law student or law graduate working under the direct supervision of the attorney or accredited representative of record on this form in accordance with the requirements of 8 CFR 292.1(a)(2).

**4.b.** Name of Law Student or Law Graduate
[_____]

---

## Part 3.  Notice of Appearance as Attorney or Accredited Representative

If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

This appearance relates to immigration matters before (select **only one** box):

**1.a.** ☒ U.S. Citizenship and Immigration Services (USCIS)

**1.b.** List the form numbers or specific matter in which appearance is entered.

L1A Ext.: I-129, L Supplement

**2.a.** ☐ U.S. Immigration and Customs Enforcement (ICE)

**2.b.** List the specific matter in which appearance is entered.

**3.a.** ☐ U.S. Customs and Border Protection (CBP)

**3.b.** List the specific matter in which appearance is entered.

**4.** Receipt Number (if any)
▶ | | | | | | | | | | | |

**5.** I enter my appearance as an attorney or accredited representative at the request of the (select **only one** box):
☐ Applicant   ☒ Petitioner   ☐ Requestor
☐ Beneficiary/Derivative   ☐ Respondent (ICE, CBP)

## *Information About Client (Applicant, Petitioner, Requestor, Beneficiary or Derivative, Respondent, or Authorized Signatory for an Entity)*

**6.a.** Family Name (Last Name)   WANG

**6.b.** Given Name (First Name)   Chun

**6.c.** Middle Name

**7.a.** Name of Entity (if applicable)
Vland, Inc.

**7.b.** Title of Authorized Signatory for Entity (if applicable)
President/CEO

**8.** Client's USCIS Online Account Number (if any)
▶ | | | | | | | | | | |

**9.** Client's Alien Registration Number (A-Number) (if any)
▶ A- | | | | | | | | |

### *Client's Contact Information*

**10.** Daytime Telephone Number
6504414427

**11.** Mobile Telephone Number (if any)

**12.** Email Address (if any)
wangchun@v1.cn

### *Mailing Address of Client*

**NOTE:** Provide the client's mailing address. **Do not** provide the business mailing address of the attorney or accredited representative **unless** it serves as the safe mailing address on the application or petition being filed with this Form G-28.

**13.a.** Street Number and Name   1999 S. Bascom Avenue

**13.b.** ☐ Apt.  ☒ Ste.  ☐ Flr.   753

**13.c.** City or Town   Campbell

**13.d.** State  CA   **13.e.** ZIP Code  95008

**13.f.** Province

**13.g.** Postal Code

**13.h.** Country
USA

## Part 4.  Client's Consent to Representation and Signature

### *Consent to Representation and Release of Information*

I have requested the representation of and consented to being represented by the attorney or accredited representative named in **Part 1.** of this form. According to the Privacy Act of 1974 and U.S. Department of Homeland Security (DHS) policy, I also consent to the disclosure to the named attorney or accredited representative of any records pertaining to me that appear in any system of records of USCIS, ICE, or CBP.

000663

## Part 4.  Client's Consent to Representation and Signature (continued)

### Options Regarding Receipt of USCIS Notices and Documents

USCIS will send notices to both a represented party (the client) and his, her, or its attorney or accredited representative either through mail or electronic delivery.  USCIS will send all secure identity documents and Travel Documents to the client's U.S. mailing address.

If you want to have notices and/or secure identity documents sent to your attorney or accredited representative of record rather than to you, please select **all applicable** items below.  You may change these elections through written notice to USCIS.

1.a. ☒ I request that USCIS send original notices on an application or petition to the business address of my attorney or accredited representative as listed in this form.

1.b. ☐ I request that USCIS send any secure identity document (Permanent Resident Card, Employment Authorization Document, or Travel Document) that I receive to the U.S. business address of my attorney or accredited representative (or to a designated military or diplomatic address in a foreign country (if permitted)).

**NOTE:** If your notice contains Form I-94, Arrival-Departure Record, USCIS will send the notice to the U.S. business address of your attorney or accredited representative.  If you would rather have your Form I-94 sent directly to you, select **Item Number 1.c.**

1.c. ☐ I request that USCIS send my notice containing Form I-94 to me at my U.S. mailing address.

### Signature of Client or Authorized Signatory for an Entity

2.a. Signature of Client or Authorized Signatory for an Entity

➡ [signature]

2.b. Date of Signature (mm/dd/yyyy)  12/10/2019

## Part 5.  Signature of Attorney or Accredited Representative

I have read and understand the regulations and conditions contained in 8 CFR 103.2 and 292 governing appearances and representation before DHS.  I declare under penalty of perjury under the laws of the United States that the information I have provided on this form is true and correct.

1.a. Signature of Attorney or Accredited Representative

[signature]

1.b. Date of Signature (mm/dd/yyyy)  12/10/2019

2.a. Signature of Law Student or Law Graduate

2.b. Date of Signature (mm/dd/yyyy)

## Part 6. Additional Information

If you need extra space to provide any additional information within this form, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this form or attach a separate sheet of paper. Type or print your name at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a** Family Name (Last Name)     WANG

**1.b** Given Name (First Name)    Chun

**1.c** Middle Name

**2.a** Page Number    **2.b** Part Number    **2.c** Item Number

**2.d**

**3.a** Page Number    **3.b** Part Number    **3.c** Item Number

**3.d**

**4.a** Page Number    **4.b** Part Number    **4.c** Item Number

**4.d**

**5.a** Page Number    **5.b** Part Number    **5.c** Item Number

**5.d**

**6.a** Page Number    **6.b** Part Number    **6.c** Item Number

**6.d**

000665



### Petition for a Nonimmigrant Worker

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-129**
OMB No. 1615-0009
Expires 01/31/2022

RECD CSC*190EC12 16:36

**5361**

| For USCIS Use Only | Receipt | Partial Approval (explain) | Action Block |
|---|---|---|---|
| | | | |

| | |
|---|---|
| Class: _____ | ☐ Classification Approved |
| No. of Workers: _____ | ☐ Consulate/POE/PFI Notified |
| Job Code: _____ | At: _____ |
| Validity Dates: _____ | |
| From: _____ | ☐ Extension Granted |
| To: _____ | ☐ COS/Extension Granted |

▶ **START HERE - Type or print in black ink.**

## Part 1. Petitioner Information

If you are an individual filing this petition, complete **Item Number 1.** If you are a company or an organization filing this petition, complete **Item Number 2.**

**1. Legal Name of Individual Petitioner**

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

**2. Company or Organization Name**

Vland, Inc.

**3. Mailing Address of Individual, Company or Organization**

In Care Of Name

Chun WANG, President/CEO

| Street Number and Name | Apt. Ste. Flr. | Number |
|---|---|---|
| 1999 S. Bascom Avenue | ☐ ☒ ☐ | 753 |

| City or Town | State | ZIP Code |
|---|---|---|
| Campbell | CA | 95008 |

| Province | Postal Code | Country |
|---|---|---|
| | | USA |

**4. Contact Information**

| Daytime Telephone Number | Mobile Telephone Number | Email Address (if any) |
|---|---|---|
| 650-441-4427 | | wangchun@v1.cn |

**5. Other Information**

| Federal Employer Identification Number (FEIN) | Individual IRS Tax Number | U.S. Social Security Number (if any) |
|---|---|---|
| ▶ 83-2402844 | ▶ | ▶ |



000666

## Part 2.  Information About This Petition (See instructions for fee information)

1. **Requested Nonimmigrant Classification**  (Write classification symbol): L-1A

2. **Basis for Classification** (select **only one** box):
   - [ ] **a.**  New employment.
   - [x] **b.**  Continuation of previously approved employment without change with the same employer.
   - [ ] **c.**  Change in previously approved employment.
   - [ ] **d.**  New concurrent employment.
   - [ ] **e.**  Change of employer.
   - [ ] **f.**  Amended petition.

3. **Provide the most recent petition/application receipt number for the beneficiary.  If none exists, indicate "None."**  ▶ W A C 1 9 0 5 8 5 0 4 5 1

4. **Requested Action** (select **only one** box):
   - [ ] **a.**  Notify the office in **Part 4.** so each beneficiary can obtain a visa or be admitted.  (**NOTE:**  A petition is not required for E-1, E-2, E-3, H-1B1 Chile/Singapore, or TN visa beneficiaries.)
   - [ ] **b.**  Change the status and extend the stay of each beneficiary because the beneficiary(ies) is/are now in the United States in another status (see instructions for limitations).  This is available only when you check "New Employment" in **Item Number 2.**, above.
   - [x] **c.**  Extend the stay of each beneficiary because the beneficiary(ies) now hold(s) this status.
   - [ ] **d.**  Amend the stay of each beneficiary because the beneficiary(ies) now hold(s) this status.
   - [ ] **e.**  Extend the status of a nonimmigrant classification based on a free trade agreement.  (See Trade Agreement Supplement to Form I-129 for TN and H-1B1.)
   - [ ] **f.**  Change status to a nonimmigrant classification based on a free trade agreement.  (See Trade Agreement Supplement to Form I-129 for TN and H-1B1.)

5. **Total number of workers included in this petition.**  (See instructions relating to when more than one worker can be included.)  ▶ ONE

## Part 3.  Beneficiary Information  (Information about the beneficiary/beneficiaries you are filing for.  Complete the blocks below.  Use the Attachment-1 sheet to name each beneficiary included in this petition.)

1. **If an Entertainment Group, Provide the Group Name**
   N/A

2. **Provide Name of Beneficiary**

   | Family Name (Last Name) | Given Name (First Name) | Middle Name |
   |---|---|---|
   | WANG | Chun | |

3. **Provide all other names the beneficiary has used.**  Include nicknames, aliases, maiden name, and names from all previous marriages.

   | Family Name (Last Name) | Given Name (First Name) | Middle Name |
   |---|---|---|
   | WANG | Xiangdong | |
   | | | |
   | | | |

4. **Other Information**

   Date of birth (mm/dd/yyyy) 01/23/1965    Gender  [ ] Male  [x] Female    U.S. Social Security Number (if any) ▶ 1 5 7 0 2 8 0 5 0

000667

**Part 3.  Beneficiary Information** (Information about the beneficiary/beneficiaries you are filing for.  Complete the blocks below.  Use the Attachment-1 sheet to name each beneficiary included in this petition.) (continued)

Alien Registration Number (A-Number)    Country of Birth

▶ **A-** [ ][ ][ ][ ][ ][ ][ ]    China

Province of Birth    Country of Citizenship or Nationality

Tianjin    China

**5.   If the beneficiary is in the United States, complete the following:**

Date of Last Arrival (mm/dd/yyyy)    I-94 Arrival-Departure Record Number    Passport or Travel Document Number

08/10/2018    ▶ [4][1][3][9][9][9][1][0][9][5][6]    KJ0526425

Date Passport or Travel Document    Date Passport or Travel Document    Passport or Travel Document Country
Issued (mm/dd/yyyy)    Expires (mm/dd/yyyy)    of Issuance

07/12/2016    07/12/2026    Hong Kong, SAR

Current Nonimmigrant Status    Date Status Expires or D/S

L-1A    (mm/dd/yyyy) 12/12/2019

Student and Exchange Visitor Information System (SEVIS)    Employment Authorization Document (EAD)
Number (if any)    Number (if any)

N/A    N/A

**6.   Current Residential U.S. Address** (if applicable) (do not list a P.O. Box)

Street Number and Name    Apt. Ste. Flr.   Number

998 Crockett Ave.    [ ][ ][ ]

City or Town    State    ZIP Code

Campbell    CA    95008

**Part 4.  Processing Information**

1.   If a beneficiary or beneficiaries named in **Part 3.** is/are outside the United States, or a requested extension of stay or change of status cannot be granted, state the U.S. Consulate or inspection facility you want notified if this petition is approved.

**a.  Type of Office** (select only one box): ☐ Consulate    ☐ Pre-flight inspection    ☐ Port of Entry

**b.  Office Address (City)**    **c.  U.S. State or Foreign Country**

N/A    

**d.  Beneficiary's Foreign Address**

Street Number and Name    Apt.Ste. Flr.   Number

    [ ][ ][ ]

City or Town    State

    

Province    Postal Code    Country

    

2.   Does each person in this petition have a valid passport?   [x] Yes    ☐ No.  If no, go to **Part 9.** and type or print your explanation.

000668

## Part 4.  Processing Information (continued)

**3.**  Are you filing any other petitions with this one?

☐ Yes.  If yes, how many? ▶ [                    ]          ☒ No

**4.**  Are you filing any applications for replacement/initial I-94, Arrival-Departure Records with this petition?  Note that if the beneficiary was issued an electronic Form I-94 by CBP when he/she was admitted to the United States at an air or sea port, he/she may be able to obtain the Form I-94 from the CBP Website at **www.cbp.gov/i94** instead of filing an application for a replacement/initial I-94.

☐ Yes.  If yes, how many? ▶ [                    ]          ☒ No

**5.**  Are you filing any applications for dependents with this petition?

☐ Yes.  If yes, how many? ▶ [                    ]          ☒ No

**6.**  Is any beneficiary in this petition in removal proceedings?

☐ Yes.  If yes, proceed to **Part 9.** and list the beneficiary's(ies) name(s).          ☒ No

**7.**  Have you ever filed an immigrant petition for any beneficiary in this petition?

☐ Yes.  If yes, how many? ▶ [                    ]          ☒ No

**8.**  Did you indicate you were filing a new petition in **Part 2.**?

☐ Yes.  If yes, answer the questions below.          ☒ No.  If no, proceed to **Item Number 9.**

    **a.**  Has any beneficiary in this petition ever been given the classification you are now requesting within the last seven years?

      ☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.  ☐ No  N/A

    **b.**  Has any beneficiary in this petition ever been denied the classification you are now requesting within the last seven years?

      ☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.  ☐ No  N/A

**9.**  Have you ever previously filed a nonimmigrant petition for this beneficiary?

☒ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.          ☐ No

**10.**  If you are filing for an entertainment group, has any beneficiary in this petition not been with the group for at least one year?

☐ Yes.  If yes, proceed to **Part 9.** and type or print your explanation.          ☐ No  N/A

**11.a.**  Has any beneficiary in this petition ever been a J-1 exchange visitor or J-2 dependent of a J-1 exchange visitor?

☒ Yes.  If yes, proceed to **Item Number 11.b.**          ☐ No

**11.b.**  If you checked yes in **Item Number 11.a.**, provide the dates the beneficiary maintained status as a J-1 exchange visitor or J-2 dependent.  Also, provide evidence of this status by attaching a copy of either a DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, a Form IAP-66, or a copy of the passport that includes the J visa stamp.

> J-2 Dependent; Please see DS-2019 attached.

## Part 5.  Basic Information About the Proposed Employment and Employer

Attach the Form I-129 supplement relevant to the classification of the worker(s) you are requesting.

**1.**  Job Title

> President/CEO

**2.**  LCA or ETA Case Number

> N/A

## Part 5.  Basic Information About the Proposed Employment and Employer (continued)

**3.** Address where the beneficiary(ies) will work if different from address in **Part 1.**

Street Number and Name

| Same as Part 1. |

Apt. Ste. Flr.  ☐ ☐ ☐   Number

City or Town

State   ZIP Code

**4.** Did you include an itinerary with the petition?   ☐ Yes  ☒ No

**5.** Will the beneficiary(ies) work for you off-site at another company or organization's location?   ☐ Yes  ☒ No

**6.** Will the beneficiary(ies) work exclusively in the Commonwealth of the Northern Mariana Islands (CNMI)?   ☐ Yes  ☒ No

**7.** Is this a full-time position?   ☒ Yes  ☐ No

**8.** If the answer to **Item Number 7.** is no, how many hours per week for the position?   ▶ N/A

**9.** Wages:  $ 433,188   per (Specify hour, week, month, or year)   ▶ Year

**10.** Other Compensation (Explain)

**11.** Dates of intended employment   From: (mm/dd/yyyy) 12/13/2019   To: (mm/dd/yyyy) 12/12/2022

**12.** Type of Business

| Social Media/Online Sports Community |

**13.** Year Established   2018

**14.** Current Number of Employees in the United States   3   **15.** Gross Annual Income   Start-up   **16.** Net Annual Income

## Part 6.  Certification Regarding the Release of Controlled Technology or Technical Data to Foreign Persons in the United States

(This section of the form is required only for H-1B, H-1B1 Chile/Singapore, L-1, and O-1A petitions.  It is not required for any other classifications.  Please review the Form I-129 General Filing Instructions before completing this section.)

**Select Item Number 1. or Item Number 2. as appropriate.  DO NOT select both boxes.**

With respect to the technology or technical data the petitioner will release or otherwise provide access to the beneficiary, the petitioner certifies that it has reviewed the Export Administration Regulations (EAR) and the International Traffic in Arms Regulations (ITAR) and has determined that:

**1.**  ☒ A license is not required from either the U.S. Department of Commerce or the U.S. Department of State to release such technology or technical data to the foreign person; or

**2.**  ☐ A license is required from the U.S. Department of Commerce and/or the U.S. Department of State to release such technology or technical data to the beneficiary and the petitioner will prevent access to the controlled technology or technical data by the beneficiary until and unless the petitioner has received the required license or other authorization to release it to the beneficiary.

000670

## Part 7. Declaration, Signature, and Contact Information of Petitioner or Authorized Signatory (Read the information on penalties in the instructions before completing this section.)

Copies of any documents submitted are exact photocopies of unaltered, original documents, and I understand that, as the petitioner, I may be required to submit original documents to U.S. Citizenship and Immigration Services (USCIS) at a later date.

I authorize the release of any information from my records, or from the petitioning organization's records that USCIS needs to determine eligibility for the immigration benefit sought. I recognize the authority of USCIS to conduct audits of this petition using publicly available open source information. I also recognize that any supporting evidence submitted in support of this petition may be verified by USCIS through any means determined appropriate by USCIS, including but not limited to, on-site compliance reviews.

If filing this petition on behalf of an organization, I certify that I am authorized to do so by the organization.

I certify, under penalty of perjury, that I have reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct.

1. **Name and Title of Authorized Signatory**

   Family Name (Last Name)

   WANG

   Given Name (First Name)

   Chun

   Title

   President/CEO

2. **Signature and Date**

   Signature of Authorized Signatory

   Date of Signature
   (mm/dd/yyyy) 12/10/209

3. **Signatory's Contact Information**

   Daytime Telephone Number

   650-441-4427

   Email Address (if any)

   wangchun@v1.cn

**NOTE:** If you do not fully complete this form or fail to submit the required documents listed in the instructions, a final decision on your petition may be delayed or the petition may be denied.

## Part 8. Declaration, Signature, and Contact Information of Person Preparing Form, If Other Than Petitioner

Provide the following information concerning the preparer:

1. **Name of Preparer**

   Family Name (Last Name)

   Chu

   Given Name (First Name)

   Peter

2. **Preparer's Business or Organization Name (if any)**

   (If applicable, provide the name of your accredited organization recognized by the Board of Immigration Appeals (BIA).)

   Law Offices of Peter Chu

**Part 8.  Declaration, Signature, and Contact Information of Person Preparing Form, If Other Than Petitioner** (continued)

**3.  Preparer's Mailing Address**

Street Number and Name

| 4615 Convoy St. |

Apt.  Ste.  Flr.  Number

☐  ☐  ☐

City or Town

| San Diego |

State

| CA |

ZIP Code

| 92111 |

Province

Postal Code

Country

| USA |

**4.  Preparer's Contact Information**

Daytime Telephone Number

| 858-268-8823 |

Fax Number

| 858-268-9229 |

Email Address (if any)

| response@peterchu.com |

*Preparer's Declaration*

By my signature, I certify, swear, or affirm, under penalty of perjury, that I prepared this petition on behalf of, at the request of, and with the express consent of the petitioner or authorized signatory.  The petitioner has reviewed this completed petition as prepared by me and informed me that all of the information in the form and in the supporting documents, is complete, true, and correct.

**5.  Signature and Date**

Signature of Preparer

Date of Signature
(mm/dd/yyyy)  12/10/2019

## Part 9.  Additional Information About Your Petition For Nonimmigrant Worker

If you require more space to provide any additional information within this petition, use the space below.  If you require more space than what is provided to complete this petition, you may make a copy of **Part 9.** to complete and file with this petition.  In order to assist us in reviewing your response, you must identify the **Page Number, Part Number and Item Number** corresponding to the additional information.

1.  A-Number  ▶ A- [ ][ ][ ][ ][ ][ ][ ][ ]

2.  **Page Number**        **Part Number**        **Item Number**
    [ 4 ]                  [ 4 ]                  [ 9 ]

Initial L-1A approved from 12/13/2018 to 12/12/2019. WAC190585041.

_____
_____
_____
_____
_____
_____

3.  **Page Number**        **Part Number**        **Item Number**
    [ ]                    [ ]                    [ ]

_____
_____
_____
_____
_____
_____

4.  **Page Number**        **Part Number**        **Item Number**
    [ ]                    [ ]                    [ ]

_____
_____
_____
_____
_____
_____
_____



# L Classification Supplement to Form I-129

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-129**
OMB No. 1615-0009
Expires 01/31/2022

---

**1.** Name of the Petitioner

Vland, Inc.

**2.** Name of the Beneficiary

Chun WANG

**3.** This petition is (select **only one** box):   ☒ **a.** An individual petition   ☐ **b.** A blanket petition

**4.a.** Does the petitioner employ 50 or more individuals in the U.S.?   ☐ Yes   ☒ No

**4.b.** If yes, are more than 50 percent of those employee in H-1B, L-1A, or L-1B nonimmigrant status?   ☐ Yes   ☐ No

---

## Section 1.   Complete This Section If Filing For An Individual Petition

**1.** Classification sought (select **only one** box):   ☒ **a.** L-1A manager or executive   ☐ **b.** L-1B specialized knowledge

**2.** List the beneficiary's and any dependent family member's prior periods of stay in an H or L classification in the United States for the last seven years.  Be sure to list only those periods in which the beneficiary and/or family members were physically present in the U.S. in an H or L classification.  Do not include periods in which the beneficiary was in a dependent status, for example, H-4 or L-2 status.  If more space is needed, go to **Part 9. of Form I-129**.

**NOTE:**  Submit photocopies of Forms I-94, I-797, and/or other USCIS issued documents noting these periods of stay in the H or L classification.  (If more space is needed, attach an additional sheet.)

| Subject's Name | Period of Stay (mm/dd/yyyy) | |
| --- | --- | --- |
| | **From** | **To** |
| Chun WANG, L-1A | 12/13/2018 | Present |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**3.** Name of Employer Abroad

V1 Group Limited

**4.** Address of Employer Abroad

Street Number and Name

| | Apt. | Ste. | Flr. | Number |
| --- | --- | --- | --- | --- |
| 30/F, 9 Queens Road, Central | ☐ | ☒ | ☐ | 3006 |

| City or Town | State | ZIP Code |
| --- | --- | --- |
| Hong Kong | | |

| Province | Postal Code | Country |
| --- | --- | --- |
| | | Hong Kong SAR |

---

## Section 1.  Complete This Section If Filing For An Individual Petition (continued)

5.  Dates of beneficiary's employment with this employer. Explain any interruptions in employment.

| Dates of Employment (mm/dd/yyyy) | | Explanation of Interruptions |
|---|---|---|
| From | To | |
| 2005 | Present | No Interruptions |
| | | |
| | | |
| | | |
| | | |
| | | |

6.  Describe the beneficiary's duties abroad for the 3 years preceding the filing of the petition.  (If the beneficiary is currently inside the United States, describe the beneficiary's duties abroad for the 3 years preceding the beneficiary's admission to the United States.)

Chief Operating Officer: Day to day operations including overseeing activities of five executives in charge of Media, Internet Medicine,

Internet Life Style, Supply Chain Finance, Administration, and Public Relations. See Cover Letter for more details.

7.  Describe the beneficiary's proposed duties in the United States.

President/CEO: Executive in charge of overall corporate functions. See Cover Letter for more details.

8.  Summarize the beneficiary's education and work experience.

See Cover Letter for more details.

9.  How is the U.S. company related to the company abroad? (select **only one** box)

☐ **a.** Parent      ☐ **b.** Branch      ☒ **c.** Subsidiary      ☐ **d.** Affiliate      ☐ **e.** Joint Venture

L Classification Supplement

**Section 1.  Complete This Section If Filing For An Individual Petition** (continued)

10. Describe the percentage of stock ownership and managerial control of each company that has a qualifying relationship.  Provide the Federal Employer Identification Number for each U.S. company that has a qualifying relationship.

| Percentage of company stock ownership and managerial control of each company that has a qualifying relationship. | Federal Employer Identification Number for each U.S. company that has a qualifying relationship |
|---|---|
| V1Group Limited owns 100% of Vland, Inc. | 83-2402844 |
| | |
| | |
| | |
| | |

11. Do the companies currently have the same qualifying relationship as they did during the one-year period of the alien's employment with the company abroad?

[X] Yes      [ ] No.  If no, provide an explanation in **Part 9. of Form I-129** that the U.S. company has and will have a qualifying relationship with another foreign entity during the full period of the requested period of stay.

12. Is the beneficiary coming to the United States to open a new office?

[ ] Yes      [X] No (attach explanation)

**If you are seeking L-1B specialized knowledge status for an individual, answer the following question:**

13.a. Will the beneficiary be stationed primarily offsite (at the worksite of an employer other than the petitioner or its affiliate, subsidiary, or parent)?

[ ] Yes      [ ] No

13.b. If you answered yes to the preceding question, describe how and by whom the beneficiary's work will be controlled and supervised.  Include a description of the amount of time each supervisor is expected to control and supervise the work.  If you need additional space to respond to this question, proceed to **Part 9.** of the Form I-129, and type or print your explanation.

13.c. If you answered yes to the preceding question, describe the reasons why placement at another worksite outside the petitioner, subsidiary, affiliate, or parent is needed.  Include a description of how the beneficiary's duties at another worksite relate to the need for the specialized knowledge he or she possesses.  If you need additional space to respond to this question, proceed to **Part 9.** of the Form I-129, and type or print your explanation.

## Section 2.   Complete This Section If Filing A Blanket Petition

List all U.S. and foreign parent, branches, subsidiaries, and affiliates included in this petition.  (Attach separate sheets of paper if additional space is needed.)

| Name and Address | Relationship |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## Section 3.   Additional Fees

**NOTE:**  A petitioner that seeks initial approval of L nonimmigrant status for a beneficiary, or seeks approval to employ an L nonimmigrant currently working for another employer, must submit an additional **$500** Fraud Prevention and Detection fee.  For petitions filed on or after December 18, 2015, you must submit an additional fee of **$4,500** if you responded yes to both questions in **Item Numbers 4.a.** and **4.b.** on the first page of this L Classification Supplement.  This **$4,500** fee is mandated by the provisions of Public Law 114-113.

**These fees, when applicable, may not be waived.** You must include payment of the fees with your submission of this form.  Failure to submit the fees when required will result in rejection or denial of your submission.  Each of these fees should be paid by separate checks or money orders.

The Law Offices of
**Peter Darwin Chu**
4615 Convoy Street
San Diego, California 92111
Telephone (858) 268-8823
Facsimile (858) 268-9229

Peter D. Chu, Esq.
Hai G. Huynh, Esq.
Lillian Chu, Esq.

December 10, 2019

<u>**VIA UPS NEXT DAY AIR**</u>

USCIS California Service Center
Attn: I-129 L
24000 Avila Road
2nd Floor, Room 2312
Laguna Niguel, CA 92677

RE:   **L-1A Extension Petition**
      **Foreign Entity:**    **V1 GROUP LIMITED**
      **Petitioner:**        **VLAND, INC.**
      **Beneficiary:**       **Chun WANG**

Dear USCIS:

This letter is submitted in support of the extension petition to classify Ms. Chun Wang as an L-1A nonimmigrant transferee to continue in her role as President of Vland, Inc.  Ms. Wang is currently in the U.S. pursuant to L-1A status which is set to expire on December 12, 2019 (EAC1905850451). At this time, Vland, Inc. seeks to extend her period of stay for three years.

### THE FOREIGN PARENT COMPANY

Established in 2005, V1 Group Limited (hereinafter "V1 Group") is an internet and mobile technology company with registration in Bermuda and Hong Kong.  In 2006, V1 Group became the first publicly-listed internet video enterprise in China on the Hong Kong Stock Exchange.  The company currently employs 285 personnel in various offices in Hong Kong and China.  Corporate formation and financial documents can be found as exhibits attached to this petition.

V1 Group is comprised of three market segments: Tele-Media, Lottery, and Mobile Games.  In its Tele-Media segment, the company provides consumers with Internet information services including mini-video news portals, mini-video news platforms, and self-produced news commentary programs.  Well-known within the industry, in 2008 V1 Group was an Official Media Partner for the Beijing Olympic Press Center.  This segment is also engaged in mobile Internet-related businesses such as online games, online shows, and e-commerce businesses.

V1 Group's Lottery-related Business segment took flight in 2009 when the company was granted a license from the Chinese government to sell lottery tickets on handheld devices and launch paperless lottery support. Now the company offers a host of lottery-related services, including lottery information, mobile phone lottery betting systems, and lottery microblogs. In Mobile Games, the company works on the development and provision of mobile games, mobile and Internet value-added services, as well as mobile communication products. For this segment, the company gained notoriety in 2011 when it partnered with Rovio Entertainment Oyj of Finland to bring the Angry Birds franchise to China and develop its own local version for hand held devices. Throughout the years the company has grown exponentially and diversely. It currently seeks to expand into the U.S. Market and establish itself there with the help of its COO, Ms. Chun Wang.

### THE U.S. SUBSIDARY

Incorporated in October of 2018, Vland, Inc. (hereinafter "Vland") is a California Corporation with an office in Campbell, California, near Silicon Valley. With an aim to concentrate on Sports Casting and Mobile Game Applications and their respective interactive platforms, the company intends to direct its energies to first securing content, then popularizing the platform, and lastly, developing a U.S. consumer base. In order to succeed, initially the company will need to focus on sourcing media content and developing relationships with content creators. It will then shift gears to optimizing its web platform to encourage content creators and consumers to consider the platform as a primary media source. As it works through these two goals, Vland will study the U.S. market in order to deliver preferred content and nurture its local consumers to encourage widespread use of its digital platform for distribution and consumption of content.

Vland's initial target market will focus on producers and consumers of sports broadcasts and mobile gaming applications. Recognizing a growing interest in soccer in the U.S., Vland hopes to secure broadcast rights with Major League Soccer. The company intends to develop a digital mobile application that will not only allow viewers to watch the game live but also provide their own commentary and interact with other viewers in real time. Vland additionally has plans to distribute licensed mobile gaming applications as well as provide a digital platform for consumers and developers to interact. This novel idea will allow developers to receive targeted feedback and it will also provide them with a direct link to consumers in order to promote special events, upcoming releases, and discounts.

Since the establishment of Vland, the United States government has been entangled in ongoing trade war with the Chinese government. This trade war has led to a general anti-China attitude in business ventures that has negatively affected Vland and its ability to conclude business dealings with proposed U.S. partners. As a result, the goals sought by Vland in its first year were largely unattainable and as it continues its efforts, Vland requires the continued support of Ms. Wang in her capacity as President of the company in reaching its corporate targets.

To help fund the company's ventures, the initial sum of $200,000 USD was wired to Vland's Bank of America bank account from the parent company, V1 Group. V1 Group has continued to provide monetary support to bolster its U.S. operations.

## THE BENEFICIARY

Ms. Chun Wang received a Master's degree in Economics from Kainan University in 2004 and shortly thereafter, recognizing such a need in a niche market, she co-founded V1 Group in 2005. Since then, she has been serving the company as its Chief Operating Officer. In this capacity, Ms. Wang has been involved in high level decision making that affects the trajectory of the business. This includes strategic planning and goal setting with regards to finance, budgeting, and sales. To ensure that her proposed plans and budgets are being adhered to, she oversaw the day-to-day operations of the company through the supervision of six high level managers of the company who oversee the Media Business, Online Medicine, Online Life Style, Supply Chain Finance, Human Resources and Administration, and Public Relations Department. Through their reports, Ms. Wang was able to discern the overall health of the company and make recommendations for further growth and expansion. In her capacity as Chief Operating Officer, Ms. Wang is authorized to enter into contracts on behalf of the company and she was also tasked with preparing regulatory filings required for a publicly traded company according to both Chinese and Hong Kongese law. In being transferred to the U.S. to establish Vland, Ms. Wang takes with her 13 years of experience in running V1 Group. While she is in the U.S. with Vland, Ms. Wang stays apprised of the parent company's happenings through thorough reports prepared by the department heads for her review.

### Ms. Wang Works in an Executive Capacity in the U.S.

#### *Ms. Wang directs the executive management of the organization.*

As President of the U.S. company, Ms. Wang will continue to direct the overall business management of the company. For the start-up, Ms. Wang's primary responsibilities involve developing the company in the U.S. Her first order of business was to find office space to house the U.S. operations. After securing business premises at 1999 S. Bascom Avenue, Suite 753 in Campbell, California, Ms. Wang then sought to partner with various business services to help to keep her in compliance with U.S. laws and regulations. To this end, Ms. Wang contracted with Sopheleus Associates & Co. for her accounting needs and MT Law PC as corporate legal counsel. With this in place, Ms. Wang began to seek out potential business partners and allies. Where discussions led to contracts, Ms. Wang worked with the attorneys at MT Law PC to review and revise as necessary. With projects on hand, Ms. Wang then shifted her focus to finding qualified employees to help carry out the corporate goals of Vland. She actively conducted a search for a pool of qualified applicants to staff the U.S. office and subsequently hired and trained two new employees, with a potential third hire coming shortly. Ms. Ke Yang is the company's Business Development Specialist while Mr. Tianyi Wang provides assistance as the Marketing Associate. These two workers focus their efforts on Mobile Games and are in the process of finding the right partners for Vland to pursue.

### *Ms. Wang establishes the goals and policies of the organization.*

Ms. Wang will formulate, establish, and direct Vland's overall developmental policies, growth strategies, and goals for the U.S. company. She will be engaged mainly in overseeing the organizational framework of the company including devising Vland's budgeting schemes, supervising corporate finance and accounting, steering advertising and other marketing-related functions, hiring and training staff, establishing internal control systems to cope with local regulations, and developing the company's image and presence in the U.S. Ms. Wang works to implement the administrative policies to help attain the primary goals and of the company.

### *Ms. Wang exercises wide latitude in discretionary decision-making.*

As President, Ms. Wang exercises wide latitude in discretionary decision-making. As discussed in detail above, she is solely responsible for formulating, establishing, and directing the company's overarching strategies concerning establishment, development, and success, as well as basic policies concerning financial, accounting, and personnel functions.

### *Ms. Wang receives only general supervision or direction from the board of directors or stockholders of the organization.*

Ms. Wang is granted autonomous decision-making authority over Vland. She holds total discretionary authority in establishing the goals and development programs of the U.S. company.

### **CONCLUSION**

As is evident, the establishment of the U.S. company requires the continued services of a full-time President. As the U.S.-China trade war significantly stalled Vland's ability to succeed, Ms. Wang's expertise is still necessary in completing the task of establishing the U.S. company. Vland must lean on her knowledge of company goals and policies and professional experience to lead its way to success. In the fast-paced and competitive global market of internet and mobile technology, a discerning eye and sharp intellect are necessary to ensure that no errors occur in the complex decision-making process involved with such business project. Allowing Ms. Wang's temporary stay in the U.S. will guarantee the success of the company.

The documentary evidence filed with this application amply supports our request for L-1A classification and all of the requirements set forth in Immigration and Nationality Act §214.2(l) and implementing regulations are met. Accordingly, we respectfully request the approval of Ms. Wang's L-1A extension petition. We thank you for your attention to and consideration of this matter.

Very truly yours,

Peter D. Chu
Attorney at Law

## I-797A | NOTICE OF ACTION
DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | Case Type |
|---|---|
| WAC1905850451 | I129 - PETITION FOR A NONIMMIGRANT WORKER |

| Received Date | Priority Date | Petitioner |
|---|---|---|
| 11/29/2018 | | VLAND INC, |

| Notice Date | Page | Beneficiary |
|---|---|---|
| 12/13/2018 | 1 of 2 | WANG, CHUN |

VLAND INC
c/o PETER D CHU
LAW OFFICES OF PETER CHU
4615 CONVOY ST
SAN DIEGO CA 92111

**Notice Type:** Approval Notice
**Class:** L1A
**Valid from** 12/13/2018 **to** 12/12/2019

The above petition and change of status have been approved. The status of the named foreign worker(s) in this classification is valid as indicated above. The foreign worker(s) can work for the petitioner, but only as detailed in the petition and for the period authorized. Changes in employment or training may require you to file a new Form I-129 petition. Since this employment or training authorization stems from the filing of this petition, separate employment or training authorization documentation is not required. The I-94 attached below may contain a grace period of up to 10 days before, and up to 10 days after the petition validity period for the following classifications: CW-1, E-1, E-2, E-3, H-1B, H-2B, H-3, L-1A, L-1B, O-1, O-2, P-1, P-2, P-3, TN-1, and TN-2. H-2A nonimmigrants may contain a grace period of up to one week before and 30 days after the petition validity period. The grace period is a period of authorized stay but does not provide the beneficiary authorization to work beyond the petition validity period. The decision to grant a grace period and the length of the granted grace period is discretionary, final and cannot be contested on motion or appeal. Please contact the IRS with any questions about tax withholding.

The petitioner should keep the upper portion of this notice. The lower portion should be given to the worker. He or she should keep the right part with his or her Form I-94, *Arrival-Departure Record*. The I-94 portion should be given to the U.S. Customs and Border Protection when he or she leaves the United States. The left part is for his or her records. A person granted a change of status who leaves the U.S. must normally obtain a visa in the new classification before returning. The left part can be used in applying for the new visa. If a visa is not required, he or she should present it, along with any other required documentation, when applying for reentry in this new classification at a port of entry or pre-flight inspection station. The petitioner may also file Form I-824, *Application for Action on an Approved Application or Petition*, to request that we notify a consulate, port of entry, or pre-flight inspection office of this approval.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

Please see the additional information on the back. You will be notified separately about any other cases you filed.

California Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 30111
Laguna Niguel CA 92607-0111

Customer Service Telephone: 800-375-5283



PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

---

Detach This Half for Personal Records
**Receipt#** WAC1905850451
**I-94#** 413999109 56
**NAME** WANG, CHUN
**CLASS** L1A
**VALID FROM** 12/13/2018 **UNTIL** 12/22/2019

**PETITIONER**
VLAND INC,
1999 S BASCOM AVE STE 700
CAMPBELL CA 95008

413999109 56
**Receipt Number** WAC1905850451
**US Citizenship and Immigration Services**

**I94 Departure Record**
Petitioner: VLAND INC

| 14. Family Name |
|---|
| WANG |

| 15. First (Given) Name | 16. Date of Birth |
|---|---|
| CHUN | 01/23/1965 |

| 17. Country of Citizenship |
|---|
| CHINA, PEOPLE'S REPUBLIC OF |

000682

FORM I-797A [REV. 08/01/16]

# I-797A | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type |
|---|---|---|
| WAC1905850451 | | I129 - PETITION FOR A NONIMMIGRANT WORKER |
| Received Date | Priority Date | Petitioner |
| 11/29/2018 | | VLAND INC, |
| Notice Date | Page | Beneficiary |
| 12/13/2018 | 2 of 2 | WANG, CHUN |

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

NOTICE: Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

California Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 30111
Laguna Niguel CA 92607-0111
Customer Service Telephone: 800-375-5283



PLEASE TEAR OFF FORM I-94 PRINTED BELOW AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

Detach This Half for Personal Records

| Receipt VOID | VOID | VOID |
|---|---|---|
| I-94# | | |
| NAME VOID | VOID | VOID |
| CLASS | | |
| VALID FROM UNTIL VOID | VOID | VOID |
| PETITIONER | | |
| VOID | VOID | VOID |
| VOID | VOID | VOID |
| VOID | VOID | VOID |

Receipt Number  VOID      VOID

US Citizenship and Immigration Services

VOID      VOID      VOID

I94 Departure Record

Petition VOID      VOID      VOID

14. Family Name

VOID      VOID      VOID

15. First (Given) Name          16. Date of Birth

VOID      VOID      VOID

17. Country of Citizenship

VOID      VOID      VOID

FORM I-797A (REV. 08/01/16)

 For: **CHUN WANG**



## U.S. Customs and Border Protection
*Securing America's Borders*

## Most Recent I-94

**Admission (I-94) Record Number : 41399910956**

**Most Recent Date of Entry: 2018 August 10**

**Class of Admission : J2**

**Admit Until Date : D/S**

**Details provided on the I-94 Information form:**

| | |
|---|---|
| Last/Surname : | **WANG** |
| First (Given) Name : | **CHUN** |
| Birth Date : | **1965 January 23** |
| Passport Number : | **KJ0526425** |
| Country of Issuance : | **China** |

Get Travel History

▶ **Effective April 26, 2013, DHS began automating the admission process. An alien lawfully admitted or paroled into the U.S. is no longer required to be in possession of a preprinted Form I-94. A record of admission printed from the CBP website constitutes a lawful record of admission. See 8 CFR § 1.4(d).**

▶ **If an employer, local, state or federal agency requests admission information, present your admission (I-94) number along with any additional required documents requested by that employer or agency.**

▶ **Note: For security reasons, we recommend that you close your browser after you have finished retrieving your I-94 number.**

OMB No. 1651-0111
Expiration Date: 12/31/2019

For inquiries or questions regarding your I-94, please click here

Accessibility | Privacy Policy

000684

KJ0526425

签证 / VISAS



**VISA** UNITED STATES OF AMERICA

Issuing Post Name
**BEIJING**

Control Number
**20181363220007**

Surname
**WANG**

Given Name
**CHUN**

Visa Type /Class
**R    J2**

Passport Number
**KJ0526425**

Sex
**F**

Birth Date
**23JAN1965**

Nationality
**HNK**

Entries
**M**

Issue Date
**22MAY2018**

Expiration Date
**30SEP2018**

**0101**

Annotation
N0029293942; 08JAN2018-30SEP2018
P/A: ZHANG, LIJUN
NOT SUBJECT TO SECTION 212(E) TWO YEAR RULE

M9840052

*

VNUSAWANG<<CHUN<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
KJ05264253HKG6501233F1809303J2BEJ308HT533014

000685



OMB APPROVAL NO 1405-0119
EXPIRES: 10/31/2020
ESTIMATED BURDEN TIME 45 min
*See Page 2

U.S. Department of State

CERTIFICATE OF ELIGIBILITY FOR EXCHANGE VISITOR STATUS (J-NONIMMIGRANT)

| 1. J-2 Surname/Primary Name: Wang | J-2 Given Name: Chun | | J-2 Gender: FEMALE | N0029293942 |
|---|---|---|---|---|

| Date of Birth (mm-dd-yyyy): 01/23/1965 | City of Birth: Tianjin | Country of Birth: CHINA | Citizenship Country Code: CH | Citizenship Country: CHINA | |
|---|---|---|---|---|---|

**J-2 Dependent**

| Legal Permanent Residence Country Code: CH | Legal Permanent Residence Country: CHINA | Position Code: 312 | Position: CORPORATE EXECUTIVE | |
|---|---|---|---|---|

Primary Site of Activity: Stanford University
450 SERRA MALL
MS&E
STANFORD, CA 94305-2004

| J-1 Surname/Primary Name: Zhang | J-1 Given Name: Lijun | J-1 Gender: MALE |
|---|---|---|

2. Program Sponsor: Stanford University, Bechtel International Center     Program Number: P-1-00162

Participating Program Official Description:
PROFESSOR; RESEARCH SCHOLAR; SHORT-TERM SCHOLAR; SPECIALIST; STUDENT ASSOCIATE; STUDENT BACHELORS;
STUDENT DOCTORATE; STUDENT INTERN; STUDENT MASTERS; STUDENT NON-DEGREE

Purpose of this form: Amend previous form: Update financial information

| 3. Form Covers Period: From (mm-dd-yyyy): 01-08-2018 To (mm-dd-yyyy): 09-30-2018 | 4. Exchange Visitor Category: RESEARCH SCHOLAR |
|---|---|
| | Subject/Field Code: 14.9999 | Subject/Field Code Remarks: Research in Management Science and Engineering |

5. During the period covered by this form, the total estimated financial support (in U.S. $) is to be provided to the exchange visitor by:
V1 GROUP LIMITED, : $62,500.00
Total : $62,500.00

6. RESPONSIBLE OFFICER OR ALTERNATE RESPONSIBLE OFFICER
ATTESTATION: I attest that prior to issuing this Form DS-2019, the Program Sponsor organization identified above, for which I serve as the Responsible Officer or Alternate Responsible Officer, has verified, in accordance with the requirements of 22 CFR 62.12(b), that each prospective exchange visitor: (i) is eligible and qualified for, and accepted into, the program in which he or she will participate;(ii) possesses adequate financial resources to participate in and complete his or her exchange visitor program, and (iii) possesses adequate financial resources to support an accompanying spouse and dependents, if any. I also attest that upon printing and signing this form, I am physically present in the United States or in a U.S. territory. A notification copy of this form has been provided to the U.S Department of State.

7. Yoanna Gerwel Federici
Name of Official Preparing Form
Bechtel International Center
584 Capistrano Way
Stanford, CA 94305
Address of Responsible Officer or Alternate Responsible Officer

Signature of Responsible Officer or Alternate Responsible Officer

Alternate Responsible Officer
Title
650-498-9068
Telephone Number
06-14-2018
Date (mm-dd-yyyy)

8. Statement of Responsible Officer for Releasing Sponsor (FOR TRANSFER OF PROGRAM):
Effective date (mm-dd-yyyy): ............. Transfer of this exchange visitor from program number ............. sponsored by ............. to the program specified in item 2 is necessary or highly desirable and is in conformity with the objectives of the Mutual Educational and Cultural Exchange Act of 1961, as amended.

Signature of Responsible Officer or Alternate Responsible Officer          Date (mm-dd-yyyy) of Signature

| PRELIMINARY ENDORSEMENT OF CONSULAR OR IMMIGRATION OFFICER REGARDING SECTION 212(e) OF THE IMMIGRATION AND NATIONALITY ACT AND PL 94-484, AS AMENDED (see items 1(a) of page 2). | TRAVEL VALIDATION BY RESPONSIBLE OFFICER (Maximum validation period is 1 year*) |
|---|---|

The Exchange Visitor in the above program:

1 ☐ Not subject to the two-year residence requirement.

2 ☐ Subject to two-year residence requirement based on:

A. ☐ Government financing and/or

B. ☐ The Exchange Visitor Skills List and/or

C. ☐ PL 94-484 as amended

(ALL USAID PARTICIPANTS G2-00283 AND ALL ALIEN PHYSICIANS SPONSORED BY P-3-01310 ARE SUBJECT TO THE TWO-YEAR HOME RESIDENCE REQUIREMENT)

*EXCEPT: Maximum validation period is up to 6 months for Short-term Scholars and 4 months for Camp Counselors and Summer Work/Travel.

(1) Exchange Visitor is in good standing at the present time

JUN 1 4 2018
Date (mm-dd-yyyy)

Signature of Responsible Officer or Alternate Responsible Officer

(2) Exchange Visitor is in good standing at the present time

Date (mm-dd-yyyy)

Name          Title

Signature of Consular or Immigration Officer          Date (mm-dd-yyyy)

Signature of Responsible Officer or Alternate Responsible Officer

THE U.S. DEPARTMENT OF STATE RESERVES THE RIGHT TO MAKE FINAL DETERMINATION REGARDING 212 (e).

EXCHANGE VISITOR CERTIFICATION: I have read and agree with the statement in item 2 on page 2 of this document.

Signature of Applicant          Place          Date (mm-dd-yyyy)

DS-2019
07-2011

000686

中華人民共和國香港特別行政區
HONG KONG SPECIAL ADMINISTRATIVE REGION, PEOPLE'S REPUBLIC OF CHINA

| 類別 TYPE | P | 簽發國代碼 | CODE OF ISSUING STATE | 護照號碼 PASSPORT NO |
|---|---|---|---|---|
| PASSPORT | P | | CHN | KJ0526425 |

姓 SURNAME: WANG
名 GIVEN NAMES: CHUN
國籍 NATIONALITY: CHINESE
性別 SEX: F
出生日期 DATE OF BIRTH: 23 JAN 65
出生地點 PLACE OF BIRTH: TIANJIN
簽發日期 DATE OF ISSUE: 12 JUL 16
有效期至 DATE OF EXPIRY: 12 JUL 26

香港特別行政區入境事務處
IMMIGRATION DEPARTMENT, HONG KONG SPECIAL ADMINISTRATIVE REGION

HKPIC R6062384(A)

KJ0526425

P<CHNWANG<<CHUN<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
KJ05264253CHN6501233F2607126<R6062384<<<<<64

000687

**L-1A Petition**
**Petitioner:    VLAND, INC.**
**Beneficiary:  Chun WANG**

## EXHIBIT LIST

**Foreign Parent Company:  V1 GROUP LIMITED**

A. Certificate of Incorporation with Change of Name and Secondary Name Certificates;
B. 2018 Audited Financial Statements;
C. Meeting Minutes indicating formation of Vland, Inc. with appointment of Ms. Chun Wang as President; and
D. Press Release on Vland, Inc. as U.S. Subsidiary.

**U.S. Subsidiary:              VLAND, INC.**

E. Articles of Incorporation with Bylaws and Written Consent Action;
F. Stock Ledger and Stock Certificate;
G. FEIN Assignment Letter;
H. Evidence of Wired Funds from V1 Group Limited's UBS Bank Account in Hong Kong to Vland, Inc.'s Bank of America Bank Account;
I. 2019 Financial Statements (to October);
J. Lease Agreement with Evidence of Payment;
K. Contract with MT Law PC with Invoice;
L. Contract with Sopheleus Associates & Co. with Invoices; and
M. Article on U.S.-China Trade War with Business Plan.

**Beneficiary:              Chun WANG**

N. 2018 Annual Report Excerpt showing Ms. Chun Wang's Position at Parent Company;
O. Organizational Chart of V1 Group Limited;
P. Employment Verification from V1 Group Limited indicating Ms. Chun Wang's Salary and Duties at the Parent Company;
Q. Organizational Chart of Ms. Chun Wang's Direct Reports at V1 Group Limited with Job Descriptions;
R. Organization Chart of Vland, Inc. with Paycheck Stubs; and
S. Beneficiary's Credentials.

000688

FORM NO. 6B                                          Registration No. 16679



**BERMUDA**

# CERTIFICATE OF SECONDARY NAME

I hereby in accordance with section 10A of *the Companies Act 1981* issue this

Certificate of Secondary Name and do certify that on the **13**th day of **June 2014**

## V1 Group Limited

was registered with the secondary name 第一視頻集團有限公司 by me in

the Register maintained by me under the provisions of section 14 of *the*

*Companies Act 1981*.

Given under my hand and the Seal of

the REGISTRAR OF COMPANIES

this **24**th day of **June 2014**





for **Registrar of Companies**

000689

**FORM NO. 3a**                                          Registration No. 16679



**BERMUDA**

# CERTIFICATE OF INCORPORATION
# ON CHANGE OF NAME

**I HEREBY CERTIFY** that in accordance with section 10 of *the Companies Act 1981*

**VODone Limited** by resolution and with the approval of the Registrar of Companies

has changed its name and was registered as **V1 Group Limited** on the **13**th day of **June**

**2014.**



Given under my hand and the Seal of

the REGISTRAR OF COMPANIES this

**24**th day of **June 2014**



for **Registrar of Companies**

000690

FORM NO. 3a

Registration No. 16679



BERMUDA

## CERTIFICATE OF INCORPORATION
## ON CHANGE OF NAME

I HEREBY CERTIFY that in accordance with section 10 of *the Companies Act 1981*

YANION INTERNATIONAL HOLDINGS LIMITED by resolution and with the

approval of the Registrar of Companies has changed its name and was registered as

VODone Limited on the 19th day of February, 2007.



Given under my hand and the Seal of the
REGISTRAR OF COMPANIES this 23rd day
of February, 2007

For Registrar of Companies

FORM NO. 6



**BERMUDA**

## CERTIFICATE OF INCORPORATION

I hereby in accordance with the provisions of section 14 of the Companies Act, 1981, issue this Certificate of Incorporation and do certify that on the 12th day of August 19 91

YANION INTERNATIONAL HOLDINGS LIMITED

was registered by me in the Register maintained by me under the provisions of the said section and that the status of the said company is that of a local/exempted company.

Given under my hand this 12th day of August 1991



Acting Registrar of Companies

RC11

000692

# INDEPENDENT
# AUDITOR'S REPORT



|  |  |
|---|---|
| Tel : +852 2218 8288 | 25th Floor Wing On Centre |
| Fax: +852 2815 2239 | 111 Connaught Road Central |
| www.bdo.com.hk | Hong Kong |
| 電話：+852 2218 8288 | 香港干諾道中111號 |
| 傳真：+852 2815 2239 | 永安中心25樓 |
| www.bdo.com.hk | |



**TO THE SHAREHOLDERS OF V1 GROUP LIMITED**
*(incorporated in Bermuda with limited liability)*

## OPINION

We have audited the consolidated financial statements of V1 Group Limited (the "Company") and its subsidiaries (together, the "Group") set out on pages 78 to 179, which comprise the consolidated statement of financial position as at 31 December 2018, and the consolidated statement of profit or loss and other comprehensive income, the consolidated statement of changes in equity and the consolidated statement of cash flows for the year then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies.

In our opinion, the consolidated financial statements give a true and fair view of the consolidated financial position of the Group as at 31 December 2018, and of its consolidated financial performance and its consolidated cash flows for the year then ended in accordance with Hong Kong Financial Reporting Standards issued by the Hong Kong Institute of Certified Public Accountants ("HKICPA") and have been properly prepared in compliance with the disclosure requirements of the Hong Kong Companies Ordinance.

## BASIS FOR OPINION

We conducted our audit in accordance with Hong Kong Standards on Auditing ("HKSAs") issued by the HKICPA. Our responsibilities under those standards are further described in the "Auditor's Responsibilities for the Audit of the Consolidated Financial Statements" section of our report. We are independent of the Group in accordance with the HKICPA's "Code of Ethics for Professional Accountants" (the "Code"), and we have fulfilled our other ethical responsibilities in accordance with the Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## KEY AUDIT MATTERS

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

### IMPAIRMENT ASSESSMENT OF GOODWILL AND INTANGIBLE ASSETS

Refer to notes 15 and 17 in the consolidated financial statements.

The Group has goodwill with gross carrying amount of HK$13,042,000 and intangible assets of HK$172,709,000 respectively relating to the cash generating unit ("CGU") of tele-media business. The CGU incurred losses for the year ended 31 December 2018. This has increased the risk that the carrying values of goodwill and intangible assets may be impaired.

In the annual impairment review, management has concluded that the carrying amounts of HK$83,196,000 and HK$179,288,000 are required to be impaired in respect of the goodwill and intangible assets respectively. This conclusion was based on a value in use model that required significant management judgment with respect to the discount rate and underlying cash flows, in particular future revenue growth.

000693

INDEPENDENT AUDITOR'S REPORT



Our response:

Our procedures in relation to management's impairment assessment included:

–    Assessing the valuation methodology;

–    Challenging the reasonableness of key assumptions adopted in the valuation, such as the discount rate, based on our knowledge of the business and industry and available market data; and

–    Reconciling input data to supporting evidence, such as latest financial forecasts approved by the management and considering the reasonableness of these forecasts.

## OTHER INFORMATION IN THE ANNUAL REPORT

The directors are responsible for the other information. The other information comprises the information included in the Company's annual report, but does not include the consolidated financial statements and our auditor's report thereon.

Our opinion on the consolidated financial statements does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

## DIRECTORS' RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL STATEMENTS

The directors are responsible for the preparation of the consolidated financial statements that give a true and fair view in accordance with Hong Kong Financial Reporting Standards issued by the HKICPA and the disclosure requirements of the Hong Kong Companies Ordinance, and for such internal control as the directors determine is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, the directors are responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the Group or to cease operations, or have no realistic alternative but to do so.

The directors are also responsible for overseeing the Group's financial reporting process. The Audit Committee assists the directors in discharging their responsibility in this regard.



000694

INDEPENDENT AUDITOR'S REPORT



## AUDITOR'S RESPONSIBILITIES FOR THE AUDIT OF THE CONSOLIDATED FINANCIAL STATEMENTS



Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. This report is made solely to you, as a body, in accordance with Section 90 of the Bermuda 1981, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report.

Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with HKSAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with HKSAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the directors.

- conclude on the appropriateness of the directors' use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Group to cease to continue as a going concern.

- evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

000695

- obtain sufficient appropriate audit evidence regarding the financial information of the entities or business activities within the Group to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the group audit. We remain solely responsible for our audit opinion.

We communicate with the Audit Committee regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide the Audit Committee with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

From the matters communicated with the directors, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditor's report unless law or regulation precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.



**BDO Limited**
*Certified Public Accountants*

**Choi Man On**
Practising Certificate no. P02410

Hong Kong, 27 March 2019

000696

# CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME

For the year ended 31 December 2018

| | Notes | 2018 HK$'000 | 2017 HK$'000 |
|---|---|---|---|
| Revenue | 6 | 3,381,809 | 510,626 |
| Cost of revenue | | (3,414,425) | (626,972) |
| Gross loss | | (32,616) | (116,346) |
| Other gains and losses | 7 | 8,697 | (17,881) |
| Selling and marketing expenses | | (38,339) | (32,469) |
| Administrative expenses | | (172,496) | (108,941) |
| Impairment of goodwill | 15 | (83,196) | (8,932) |
| Impairment of intangible assets | 17 | (179,288) | (63,691) |
| Impairment of interest in an associate | 14 | (110,329) | – |
| Share of losses of associates | 14 | (47,147) | (23,440) |
| Loss before income tax | 8 | (654,714) | (371,700) |
| Income tax expense | 11(a) | (274) | – |
| **LOSS FOR THE YEAR** | | (654,988) | (371,700) |
| **Other comprehensive income** | | | |
| Items that maybe reclassified subsequently to profit or loss: | | | |
| Change in value of available-for-sale financial assets | | – | 2,316 |
| Fair value loss of financial assets at fair value through other comprehensive income | | (3,256) | – |
| Exchange differences arising on translation of foreign operations | | (24,666) | 29,676 |
| Other comprehensive (loss)/income for the year | | (27,922) | 31,992 |
| **TOTAL COMPREHENSIVE INCOME FOR THE YEAR** | | (682,910) | (339,708) |
| **LOSS FOR THE YEAR ATTRIBUTABLE TO:** | | | |
| Owners of the Company | | (647,558) | (366,304) |
| Non-controlling interests | | (7,430) | (5,396) |
| | | (654,988) | (371,700) |
| **TOTAL COMPREHENSIVE INCOME FOR THE YEAR ATTRIBUTABLE TO:** | | | |
| Owners of the Company | | (675,865) | (336,844) |
| Non-controlling interests | | (7,045) | (2,864) |
| | | (682,910) | (339,708) |
| **LOSS PER SHARE** | | | |
| – Basic (HK cents) | 12 | (19.02) cents | (11.11) cents |
| – Diluted (HK cents) | 12 | (19.02) cents | (11.11) cents |

000697

# CONSOLIDATED STATEMENT OF CASH FLOWS

For the year ended 31 December 2018



|  | 2018 HK$'000 | 2017 HK$'000 |
|---|---|---|
| **OPERATING ACTIVITIES** |  |  |
| Loss before income tax | (654,714) | (371,700) |
| Depreciation of property, plant and equipment | 2,598 | 8,358 |
| Amortisation of intangible assets | 34,578 | 37,452 |
| Loss on disposal of property, plant and equipment | 1,115 | 13 |
| Impairment of property, plant and equipment | – | 29,318 |
| Impairment of goodwill | 83,196 | 8,932 |
| Impairment of intangible assets | 179,288 | 63,691 |
| Impairment of interest in an associate | 110,329 | – |
| Share of losses of associates | 47,147 | 23,440 |
| Share-based payment expenses in respect of:– |  |  |
| – granting of share options | 23,828 | – |
| – granting of shares of subsidiary | – | (63) |
| Interest income | (4,116) | (6,062) |
| Fair value gain on financial assets at fair value through profit or loss | (2,356) | – |
| Realised fair value gain on other financial assets | – | (6,291) |
| Operating cash flows before working capital changes | (180,107) | (212,912) |
| Increase in inventories | (63,966) | – |
| Increase in trade receivables | (2,167) | – |
| Increase in other receivables, deposits and prepayments | (19,120) | (3,144) |
| Decrease/(increase) in amount due from an associate | 38,368 | (49,661) |
| Decrease in amounts due from related companies | 2,868 | 1,396 |
| Increase in trade payables | 22,651 | – |
| Increase/(decrease) in deposits received, other payables and accruals | 22,031 | (2,939) |
| Decrease in amount due to an associate | (374) | (12,049) |
| (Decrease)/increase in amounts due to related companies | (38,811) | 36,970 |
| Increase in contract liabilities | 20,047 | – |
| Effect of foreign exchange rate changes | (3,839) | 9,264 |
| Net cash used in operating activities | (202,419) | (233,075) |

000698

## CONSOLIDATED STATEMENT OF CASH FLOWS

For the year ended 31 December 2018

| | Notes | 2018 HK$'000 | 2017 HK$'000 |
|---|---|---|---|
| **INVESTING ACTIVITIES** | | | |
| Purchases of property, plant and equipment | | (1,405) | (21,776) |
| Proceeds on disposal of property, plant and equipment | | 61 | 34 |
| Purchases of intangible assets | | – | (16,905) |
| Decrease in held-to-maturity investments | | – | 387,501 |
| Purchase of available-for-sale financial assets | | – | (177,987) |
| Purchase of financial asset at amortised cost | | (1,139) | – |
| Purchase of financial asset at fair value through profit and loss | | (54,154) | – |
| Purchase of financial asset at fair value through other comprehensive income | | (50,283) | – |
| Proceed from disposal of financial asset through profit or loss | | 68,368 | – |
| Investment in associates | | – | (241,622) |
| Acquisition of subsidiaries, net of cash acquired | 26 | (98,993) | (453) |
| Interest received | | 4,116 | 6,062 |
| Net cash used in investing activities | | (133,429) | (65,146) |
| **FINANCING ACTIVITY** | | | |
| Proceeds from exercise of share options | | 18,173 | – |
| Net cash generated from financing activity | | 18,173 | – |
| **NET DECREASE IN CASH AND CASH EQUIVALENTS** | | (317,675) | (298,221) |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR** | | 451,771 | 745,535 |
| Effect of foreign exchange rate changes | | (2,178) | 4,457 |
| **CASH AND CASH EQUIVALENTS AT END OF YEAR** | | 131,918 | 451,771 |
| **ANALYSIS OF THE BALANCES OF CASH AND CASH EQUIVALENTS** | | | |
| Bank balances and cash | | 131,918 | 219,271 |
| Short term deposits | | – | 232,500 |
| Bank balances and cash | | 131,918 | 451,771 |

000699

Certificate of Translation

I, Andrea Chu certify that I am competent in both the Chinese and English language, the attached is a true and correct translation from Chinese into English to my best knowledge.

Andrea Chu

Date: 12 - 1 - 19

000700

V1 Group Limited

([Our Company])

(Registered in Bermuda as a Limited Company)

Our company held Board of Directors' Meeting at 4:00 pm on October 18, 2018 at 17/F, Tower 1, Recero International Center, No. 8 Wangjing East Road, Chaoyang District, Beijing, China. Here is the meeting minutes.

Attendees:     As listed in the Attendance Sheet in the appendix

Chaired by:    Lijun Zhang

People Noticed and Quorum: It is recorded at the meeting that the notice of the meeting has been delivered to all directors and a quorum of directors has attended the meeting. Ms. Chun Wang was unable to attend the meeting because she was abroad.

Content Discussed: 1. To promote the Group's business to North America, the Group plans to set up a branch in the United States to look for cooperation opportunities and partners for the group's business. The business scope of the planned US branch will include looking for Internet-based content and technology for sports, entertainment, education, and health for the Group's business, and developing cooperation in the fields of automobiles, infrastructure, finance, etc.

Board Resolution: 1. The Meeting passed a resolution to set up a branch in California to develop the company's business.

2. The Meeting passed a resolution to appoint Ms. Chun Wang, an executive director of our Company, as the president of the North American branch for a period of one year. Her compensation plan will be agreed upon in the appropriate terms.

3. Authorize any of the directors of the Company to sign other documents, instruments or agreements as may be necessary for the establishment of the North American branch on behalf of the Company, and (if necessary) to affix the seal of the company. The relevant signature will constitute the final proof of the approval of revision, change, or addition of their contents.

The End of Meeting: With nothing else to discuss, the Chair announced the end of the meeting.


Signature of Chair

Lijun Zhang

000701

# V1 GROUP LIMITED
## ATTENDANCE SHEET
### 出席签名表

NATURE OF MEETING  :  BOARD OF DIRECTORS' MEETING

PLACE  :  16-18/F, TOWER 1, RECERO INTERNATIONAL CENTRE, NO.8 WANG JING EAST ROAD, CHAO YANG DISTRICT, BEIJING, PRC 100102

DATE & TIME  :  THURSDAY, 18 OCTOBER 2018 AT 4:00 PM

| NAME OF DIRECTOR | SIGNATURE |
|---|---|
| ZHANG LIJUN  张力军 | |
| WANG CHUN  王淳 | |
| JI QIANG  姬强 | |
| LOKE YU alias LOKE HOI LAM  陆海林 | |
| GONG ZHANKUI  宫占奎 | |
| WANG LINAN  王临安 | |

000702

第一视频集团有限公司
（「本公司」）
（于百慕达注册成立之有限公司）

本公司于二零一八年十月十八日下午四时正假座中国北京市朝阳区望京东路 8 号锐创国际中心 1 号楼 17 层举行的董事会会议纪录

| | |
|---|---|
| **出席** | 如附录出席表所列。 |
| **主席** | 会议由张力军主持。 |
| **通知及法定人数** | 会上录下是次会议的通知已送达所有董事，且已达法定人数的董事已出席。王淳女士由于身处国外，因此未能参加本会议。 |
| **讨论内容** | 为了在北美开展集团业务，本集团计划在美国设立分公司，为集团业务寻找合作机会及合作伙伴。美国分公司的业务范围将包括：为集团寻找基于互联网的体育娱乐、教育、健康等内容和技术。开拓汽车、基础设施、金融等领域的合作。 |
| **董事会决议** | 1. 议决通过在美国加州设立分公司以发展公司业务。<br><br>2. 议决通过任命本公司执行董事王淳女士担任该北美分公司之总裁职位，为期一年。王淳女士的薪酬方案将按合适条款约定。<br><br>3. 授权本公司任何一名董事代表本公司签署该等与成立该北美分公司所需的其他文件、文书或协议，及（如需要）于其上加盖本公司印章，其相关签名将构成其批准有关修订、更改或新增内容之最终凭证。 |
| **会议结束** | 再无其他事项，主席宣布会议结束。 |



张力军
主席

000703

# VI GROUP LIMITED
## ATTENDANCE SHEET
出席签名表

NATURE OF MEETING : BOARD OF DIRECTORS' MEETING

PLACE : 16-18/F, TOWER 1, RECERO INTERNATIONAL CENTRE, NO.8 WANG JING EAST ROAD, CHAO YANG DISTRICT, BEIJING, PRC 100102

DATE & TIME : THURSDAY, 18 OCTOBER 2018 AT 4:00 PM

| NAME OF DIRECTOR | SIGNATURE |
|---|---|
| ZHANG LIJUN 张力军 | |
| WANG CHUN 王淳 | |
| JI QIANG 嵇强 | |
| LOKE YU alias LOKE HOI LAM 陆海林 | |
| GONG ZHANKUI 宫占奎 | |
| WANG LINAN 王临安 | |

← Back to Newsroom (/newsroom)



**V1 Group Ltd**
Company Website (http://ir.v1.cn/index/#/)

# V1 Group's New Home Vland Landed in Silicon Valley, the United States

*Monday, December 17, 2018 8:28 AM*

**HONG KONG, CHINA / ACCESSWIRE / On December 17, 2018 /** (US time), V1 Group's US branch Vland Inc. ("Vland") was officially opened. Dr. Lijun Zhang, Chairman of the Board of V1 Group, Ms. Chun Wang, Executive Director and COO of V1 Group, and Mr. Busheng Tang, Secretary General of China APEC Development Council, attended and held the opening ceremony.

Dr. Lijun Zhang said that "After three months of preparations, the opening of Vland is a milestone event for V1 Group. V1 Group's US branch will be at the forefront of innovation, combining new business models with huge market opportunities and establishing a new platform for sustainable development of V1 Group."

Ms. Chun Wang, CEO of Vland in the United States, said that "From now on, V1 Group has a home in the United States. Vland will cultivate and find new development opportunities and partners for V1 Group and become the new pivot for the Group's development!"

V1 Group has just released the development strategy of "digital + new culture and sports". Setting up a branch in the United States is undoubtedly an important measure for this strategic deployment, which will bring new perspectives and opportunities for the development of V1 Group.

### About V1 Group (00082.HK)

V1 Group was established in 2005, listed on the Main Board of Hong Kong Stock Exchange in 2006, became the first Chinese video media enterprise listed in Hong Kong. In 2015, V1 Group has developed into one of the largest new media industry groups in China. In 2016, V1 Group successfully transformed from the new media industry group into a new economy in the internet industry, and has extensively deployed in media, Internet life, Internet finance, and Internet frontier technology. In 2018, V1 Group wholly acquired CrazySports, accelerating the industrial structure of "digital + new culture and sports" as its core businesses.

V1 Group IR website: http://ir.v1.cn (http://pr.report/kG7bOrYV)

For further information, please contact:
Doris Chan
Tel: (852) 2869 8966
E-mail: dorischan@vodone.com.hk (mailto:dorischan@vodone.com.hk)

**SOURCE:** V1 Group Ltd.

000705

4 2 J 3 1 6 6

FILED
Secretary of State
State of California

OCT 10 2018

# ARTICLES OF INCORPORATION

## OF

## Vland Inc.

### I.

The name of this corporation is:

### Vland Inc.

### II.

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California, other than the banking business, the trust company business, or the practice of a profession permitted to be incorporated by the California Corporations Code.

### III.

The name and address in the State of California of this corporation's initial agent for service of process is:

Peter D. Chu
4615 Convoy Street
San Diego, CA 92111

### IV.

The corporation's initial addresses are:

Street address: 4615 Convoy Street, San Diego, CA 92111
Mailing address: 4615 Convoy Street, San Diego, CA 92111

### V.

This corporation is authorized to issue only one class of stock and total number of shares which this corporation is authorized to issue is **1,000,000 (one million)**.

I hereby declare that I am the person who executed the foregoing Articles of Incorporation, which execution is my act and deed.

Peter D. Chu
Incorporator

000706

# BYLAWS

# OF

# VLAND INC.

000707

# TABLE OF CONTENTS

| Article | | | Page |
|---|---|---|---|
| I | | | |
| | | OFFICE | 1 |
| | 1. | Principal Executive Offices | 1 |
| | 2. | Other Offices | 1 |
| II | | | |
| | | MEETINGS OF SHAREHOLDERS | 1 |
| | 1. | Place of Meetings | 1 |
| | 2. | Annual Meetings | 2 |
| | 3. | Special Meetings | 2 |
| | 4. | Adjourned Meetings | 2 |
| | 5. | Notice and Waiver | 3 |
| | 6. | Validation of Meetings Held Without Proper Call or Notice | 4 |
| | 7. | Quorum | 5 |
| | 8. | Action Without Meeting | 5 |
| | 9. | Election of Directors | 6 |
| | 10. | Proxies | 7 |
| | 11. | Inspectors of Election | 7 |
| III | | | |
| | | Directors | 8 |
| | 1. | Powers | 8 |
| | 2. | Number and Qualifications of Directors | 11 |
| | 3. | Election and Term of Office | 11 |
| | 4. | Vacancies | 11 |
| | 5. | Place of Meetings | 12 |
| | 6. | Telephonic Meetings | 13 |
| | 7. | Organization Meetings | 13 |
| | 8. | Other Regular Meetings | 13 |
| | 9. | Special Meetings | 13 |
| | 10. | Notice of Directors Meetings | 13 |
| | 11. | Quorum | 14 |
| | 12. | Voting | 14 |
| | 13. | Validation of Meetings Held Without Proper Call or Notice | 14 |
| | 14. | Adjournment | 15 |
| | 15. | Unanimous Written Consent to Actions Taken | 15 |
| | 16. | Fees and Compensation | 15 |
| | 17. | Executive Committee | 15 |

000708

IV

    OFFICERS.................................................................... 16

    1.    Officers.................................................................. 16
    2.    Election................................................................. 17
    3.    Subordinate Officers............................................. 17
    4.    Removal................................................................ 17
    5.    Resignation........................................................... 17
    6.    Vacancies.............................................................. 17
    7.    Chairman of the Board.......................................... 17
    8.    President............................................................... 18
    9.    Vice-Presidents..................................................... 18
    10.    Secretary............................................................... 18
    11.    Chief Financial Officer.......................................... 19

V

    MISCELLANEOUS...................................................... 19

    1.    Record Date........................................................... 20
    2.    Director Inspection of Corporate Records................ 20
    3.    Shareholders Inspection of Corporate Records......... 21
    4.    Annual and Financial Reports................................. 22
    5.    Share Certificates.................................................. 23
    6.    Representation of Shares of Other Corporations....... 25
    7.    Registrars and Transfer Agents.............................. 25
    8.    S Corporation Election.......................................... 25
    9.    Fiscal Year............................................................ 26
    10.    Checks, Drafts and Other Instruments.................... 26
    11.    Execution of Contracts and Instruments................. 26
    12.    Construction and Definitions.................................. 26
    13.    Indemnification and Liability Insurance.................. 26

VI

    RESTRICTIONS ON TRANSFER OF SHARES............... 27

    1.    Options to Purchase............................................... 27
    2.    Nonmonetary Consideration................................... 29
    3.    Waiver.................................................................. 30
    4.    Termination........................................................... 30

VII

    AMENDMENTS.......................................................... 30

    1.    Power of Shareholders........................................... 30
    2.    Power of Directors................................................. 31

CERTIFICATE OF SECRETARY......................................... 32
CERTIFICATE OF INCORPORATOR.................................. 33

000709

# BYLAWS

## OF

# VLAND INC.

## ARTICLE I

### OFFICES

1.  Principal Executive Offices. The Principal executive
    office of the Corporation is hereby fixed and located
    at **998 Crockett, Campbell, CA 95008.** The Board of
    Directors is hereby granted full power and authority
    to change said principal executive office from one
    location to another. Any such change of location may
    be noted on the Bylaws by the Secretary opposite this
    section or this section may be amended to state the
    new location.

2.  Other Offices. Other offices of the Corporation may
    be established by the Board of Directors at any place
    or places where the Corporation is qualified to do
    business.

## ARTICLE II

### MEETINGS OF SHAREHOLDERS

1.  Place of Meetings. All meetings of shareholders shall
    be held at the principal executive office of the
    Corporation, at the place specified in the notice or
    at any other place within or without the State of
    California designated either by the Board of Directors
    or by the written consent of all persons entitled to
    vote thereat and not present at the meeting, given
    either before or after the meeting and filed with the
    Secretary of the Corporation.

2.  Annual Meetings. The annual meetings of shareholders
    shall be held on the 2nd **Monday** of **November** of each

1

000710

year at 10:00 a.m. of said day; provided, however, that should said day fall on a legal holiday then any such annual meeting of shareholders shall be held at the same time and place on the next full business day thereafter ensuing.     At   annual   meetings   of shareholders, Directors shall be elected, reports of the affairs of the Corporation shall be considered, and any other business may be transacted which is within the powers of the shareholders.

3.   <u>Special Meetings</u>.   Special meetings of shareholders may be called for the purposes of taking any action permitted by shareholders under the California General Corporations Law and the Articles of Incorporation at any time by the Chairman of the Board or the President, or by the Board of Directors, or by one (1) or more shareholders holding not less than ten percent (10%) of the shares entitled to vote at the meeting. Upon request in writing that a special meeting of shareholders be called for any proper purpose, directed to the Chairman of the Board, President, vice-president, or Secretary by any person or persons (other than the Board) entitled to call a special meeting of the shareholders, the officer shall cause notice to be given to shareholders entitled to vote at the meeting as set forth in Article II, Section 5 hereinbelow.   In the event such notice has not been given within twenty (20) days after receipt of the request, the person or persons entitled to call the meeting may give the notice.   No business other than that described in the notice of the meeting may be transacted at a special meeting of shareholders.

4.   <u>Adjourned Meetings</u>.   Any meeting of shareholders, whether or not a quorum is present or has been established, may be adjourned from time to time by the vote of a majority of the shares the holders of which are either present in person or represented by proxy. When any meeting of shareholders is adjourned for forty-five (45) days, notice of the time and place of the adjourned meeting or the business to be transacted need not be given in the event the time and place thereof are announced at the meeting at which the adjournment is taken.   At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting.

2

5. <u>Notice and Waiver</u>. Written notice of every meeting of shareholders shall be given to each shareholder entitled to vote at such meeting, either personally or by mail, telegram or other means of written communication, charges prepaid, addressed to such shareholder at his address appearing on the books of the Corporation or given by him to the Corporation for the purpose of notice. In the event any notice or report addressed to a shareholder at the address of such shareholder appearing on the books of the Corporation is returned to the Corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice or report to the shareholder at such address, all future notices or reports shall be deemed to have been fully given without further mailing if the same shall be available for the shareholder upon written demand of the shareholder at the principal executive office of the Corporation for a period of one (1) year from the date of the giving of the notice or report to any other shareholder. If no address appears on the books of the Corporation and a shareholder gives no address, notices shall be deemed to have been given to such shareholder if sent by mail, telegram or other means of written communication addressed to the place where the principal executive office of the Corporation is located, or if published at least once in a newspaper of general circulation in the County in which the principal executive office of the Corporation is located.

All notices shall be personally delivered, deposited in the mail, or sent by other means of written communication to each shareholder entitled thereto not less than ten (10) nor more than sixty (60) days before such meeting. An affidavit of mailing of any such notice in accordance with the foregoing provisions, executed by the Secretary, assistant secretary or any transfer agent of the Corporation shall be <u>prima facie</u> evidence of the giving of the notice.

Except in special cases where other express provision is made by statute, notice of meetings shall contain the following information:

   a.   The place, date, and hour of the meeting;

3

000712

b.   The general nature of the business to be transacted or proposed, if any, including but not limited to actions with respect to the approval of (i) a contract or other transaction with an interested Director, (ii) the amendment of the Articles of Incorporation, (iii) a merger, exchange or sale of assets reorganization as defined by Section 181 of the California General Corporations Law, (iv) the voluntary dissolution of the Corporation, or (v) a distribution and dissolution other than in accordance with the rights of outstanding preferred shares, if any;

c.   If Directors are to be elected, the names of nominees intended at the time of the notice to be presented by management for election, if any; and

d.   In the case of an annual meeting, those matters which the Board of Directors at the time of the mailing of the notice intends to present for action by the shareholders.

6.   <u>Validation of Meetings Held Without Proper Call or Notice</u>. The transactions of any meeting of shareholders, however called and noticed, and wherever held, shall be valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if either before or after the meeting, each of the persons entitled to vote and not present in person or by proxy, or who though present has at the beginning of the meeting objected to the transaction of any business because the meeting was not lawfully called or convened or has objected to the consideration of particular matters of business required to have been included in the notice of the meeting but not so included, signs a written waiver of notice, a consent to the holding of such meeting, or an approval of the minutes thereof. All such waivers, consents and approvals shall be filed with the corporate records of made part of the minutes of the meeting.

7.   <u>Quorum</u>. The presence in person or by proxy of the holders of a majority of the shares entitled to vote

4

at any meeting shall constitute a quorum for the transaction of business. Shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding a withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

8.   <u>Action Without a Meeting</u>. Except with respect to the election of Directors as hereinafter provided, any action which may be taken at a meeting of the shareholders may be taken without a meeting and without prior notice except as hereinafter set forth, if a consent or consents in writing, setting forth the action so taken, is signed by the holders of shares having not less than the minimum number of votes that would be necessary to authorize such action at a meeting at which all shareholders entitled to vote thereon were present and voted. In the event the consents of all shareholders entitled to vote have not been solicited in writing, notices shall be given in the manner as provided in Section 5 of Articles II of these Bylaws as follows:

a.   At least ten (10) days before consummation of the action authorized by shareholder approval, notice shall be given of shareholder approval of (i) a contract or other transaction with an interested Director (ii) indemnification of an agent of the Corporation, (iii) a merger, exchange or sale of assets reorganization as defined in Section 181 of the California General Corporations Law, or (iv) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, if any; and

b.   Promptly with respect to any other corporate action approved by shareholders without a meeting by less than unanimous written consent, to those shareholders entitled to vote who have not consented in writing.

In the event the Board of Directors has not fixed a record date as provided in Section 1 of Article V of these Bylaws, for the determination of shareholders entitled to give such written

5

000714

consent, the record date for determining
shareholders entitled to give consent to
corporate action in writing without a meeting
shall be at the close of business on the day on
which the Board adopts resolution relating
thereto, or the sixtieth (60th) day prior to the
date of such action, whichever is later, and in
the event no prior action by the Board has been
taken the day on which the first written consent
is given.   All such written consents shall be
filed with the Secretary of the Corporation.

Any shareholder giving a written consent, or the
shareholder's proxyholders or a transferee of the
shares or personal representative of the
shareholder or their respective proxyholders, may
revoke the consent by a writing received by the
Corporation prior to the time that written
consents of the number of shares required to
authorize the proposed action have been filed
with the Secretary of the Corporation, but may
not do so thereafter.   Such revocation is
effective upon its receipt by the Secretary of
the Corporation. Directors may be elected without
a meeting by unanimous written consent of the
persons who would be entitled to vote for the
election of Directors; Provided that in the event
a vacancy on the Board of Directors exists and
has not been filled by the Directors, a Director
may be elected at any time without prior notice
by the written consent of persons holding a
majority of the outstanding shares entitled to
vote for the election of Directors.

9.   Election of Directors.   In any election of Directors,
the candidates receiving the highest number of votes
of the shares entitled to be voted for them up to the
number of Directors to be elected by such shares are
elected.    Elections for Directors need not be by
ballot unless a shareholder demands election by ballot
at the meeting and before the voting begins.

Every shareholder entitled to vote at any election of
Directors may cumulate such shareholder's votes and
give one (1) candidate a number of votes equal to the
number of Directors to be elected multiplied by the
number of votes to which the shareholder's votes on

6

000715

the same principle among as many candidates as the shareholder thinks fit, provided, however, that no shareholder shall be entitled to cumulate votes unless the name of each such candidate has been placed in nomination prior to the voting and a shareholder has given notice at the meeting prior to the voting of such shareholder's intention to cumulate such shareholder's votes.

10. <u>Proxies</u>. Every person entitled to vote shares shall have the right to do so in person or by one (1) or more agents authorized by a written proxy executed by such person or his duly authorized agent and filed with the Secretary of the Corporation. Any proxy executed is not revoked and continues in full force and effect until (i) in writing stating that the proxy is revoked or a duly executed proxy bearing a later date is filed with the Secretary of the Corporation prior to the vote pursuant thereto, (ii) the person executing the proxy attends the meeting and votes in person, or (iii) written notice of the death or incapacity of the maker of such proxy is received by the Corporation before the vote pursuant thereto is counted; provided that not proxy shall be valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

11. <u>Inspectors of Election</u>. In advance of any meeting of shareholders the Board may appoint inspectors of election to act at the meeting and any adjournment thereof. If inspectors of election are not so appointed, or if any person so appointed fails to appear or refuses to act, the chairman of any meeting of shareholders may, and on the request of any shareholder or a shareholder's proxy shall appoint inspectors of election (or persons to replace those who so fail or refuse) at the meeting. The number of inspectors shall either be one (1) or three (3). If appointed at a meeting on the request of one (1) or more shareholders or proxies, the majority of shares represented in person or by proxy shall determine whether one (1) or three (3) inspectors are to be appointed.

7

000716

The inspectors of election shall determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum and the authenticity, validity and effectiveness of proxies, receive votes, ballots or consents, hear and determine all challenges and questions in any way arising in connection with the right to vote, count and tabulate all votes or consents, determine when the polls shall close, determine the result and do such acts as may be proper to conduct the election or vote with fairness to all shareholders.

The inspectors of election shall perform their duties impartially, in good faith, to the best of their ability and as expeditiously as is practical. If there are three (3) inspectors of election, the decision, act or certificate of a majority is effective in all respects as the decision, act, or certificate of all. Any report or certificate made by the inspectors of election is prima facie evidence of the facts stated therein.

## ARTICLE III

## DIRECTORS

1. Powers. Subject to the limitations of the Articles of Incorporation and of the California General Corporations Law as to action to be authorized or approved by the shareholders, the business and affairs of the Corporation shall be managed and all the corporate powers shall be exercised by or under the direction of the Board of Directors.

FIRST: To select and remove all the officers, agents and employees of the Corporation; prescribe such powers and duties for them as may not be inconsistent with law, with the Articles of Incorporation or these Bylaws; fix their compensation; and require from them security for faithful service.

SECOND: To conduct, manage and control the affairs and business of the Corporation, and to make such rules and regulations therefor not inconsistent with law, or the Articles of Incorporation or these Bylaws, as they may deem best.

8

000717

THIRD:   To change the principal executive office and
the principal office for the transaction of business
of the Corporation from one location to another as
provided in Article I, Section 1 hereof; to fix and
locate from time to time one (1) or more subsidiary
offices of the Corporation within or without the State
of California as provided in Article I, Section 2
hereof; to designate any place within or without the
state for holding of any meetings of shareholders; to
adopt, make and use the corporate seal and to
prescribe the forms of certificates from time to time
as in their judgment they deem best, provided such
seal and such certificates shall at all times comply
with the provisions of law.

FOURTH:   To authorize issuance of shares of the
Corporation from time to time upon such terms as may
be lawful in consideration of money paid, labor done,
services actually rendered to the Corporation or for
its benefit or in its formation or reorganization,
debts or securities canceled, and tangible or
intangible property actually received either by the
Corporation or any one of its wholly owned
subsidiaries, if any, or as a share dividend or upon a
stock split, reverse stock split, reclassification,
conversion or exchange of shares for shares of another
class or series of shares, but not in consideration of
promissory notes of the purchaser (unless adequately
secured by collateral other than the shares acquired
or pursuant to a stock purchase plan or agreement or
stock option plan or agreement authorized by section
408 of the California General Corporations Law or
future services.

FIFTH:  To borrow money and incur indebtedness for the
purposes of the Corporation, and to cause to be
executed and delivered therefor in the corporate name
promissory notes, bonds, debentures, deeds of trust,
mortgages, pledges, hypothecation's or other evidences
of debt and securities therefor.

SIXTH:   By resolution adopted by a majority of the
authorized number of Directors, to designate an
executive committee and other committees, each
consisting of two (2) or more Directors, to serve at
the pleasure of the Board.   Unless the Board of

9

000718

Directors shall otherwise prescribe the manner of proceedings of any such committee, meetings of such committee (other than the executive committee whose proceedings shall be governed by Section 17 of this Article III of these Bylaws) may be regularly scheduled in advance and may be called at any time by two (2) members thereof; otherwise, the provisions of these Bylaws with respect to notice and conduct of the meetings of the Board shall govern. Any such committee, to the extent provided in a resolution of the Board, shall have all the authority of the Board, except with respect to:

    i.    The approval of any action for which the California General Corporations Law or Articles of Incorporation also require shareholder approval;

    ii.    The filing of vacancies on the Board of Directors or on any committee;

    iii.    The fixing of compensation of the Directors for serving on the Board or on any committee;

    iv.    The adoption, amendment or repeal of Bylaws;

    v.    The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable;

    vi.    The declaration of a dividend, or the authorization or ratification of the repurchase or redemption of shares, except at a rate or in a periodic amount or within a price range determined by the Board of Directors; and

    vii.    The appointment of other committees of the Board or the members thereof.

2.    <u>Number and Qualifications of Directors</u>.

    a.    The number of Directors of the Corporation shall not be less than one (1) nor more than seven (7) until changed by amendment of Articles of

000719

Incorporation or by a Bylaw amending this section duly adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote. Directors need not be shareholders of the Corporation. Although the number of authorized Directors may be increased or decreased from time to time as provided herein, any proposal to reduce the number of Directors then authorized to a number below one (1) cannot be adopted if the votes cast against its adoption at a meeting, or the shares not consenting in the case of an action by written consent, are equal to more than sixteen and two-thirds percent (16-2/3%) of the outstanding shares entitled to vote. The exact number of Directors shall be fixed from time to time, within the limits specified in the Articles of Incorporation or this section, by a Bylaw or amendment thereof, duly adopted by shareholders or by the Board of Directors; and Subject to the foregoing provisions for changing the number of Directors, the exact number of Directors of this Corporation shall be one (1).

3.   Election and Term of Office.   The Directors shall be elected at each annual meeting, but if any such annual meeting is not held or the Directors are not elected thereat, the Directors may be elected at any special meeting of shareholders held for that purpose.   All Directors shall hold office until the next annual meeting of shareholders and until their respective successors have been elected and qualified, subject to the California General Corporations Law and the provisions of these Bylaws with respect to vacancies on the Board of Directors.

4.   Vacancies.   A vacancy in the Board of Directors shall be deemed to exist in the event of the death, resignation or removal of any Director, an increase of the authorized number of Directors, or the failure of the shareholders at any annual or special meeting of shareholders at which any authorized number of Directors to be voted for at that meeting. The Board of Directors may declare vacant the office of a Director who has been declared of unsound mind by an order of court or convicted of a felony.

11

000720

A vacancy or vacancies in the Board of Directors, except for a vacancy created by the removal of a Director, may be filled by a majority of the remaining Directors, though less than a quorum, or by a sole remaining Director, and each Director so elected shall hold office until his successor is elected in an annual or special meeting of shareholders called for that purpose. A vacancy in the Board of Directors created by the removal of a Director may be filled only by the vote of the majority of the shares entitled to vote represented at a duly held meeting at which a quorum is present, or by the written consent of the holders of the majority of the outstanding shares. The shareholders may elect a Director or Directors at any time to fill any vacancy or vacancies not filled by Directors. Any such election by written consent shall require the consent of holders of a majority of the outstanding shares entitled to vote.

Any Director may resign effective upon giving written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors of the Corporation, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation is effective at a future time, a successor may be elected to take office when the resignation becomes effective. No reduction of the authorized number of Directors shall have the effect of removing any Director prior to the expiration of his term in office.

5. <u>Place of Meetings</u>. All meetings of the Board of Directors shall be held at any place within or without California which has been designated in the notice of the meeting, or if not stated in the notice or if there is no notice, at any place designated from time to time by resolution of the Board or by written consent of all members of the Board. In the absence of such designation, meetings shall be held at the principal executive office of the Corporation.

6. <u>Telephonic Meetings</u>. The members of the Board may participate in a meeting through use of conference telephone or similar communications equipment, so long as all members participating in the meeting can hear one another. Participation in a meeting as permitted

12

000721

in the preceding sentence constitutes presence in person at such meeting.

7. <u>Organization Meeting</u>. Immediately following each annual meeting of shareholders, the Board of Directors shall hold a regular meeting at the place of the annual meeting of shareholders or at such other place as shall be fixed by the Board of Directors, for the purpose of organization, election of officers, and the transaction of other business.

8. <u>Other Regular Meetings</u>. Other regular meetings of the Board of Directors shall be held without call at 11:00 a.m. on the last day of August of each year. Provided however, should said day fall on a legal holiday, then the meeting shall be held at the same time on the next day thereafter ensuing which is a full business day.

9. <u>Special Meetings</u>. Special meetings of the Board of Directors for any purpose or purposes may be called at anytime by the Chairman of the Board, the President, any vice-president, the Secretary or any two (2) Directors.

10. <u>Notice of Directors' Meetings</u>. Call and notice of the annual organization meeting and other regular meetings of the Board of Directors are hereby dispensed with. Notice of the time and place of special meetings shall be personally delivered to each Director or communicated to each Director by telephone, telegraph or mail, charges prepaid, addressed to him at his address as is shown upon the records of the Corporation, or if it is not so shown on such records or is not readily ascertainable, at the place at which the meetings of Directors are regularly held. In the case notice is mailed, it shall be deposited in the United States mail at least ninety-six (96) hours prior to the time of the holding of the meeting. In the event notice is communicated by telegraph, it shall be delivered to the telegraph company at least forty-eight (48) hours prior to the time of the holding of the meeting. In the event notice is delivered personally or communicated by telephone, it shall be so delivered or communicated at least forty-eight (48) hours prior to the time of the holding of a meeting.

13

000722

A notice need not specify the purpose of any regular or special meeting of the Board of Directors. Whenever any Director has been absent from any meeting of the Board of Directors for which notice has not been dispensed with, an entry in the minutes to the effect that notice has been duly given shall be conclusive and incontrovertible evidence that due notice of such meeting was given to such Director.

11. <u>Quorum</u>. The presence of a majority of the number of Directors then authorized by the Bylaws of this Corporation at a meeting of the Board of Directors shall constitute a quorum for the transaction of business. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of enough Directors to leave less than a quorum, provided that any action taken is approved by at least a majority of the required quorum for such meeting.

12. <u>Voting</u>. Every act or decision done or made by a majority of the Directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors, unless a greater number, or the same number after disqualifying one (1) or more Directors from voting, is required by law, by the Articles of Incorporation or by these Bylaws.

13. <u>Validation of Meetings Held Without Proper Call or Notice</u>. The transaction of any meeting of the Board of Directors, however called and noticed or wherever held, shall be valid as though had at a meeting duly held after regular call and notice, if a quorum is initially present, and if, either before or after the meeting, each of the Directors not present or who though present has prior to the meeting or at its commencement protested the lack of proper notice to him signs a written waiver of notice, a consent to holding of such meeting or at its commencement protested the lack of proper notice to him signs a written waiver of notice, a consent to holding of such meeting or an approval of the minutes thereof. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

000723

14. <u>Adjournment</u>.   A majority of the Directors present, whether or not a quorum is present, may adjourn any Directors' meeting to meet again at another time or place.   In the event a meeting of the Board of Directors is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Directors who were not present at the time of the adjournment.   Otherwise, notice of the time and place of holding an adjourned meeting need not be given to absent Directors if the time and place is fixed and announced at the meeting so adjourned.

15. <u>Unanimous Written Consent to Actions Taken</u>.   Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all the members of the Board of Directors shall individually or collectively consent in writing to such action. Such consents shall be filed with the minutes of the proceedings of the Board of Directors and shall have the same force and effect as a unanimous vote of the Directors.

16. <u>Fees and Compensation</u>.   Directors and members of committees may receive such compensation, if any, for their services and such reimbursement for expenses as may be fixed or determined by resolution of the Board of Directors.   Nothing herein shall be considered to preclude any Director from serving the Corporation in any other capacity, including as an officer, agent, employee or otherwise, and receiving compensation therefor.

17. <u>Executive Committee</u>.   In the event the Board of Directors shall appoint an executive committee and shall not provide otherwise, regular meetings of the executive committee shall be held at such times as are determined by the Board or by such committee as appointed, and notice of such regular meetings is hereby dispensed with.   Meetings of the executive committee shall be held at the place designated in the notice of the meeting, or if not stated in the notice or if there is not notice, at any place which has been designated from time to time by resolution of the executive committee or by written consent of all the members thereof, or in the absence of such

15

000724

designation, at the principal executive office of the Corporation. Special meetings of the executive committee may be called by the Chairman of the Board, the President, any vice-president who is a member of the executive committee, or any two (2) members thereof, upon written notice to the members of the executive committee, or any two (2) members thereof, upon written notice to the members of the executive committee of the time and place of such special meeting given in the manner and within the time provided for giving of notice to members of the Board of Directors of the time and place of special meeting thereof. Minutes shall be recorded of each meeting of the executive committee and kept in the book of minutes of the Corporation. Vacancies in the membership of the Board of Directors shall serve as members of the executive committee. A majority of the authorized number of members of the executive committee shall constitute a quorum for the transaction of business. The provisions of this Article III of these Bylaws also apply to the executive committee and action by the executive committee, mutatis mutandis. The Board of Directors may designate one (1) or more Directors as alternate members of the executive committee, who may replace and act in the stead of any absent members at any meeting of such committee.

## ARTICLE IV

### OFFICERS

1.  Officers.  The officers of the Corporation shall be a President, a Secretary and a Chief Financial Officer (who may be called the Treasurer).  The Corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one (1) or more vice-presidents, one (1) or more assistant secretaries, one (1) or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article IV.  The same person may hold any number of offices.

2.  Election.  The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 of this Article IV, shall be chosen by the Board of Directors, and each shall

16

000725

hold his office until he shall resign or shall be removed by the Board of Directors or otherwise disqualified to serve, or his successor shall be elected and qualified.

3. <u>Subordinate Officers</u>.  The Board of Directors may appoint, and may empower the Chairman of the Board or the President to appoint, such other officers as the business of the Corporation may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Board of Directors.

4. <u>Removal</u>.  Any officer may be removed, either with or without cause, by the Board of Directors, at any regular or special meeting thereof or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors (subject, in each case, to the rights, if any, of an officer under any contract of employment).

5. <u>Resignation</u>.  Any officer may resign at any time by giving written notice to the Board of Directors or to the President or to the Secretary of the Corporation, without prejudice however to the rights, if any, of the Corporation under any contract to which such officer is a party.  Any such resignation shall take effect at the date of the receipt of such notice or nay later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

6. <u>Vacancies</u>.  A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to such office.

7. <u>Chairman of the Board</u>.  The Chairman of the Board, if there shall be such an officer, shall, if present, preside at all meetings of the Board of Directors and shareholders and exercise and perform such other powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by these Bylaws.

000726

8.  <u>President</u>.  Subject to such powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the President shall be the Chief Executive Officer of the Corporation and shall, subject to the control of the Board of Directors, have general supervision, direction and control of the business and officers of the Corporation.  In the absence of the Chairman of the Board, or if there be none, he shall preside at all meetings of the shareholders and the Board of Directors.

9.  <u>Vice-Presidents</u>.  In the absence or disability of the President, the vice-presidents, if there be any, in order of their rank as fixed by the Board of Directors, or, if not ranked, the vice-president designated by the Board of Directors, shall perform all the duties of the President, and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President.  The vice-presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors or these Bylaws.

10.  <u>Secretary</u>.  The Secretary shall record or cause to be recorded, and shall keep or cause to be kept, at the principal executive office of the Corporation and such other place or places as the Board of Directors may order, a book of minutes of actions taken at all meetings of Directors, committees and shareholders, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice thereof given, the names of those present at Directors' and committee meetings, the number of shares present or represented at shareholders' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the Corporation's transfer agent, a share register, or a duplicate share register, showing the names of the shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same, and the number and

000727

date of cancellation of every certificate surrendered
for cancellation.

The Secretary shall give, or cause to be given, notice
of all the meetings of the shareholders and the Board
of Directors required by these Bylaws or by law to be
given, and he shall keep the seal of the Corporation
in safe custody, and shall have such other powers and
perform such other duties as may be prescribed by the
Board of Directors or by these Bylaws.

The Secretary shall keep at the principal executive
office, and if the Corporation's principal executive
office is not in California, at the Corporation's
principal business office in California, the original
or a copy of these Bylaws as amended to date.

11. <u>Chief Financial Officer</u>.  The Chief Financial Officer
(who may also be called the Treasurer) shall keep and
maintain, or cause to be kept and maintained, adequate
and correct accounts of the properties and business
transactions of the Corporation, including accounts of
its assets, liabilities, receipts, disbursements,
income, losses, changes in financial position, capital
stock, retained earnings and shares.

The Chief Financial Officer shall deposit all moneys
and other valuables in the name and to the credit of
the Corporation with such depositories as may be
designated by the Board of Directors.  He shall
disburse the funds of the Corporation as may be
ordered by the Board of Directors, shall render to the
President and the Directors, whenever they request it,
and account of all of his transactions as Chief
Financial Officer and of the financial condition of
the Corporation, and shall have such other powers and
perform such other duties as may be prescribed by the
Board of Directors or these Bylaws.

**ARTICLE V**

**MISCELLANEOUS**

1. <u>Record Date</u>.  The Board of Directors may fix a time in
the future as a record date for the determination of
the shareholders entitled to notice of and to vote at
any meeting of shareholders, give consent to corporate

000728

action in writing without a meeting, receive any report, receive any dividend or other distribution or any allotment of rights, or exercise rights in respect to any change, conversion or exchange of shares. The record date so fixed shall not be more than sixty (60) days nor less than ten (10) days prior to the date of any meeting, nor more than sixty (60) days prior to any other event for the purposes of which it is fixed. In the event the Board of Directors does not fix a record date, the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be the close of business on the business day next preceding the day on which the meeting is held; the record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board of Directors has been taken, shall be the day on which the first written consent is given; and the record date for determining shareholders for any other purpose shall be the close of business on the day on which the Board adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later. Only shareholders of record on the record date are entitled to notice of and to vote at any such meeting, give consent without a meeting, receive any report, receive a dividend, distribution or allotment of rights, or exercise the rights, as the case may be, notwithstanding any transfer of shares on the books of the Corporation after the record date, except as otherwise provided in the Articles of Incorporation or these Bylaws. A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting. In the event such a meeting is adjourned for more than forty-five (45) days from the date set for the original meeting, the Board of Directors shall fix a new record date.

2. <u>Director Inspection of Corporate Records</u>. Every Director shall have the absolute right at any reasonable time to inspect all books of account, records and documents of every kind and to inspect the physical properties of the Corporation and all of its subsidiaries, both domestic and foreign. Inspection by a Director may be made in person or by agent or

000729

attorney and the right of inspection includes the right to copy and make extracts.

3.   Shareholder Inspection of Corporate Records.   The accounting books and records and minutes of proceedings of the shareholders and the Board of Directors and committees of the Board of this Corporation and all of its subsidiaries shall be open to inspection upon the written demand on the Corporation of any shareholder or holders of a voting trust certificate at any reasonable time during usual business hours for a purpose reasonably related to such holder's interest as a shareholder or as a holder of such voting trust certificate.   Inspection by a shareholder or a holder of a voting trust certificate may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts.

A shareholder or shareholders who hold at least five percent (5%) in the aggregate of the outstanding voting shares of the Corporation, or hold at least one percent (1%) of such voting shares and have filed a Schedule 14B with the United States Securities and Exchange Commission relating to the election of Directors of the Corporation shall have the right, exercisable in person or by agent or attorney, to inspect and copy the record of shareholders' names and addresses and shareholdings, as of the most recent record date for which it has been compiled or as of a date specified by the shareholder subsequent to the date of demand.   The list shall be made available on or before the later of five (5) business days after the demand is received or the date specified therein as the date as of which the list is to be compiled.

Every shareholder shall have the absolute right to inspect at all reasonable times during office hours the original or a copy of these Bylaws as amended to date, at the Corporation's principal executive office, or if its principal executive office is not in California, then at its principal business office in California.   In the event the principal executive office is outside California and Corporation has no principal business office in California, it shall upon the written request of any shareholder furnish to such shareholder a copy of the Bylaws as amended to date.

21

000730

4.   Annual and Financial Reports.

    a.   The requirement for the sending of an annual report to the shareholders, except upon proper request as set forth below, is hereby expressly waived.

    b.   A shareholder or shareholders holding in the aggregate at least five percent (5%) of the outstanding shares of any class of the Corporation may make a written request to the Corporation for an income statement of the Corporation for the three (3) month, six (6) month, or nine (9) month period of the current fiscal year ended not less than thirty (30) days prior to the date of the request and a balance sheet of the Corporation as of the end of such period, and in addition, if no annual report for the last fiscal year has been sent to shareholders, the annual report for the last fiscal year.   The income statement, balance sheet, and if applicable the annual report, shall be delivered to the person making the request within thirty (30) days thereafter.   In addition, the Corporation shall upon a written request of any shareholder mail to the shareholder a copy of the last annual, semiannual or quarterly income statement which it has prepared and a balance sheet as of the end of the period.   The annual report, quarterly income statements and balance sheets and other financial statements referred to in this section shall be accompanied by the report thereon, if any, of any independent accountants engaged by the Corporation, or the certificate of the Chief Financial Officer or any other officer authorized by the Board of Directors that such financial statements were prepared without audit from the books and records of the Corporation.   A copy of any of such statements and reports shall be kept on file in the principal executive office of the Corporation for twelve (12) months and they shall be exhibited at all reasonable times to any shareholder demanding an examination of them or a copy shall be mailed to such shareholder.

000731

5. <u>Share Certificates</u>. Every holder of shares in the Corporation shall be entitled to have a certificate signed in the name of the Corporation by the Chairman or Vice-Chairman of the Board or the President or any vice-president and by the Chief Financial Officer or any assistant financial officer or the Secretary or any assistant secretary, certifying the number of shares and the class or series of shares owned by the shareholder. Any of the signatures on the certificate may be a facsimile, provided that in such event at least one (1) signature, including that of any of the aforementioned officers or the Corporation's registrar or transfer agent, if any, shall be manually signed. In the event any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate, shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, the certificate may be issued by the Corporation with the same effect as if such person were an officer, transfer agent or registrar at the date of issue.

There shall appear on certificates for shares of the Corporation the following facts if, and to the extent, applicable:

a.   The shares are subject to restrictions upon transfer, including those imposed by the California Corporate Securities Law of 1968, the federal securities laws, any agreement between the Corporation and the issue thereof, the Articles of Incorporation, these Bylaws or otherwise;

b.   The shares are assessable;

c.   The shares are not fully paid and the total amount of the consideration to be paid therefore and the amount theretofore paid thereon;

d.   The shares are subject to restrictions upon voting rights contractually imposed by the Corporation;

e.   The shares are subject to restrictions upon voting rights contractually imposed by the Corporation;

23

000732

f.   The shares are redeemable;

g.   The shares are convertible and the period for conversion;

h.   The Corporation has elected to be taxed pursuant to the provisions of Subchapter S of the Internal Revenue Code of 1986, as amended; and

i.   The shares are classified or a class of the shares has two (2) or more series, and a statement setting forth the office or agency of the Corporation from which shareholders may obtain, upon request and without charge, a copy of a statement of the rights, preferences, privileges and restrictions granted to or imposed upon each class or series of shares authorized to be issued and upon the holders thereof.

No new certificate for shares shall be issued in lieu of an old certificate unless the latter is surrendered and canceled at the same time; provided, however that the Board of Directors may authorize- the issuance of a new share certificate in the place of any certificate theretofore issued by the Corporation and alleged to be lost, stolen or destroyed in the event that: (i) the request for the issuance of the new certificate is made within a reasonable time after the holder of the old certificate has notice of its loss, destruction or theft and prior to the receipt of notice by the Corporation that the old certificate has been acquired by a bona fide purchaser or holder in due course; and (ii) the holder of the old certificate files a sufficient indemnity bond with or provides other adequate security to the Corporation and satisfies any other reasonable requirements imposed by the Board. In the event of the issuance of a new certificate, the rights and liabilities of the Corporation and the holders of the old and new certificates

24

000733

shall be governed by the provisions of
Sections 8104 and 8405 of the California
Commercial Code.

6.  Representation of Shares of Other Corporations.  The
Chairman of the Board, the President or any vice-
president, or the Chief Financial Officer, or any
assistant financial officer, and the Secretary or any
assistant secretary of this Corporation are authorized
to vote, represent and exercise on behalf of this
Corporation all rights incident to any and all shares
of any other Corporation or Corporations standing in
the name of the Corporation.  The authority herein
granted to said officers to vote or represent on
behalf of this Corporation any and all shares held by
this Corporation in any other Corporation or
Corporations may be exercised either by such officers
in person or by any other person authorized to do so
by proxy o r power of attorney duly executed by any of
said officers.

7.  Registrars and Transfer Agents.  The Board of
Directors may appoint one (1) or more registrars of
transfers, which shall be incorporated banks or trust
companies, either domestic or foreign, and one (1) or
more transfer agents or transfer clerks, who shall be
appointed at such times and places as the Board of
Directors shall determine.

8.  S Corporation Election.  If this Corporation has
elected to be taxed pursuant to the provisions of
Subchapter S of the Internal Revenue Code of 1986 as
amended, then the Corporation, any shareholder and any
person to whom any of its shares are transferred shall
not do any act or take any course of conduct which
shall have the effect of terminating such election
without the prior vote of at least sixty-six and two-
thirds percent (66 2/3%) of the outstanding shares of
the Corporation or the written consent of the persons
entitled to vote such shares.

9.  Fiscal Year.  The fiscal year of the Corporation shall
be determined by the Board of Directors, and having
been so determined, is subject to change from time to
time as the Board of Directors shall determine.

000734

10. <u>Checks, Drafts and Other Instruments</u>.   All Checks, drafts, or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the Corporation, shall be signed or endorsed by such person or persons and in such manner as from time to time shall be determined by resolution of the Board of Directors.

11. <u>Execution of Contracts and Instruments</u>.   The Board of Directors, except as these Bylaws may otherwise provide, may authorize one (1) or more officers or agents of the Corporation to enter into any contract or execute any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances. Any instrument may also be executed on behalf of and in the name of the Corporation by the Chairman of the Board, the President, or any vice-president, and the Secretary or any assistant secretary, Chief Financial Officer or any assistant financial officer.

12. <u>Construction and Definitions</u>.   Unless the context otherwise requires, the general provisions, rules of construction and definitions contained in the California General Corporations Law shall govern the construction of these Bylaws. Without limiting the generality of the foregoing, the masculine gender includes the plural and the plural number includes the singular, and the term "person" includes a Corporation, partnership and trust, as well as a natural person.

13. <u>Indemnification and Liability Insurance</u>.   This Corporation shall indemnify any director (including any director who is also an officer of this Corporation) who was or is a party or is threatened to be made a party to any proceeding by reason of the fact that such director is or was an agent of this Corporation, against expenses, judgments, fines, settlements and other amounts incurred in connection with such proceeding to the fullest extent expressly permitted under Section 317 of the California Corporations Code. Further, pursuant to provisions in this Corporation's Articles of Incorporation, this Corporation may provide indemnification in excess of that expressly permitted by Section 317 for any agents (as defined in Section 317 of the California Corporations Code) of the Corporation of breach of

26

000735

duty to the Corporation or its stockholders to the fullest extent permitted by applicable law, as such law exists from time to time.

## ARTICLE VI

### RESTRICTIONS ON TRANFER OF SHARES

1. Options to Purchase. The shares of this Corporation shall be issued and held upon the condition that before there can be a valid sale or transfer of any of said shares or any interest therein for value, the holder of the shares to be sold or transferred shall give notice to the Secretary of this Corporation of its intention to sell or transfer such shares. Said notice shall specify the number of shares to be sold or transferred, the purchase consideration and the price per share, the terms upon which such holder intends to make such sale or transfer, and the name of the intended purchaser or transferee. The Board of Directors shall have ten (10) days from the date of receipt of such notice by the Secretary within which to exercise an option to purchase such shares for the Corporation at the same price and upon the same terms as set forth in said notice. The right of this Corporation to exercise such option and to purchase such shares is subject to the restrictions governing the right of a Corporation to purchase its own shares contained in Chapter 5 of the California General Corporations Law, and such other pertinent governmental restrictions as may from time to time be effective.

If any such shares shall not be purchased by the Corporation, the Secretary shall notify all of the shareholders of record by mail of said proposed sale or transfer. Said notice to shareholders shall contain the same information concerning the proposed sale or transfer as received by the Corporation, and the Secretary shall mail said notice to the shareholders immediately upon receipt by him of notification from the Board of Directors that the Corporation will not purchase any or all of said shares, and in no event later than ten (10) days after receipt by the Secretary of the notice of intended sales or transfer. Within twenty (20) days after the date of mailing of said notice to the shareholders,

27

000736

any shareholder desiring to acquire any or all of the shares referred to in said notice shall deliver to the Secretary a written offer to purchase said shares or a specified number thereof at the same price per share and upon the same terms stated in the above-mentioned notice filed with the Secretary.

If the total number of shares specified in such offers by shareholders equals but does not exceed the number of shares referred to in said notice and not purchased by this Corporation, then the offering shareholders shall be entitled to purchase the shares pursuant to their respective offers. If the total number of shares specified in said offers exceeds the number of shares referred to in said notice and not purchased by the Corporation, each offering shareholder shall be entitled to purchase such proportion of the shares available for purchase as the number of shares of the Corporation which he holds bears to the total number of shares held by all of such shareholders offering to purchase shares. If the total number of shares specified in such offers to purchase is less than the number of shares referred to in said notice and not purchased by the Corporation, the offering shareholders shall not be entitled to purchase any shares, and the exercise of any option to purchase, or election to purchase any shares by the Corporation shall be void and without force and effect. The seller or transferor in such case may sell or transfer said shares subject to the provisions and restrictions provided for below.

Any shares mentioned in such a notice of intention to transfer and not purchase by the Corporation or the shareholders, may be sold or transferred at any time within six (6) months from the date of such notice to the person and at the price and terms specified therein. Such purchaser or transferee shall receive and hold said shares subject to all of the provisions and restrictions herein contained.

2.    Nonmonetary Consideration.  Notwithstanding anything in Section 1 of this Article VI to the contrary, in the event that part or all of the purchase consideration specified in the notice to the Secretary of the Corporation is other than money, such notice shall also specify the fair market value in monetary

000737

terms of such other consideration; and the Corporation and the shareholders shall have the right to exercise their respective options to purchase said shares by delivery of a written offer specifying a per share purchase price equal to the total of the money consideration and the fair market value of the consideration other than money specified in said notice. With regard to the terms of the offer of the Corporation or a shareholder, the fair market value of consideration other than money shall be paid in cash. As used in this section, "consideration other than money" shall not mean the proposed purchaser's promissory note or other evidence of indebtedness.

In the event the Corporation or any shareholder, as the case may be, objects to the amount specified in the notice as the fair market value of consideration other than money, they may give within ten (10) days of the receipt of such notice written notice to the Secretary of its or his intention to submit the matter to an appraiser for a determination. Pending such determination, the time for exercising options to purchase shall be stayed. Within fifteen (15) days from the date of delivery of such notice of submission to an appraiser, the objector and the holder of the shares to be sold shall select a mutually satisfactory single neutral appraiser. In the event the parties are unable to make such a selection, then either party may at any time thereafter apply to the Superior Court of the State of California in and for the County of San Diego (pursuant to a petition to compel arbitration) for the appointment of a single neutral appraiser in accordance with the California Code of Civil Procedure.

The appraiser shall determine the fair market value of the consideration other than money. The decision of the appraiser shall be final and binding upon the objector and the holder of the shares to be sold. As soon as the purchase price has been determined, the appraiser shall give written notice thereof to the parties and to the Secretary. All expenses of appraisal and proceedings to appoint an appraiser shall be borne equally by the parties who exercise their option to purchase shares (who shall share such expenses between themselves in proportion to the number of shares each elects to purchase), on the one

29

hand, and the holder of shares to be sold on the other, unless the Corporation and every shareholder thereafter fail to exercise their respective options, in which case the objector shall bear all such expenses.

3.   Waiver.   The provisions of Sections 1 and 2 of this Article VI and the options and rights therein granted may be waived in writing by the Corporation or by any shareholder (other than the selling or transferring shareholder) with respect to any proposed sale or transfer of shares.   In the event any such waiver is given, the provisions of this Articles as to each of the waiving parties shall not be applicable to the proposed sale or transfer of shares with respect to which such waivers shall have been executed, but shall be applicable with respect to nonwaiving parties and to any other shares or transfer of shares.

4.   Termination.   The provisions of this Article VI with respect to the transfer of shares shall be applicable until the earliest date on which the Corporation has thirty-five (35) or more shareholders of record, and thereupon, shall automatically cease to be of any further force or effect.   For purposes of this Section 4 of Article VI, shares held by husband and wife, whether or not jointly, shall be considered to be held by one (1) person.

## ARTICLE VII

### AMENDMENTS

1.   Power of Shareholders.   New Bylaws may be adopted or these Bylaws may be amended or repealed by the affirmative vote of a majority or the shares entitled to vote or by the written consent of shareholders entitled to vote such shares, except as otherwise provided by law or by the Articles of Incorporation.

2.   Power of Directors.   Subject to the right of shareholders as provided in Section 1 of this Article VII to adopt, amend or repeal Bylaws, the Board of Directors may adopt, amend or repeal these Bylaws provided, however, that the Board of Directors may not adopt, amend or repeal a Bylaw changing the authorized number of Directors except for the purpose of fixing

30

the exact number of Directors within the limits specified in Section 2 of Article III of these Bylaws if said section provides for a variable number of Directors.

000740

# WRITTEN CONSENT ACTION

# OF THE INCORPORATOR OF

# VLAND INC.

The undersigned, being the sole incorporator of **VLAND INC.**, a California corporation, incorporated on **October 10, 2018** hereby takes the following action pursuant to Section 210 of the California Corporations Code, for the purpose of completing the organization of said corporation:

1.  Adopts bylaws for said corporation in the form contained in the minute book of the corporation and certified on this date by the undersigned;

2.  Elects the following person as directors of said corporation:

    **Chun Wang**
    **Lijun Zhang**

3.  Elects the following persons to the offices set opposite his name:

    | Name | Office |
    |------|--------|
    | **Chun Wang** | **President** |
    | **Chun Wang** | **Treasurer** |
    | **Lijun Zhang** | **Secretary** |

4.  Resigns as the Incorporator of the Corporation, effective as of the date hereof.

Dated: November 1, 2018

Peter D. Chu, Esq.
Incorporator

33

000741

# WRITTEN CONSENT ACTION OF

## BOARD OF DIRECTORS OF

## VLAND INC.

The undersigned, constituting the entire Board of Directors of **VLAND INC.**, a California corporation, hereby take the following actions and adopt the following resolutions:

1. <u>Ratification</u>.  The action of the incorporator by written consent dated **November 1, 2018** adopting bylaws, electing directors and electing officers of this corporation is hereby ratified and confirmed. The appointment of an agent for service of process as contained in the Articles of Incorporation is hereby ratified and confirmed.

2. <u>Corporate Seal</u>.  The Corporate seal, consisting of two concentric circles with the "**VLAND INC.**" and the words and figures "**Incorporated October 10, 2018 California**" and in the form and figures as set forth below is adopted as the seal of this corporation.

3. <u>Share Certificate</u>.  The standard printed form of share certificate contained in the minute book of this corporation is adopted as the form of share certificate for this corporation.

4. <u>Banking Resolutions</u>.  This corporation shall open accounts with such banks or financial institutions as shall be directed and determined from time to time by the President of this corporation. **Chun Wang** and **Lijun Zhang** shall be authorized to execute checks and other instruments drawn on any such account in person or by facsimile and to endorse instruments to be deposited therein as may be designated from time to time by a written instrument executed by the President of this

000742

corporation, and the standard form of banking resolution ordinarily used by each such bank or financial institution is hereby adopted and incorporated herein by reference, and any officer of this corporation is hereby authorized to certify to the due adoption thereof as of this date.

5.   Organizational Expenses.   Any officer of this corporation is hereby authorized and instructed to pay all the organizational expenses of this corporation.

6.   Fiscal Year.   This corporation elects a fiscal year ending on the last day of the month of December of each year.

7.   Purpose.   This corporation was formed for the purpose of owning and operating an information technology business and the officers and agents of this corporation are authorized and instructed to proceed with establishing and operating such business.

8.   Issuance of Shares.   This corporation shall issue or sell 100,000 shares of this corporation's shares for cash, cancellation of debt, or for other considerations, at a price of $2.00 per share to the following:

| Name | Consideration | Shares |
|------|--------------|--------|
| **V1 GROUP LIMITED** | $200,000 | 100,000 |

Any officer of this corporation is authorized to so sell and issue said shares upon receipt of payment therefor, provided the sale is under conditions such that it will be exempt from qualification under Section 25102(f) of the California Corporate Securities Act, and the officers or attorneys for this corporation are authorized to execute on behalf of this corporation such notification to the California Commission of Corporations as may be required in order to perfect the exemption from such qualification.

9.   Borrowing Authority.   The President and Treasurer, **Chun Wang**, and **Lijun Zhang**, Secretary of this corporation, are hereby authorized to borrow funds on behalf of this corporation from such lenders, including any shareholders of this corporation, at such interest rate and for such terms as the officers

2

000743

may deem appropriate, and to execute and deliver promissory notes evidencing said indebtedness. Any one of the officers of this corporation is hereby authorized to certify standard form Board of Directors resolutions for borrowing provided by any institutional lender as having been duly adopted by this action, all of which resolutions are incorporated herein by reference. Any borrowing by this corporation from one of its shareholders shall require the signature of an officer of this corporation other than the lender shareholder, if there is such other officer.

10. <u>Signing Authority</u>. The Chief Executive Officer or the President, acting alone, or any other two elected officers of the Corporation, signing together, are authorized and directed to execute, on behalf of this corporation, any and all documents, including but not limited to: Escrow Instructions, Reconveyance Assignments, Notice of Completions, Promissory Notes and Deeds of Trust, Subdivision Documents and Easements, and to do all acts and things which may be deemed necessary or advisable in order to carry out the business of the corporation.

11. <u>Lease of Office Space</u>. This corporation hereby authorizes the officers, and any of them, to enter into negotiations for the lease of certain real property to be used as the permanent office space of this corporation. The officers are specifically authorized to negotiate with any and all parties in connection with such office space. The officers of this corporation, and each of them, are authorized to execute such documents as may be necessary to affect such lease by this corporation of real property for the purpose of operating its offices.

12. <u>Purchase or Lease of Automobile</u>. The officers, and each of them, are authorized to execute such documents as may be necessary to purchase or lease an automobile for use by the corporation in connection with its business affairs.

13. <u>General Authority</u>. The offices of the Corporation are hereby authorized to take all actions and to execute all documents as may be necessary or appropriate to

3

000744

effect and complete the actions contained in this written consent action.

DATED: November 1, 2018

_____
Chun Wang, Director

_____
Lijun Zhang, Director

Stock Transfer Ledger

## VLAND INC.

000746

| Name of Stockholder | Place of Residence | Date Became Owner | From Whom Shares Were Transferred (If Original Issue, Enter as Such) | Certificates Surrendered Nos. & Nos. of Shares | Certificates Issued Nos. & Nos. of Shares | Amount Paid Thereon | Balance Shares Held | Date of Transfer | To Whom Transferred |
|---|---|---|---|---|---|---|---|---|---|
| V1 GROUP LIMITED | Hong Kong | 11/01/2018 | Original | | No. 1 100,000 | $200,000 | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |



*Dated* _____ November 1 _____ , 2018

*Dated* _____ this _____ day of

| NO. ORIGINAL CERTIFICATE | NO. ORIGINAL SHARES | , SHARES TRANSFERRED |
|---|---|---|

Vland Inc.

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA
OCTOBER 10, 2018

AUTHORIZED 1,000,000 SHARES COMMON STOCK

**This Certifies that** _____ V1 GROUP LIMITED _____

registered holder of _____ One Hundred Thousand _____ *Shares*

of the above named Corporation transferable only on the books of the Corporation by the
holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

**In Witness Whereof,** the said Corporation has caused this Certificate to be signed
by its duly authorized officers and its Corporate Seal to be hereunto affixed.

this _____ 1st _____ day _____ of _____ November _____ A.D. _____ 2018.

SECRETARY

PRESIDENT

© 2011 Attorneys Corporation Service, Inc.

000747

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH  45999-0023

Date of this notice:  11-01-2018

Employer Identification Number:
83-2402844

Form:  SS-4

Number of this notice:  CP 575 A

VLAND INC
998 CROCKETT AVE
CAMPBELL, CA  95008

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

     Thank you for applying for an Employer Identification Number (EIN).  We assigned you
EIN 83-2402844.  This EIN will identify you, your business accounts, tax returns, and
documents, even if you have no employees.  Please keep this notice in your permanent
records.

     When filing tax documents, payments, and related correspondence, it is very important
that you use your EIN and complete name and address exactly as shown above.  Any variation
may cause a delay in processing, result in incorrect information in your account, or even
cause you to be assigned more than one EIN.  If the information is not correct as shown
above, please make the correction using the attached tear off stub and return it to us.

     Based on the information received from you or your representative, you must file
the following form(s) by the date(s) shown.

              Form 1120                     04/15/2019

     If you have questions about the form(s) or the due date(s) shown, you can call us at
the phone number or write to us at the address shown at the top of this notice.  If you
need help in determining your annual accounting period (tax year), see Publication 538,
*Accounting Periods and Methods*.

     We assigned you a tax classification based on information obtained from you or your
representative.  It is not a legal determination of your tax classification, and is not
binding on the IRS.  If you want a legal determination of your tax classification, you may
request a private letter ruling from the IRS under the guidelines in Revenue Procedure
2004-1, 2004-1 I.R.B. 1 (or superseding Revenue Procedure for the year at issue).  Note:
Certain tax classification elections can be requested by filing Form 8832, *Entity
Classification Election*.  See Form 8832 and its instructions for additional information.

     IMPORTANT INFORMATION FOR S CORPORATION ELECTION:

     If you intend to elect to file your return as a small business corporation, an
election to file a Form 1120-S must be made within certain timeframes and the
corporation must meet certain tests.  All of this information is included in the
instructions for Form 2553, *Election by a Small Business Corporation*.

000748

(IRS USE ONLY)      575A            11-01-2018  VLAN  B  9999999999  SS-4

If you are required to deposit for employment taxes (Forms 941, 943, 940, 944, 945, CT-1, or 1042), excise taxes (Form 720), or income taxes (Form 1120), you will receive a Welcome Package shortly, which includes instructions for making your deposits electronically through the Electronic Federal Tax Payment System (EFTPS). A Personal Identification Number (PIN) for EFTPS will also be sent to you under separate cover. Please activate the PIN once you receive it, even if you have requested the services of a tax professional or representative. For more information about EFTPS, refer to Publication 966, *Electronic Choices to Pay All Your Federal Taxes*. If you need to make a deposit immediately, you will need to make arrangements with your Financial Institution to complete a wire transfer.

The IRS is committed to helping all taxpayers comply with their tax filing obligations. If you need help completing your returns or meeting your tax obligations, Authorized e-file Providers, such as Reporting Agents (payroll service providers) are available to assist you. Visit the IRS Web site at www.irs.gov for a list of companies that offer IRS e-file for business products and services. The list provides addresses, telephone numbers, and links to their Web sites.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov. If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

IMPORTANT REMINDERS:

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is VLAN. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.

(IRS USE ONLY)     575A          11-01-2018  VLAN  B  9999999999  SS-4

Keep this part for your records.        CP 575 A (Rev. 7-2007)

-----------------------------------------------------------------------------

Return this part with any correspondence
so we may identify your account.  Please                        CP 575 A
correct any errors in your name or address.
                                                              9999999999

Your Telephone Number  Best Time to Call  DATE OF THIS NOTICE:  11-01-2018
( )    -                                  EMPLOYER IDENTIFICATION NUMBER:  83-2402844
_____  _____    FORM:  SS-4              NOBOD


INTERNAL REVENUE SERVICE                  VLAND INC
CINCINNATI OH  45999-0023                 998 CROCKETT AVE
Ialalalalalalalalalalalalalalalalalalalal CAMPBELL, CA  95008

000750



000751



V1 GROUP LIMITED
HONG KONG

Portfolio no.: 0530 00367818 0002
As of: 20.11.2018

## Details of transaction

### Account Information

| Ccy. | Number/Amt. | Description / Account no. / BIC | | Category/Account no. | Duration |
|------|-------------|--------------------------------|---|---------------------|----------|
| USD | | UBS Current Account for Private Clients 0530 00367818.03D / UBSWHKHHXXX | Ind | 0530 00367818.03D | |

| Booking | | | | | Valued in USD |
|---------|---|------------|---|----------------|---------------|
| Dates | | Description | | Transaction no. | Booking amount |
| Trade date | 20.11.2018 | Telefax Order | | ZD30324ED0055582 | -200'000.00 |
| Booking | 20.11.2018 | | | | |
| Value date | 20.11.2018 | | | | |
| Receipt of order | 20.11.2018 | Origin of order: generated order | | | |

### Details

VLAND INC
CA 95008, USA

Outward Remittance
Manual exemption

This printout is for information only and must not be used for official purposes. Your official account statement or statement of assets takes precedence in case of any discrepancies. UBS is not liable for any inaccuracies due to technical or administrative error or otherwise, and UBS reserves the right to correct any such inaccuracies.

000752

000753

# Viand Inc
## Balance Sheet
### As of October 31, 2019

| | Jan 2019 | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| **Bank Accounts** | | | | | | | | | | |
| 1100000 Cash and Cash Equivalents | | | | | | | | | | |
| 1100010 Checking_BOA | 171,180.94 | 167,306.76 | 164,010.55 | 195,216.79 | 187,315.91 | 127,873.91 | 153,815.38 | 420,465.26 | 413,598.64 | 405,165.76 |
| Total 1100000 Cash and Cash Equivalents | $ 171,180.94 | $ 167,306.76 | $ 164,010.55 | $ 195,216.79 | $ 187,315.91 | $ 127,873.91 | $ 153,815.38 | $ 420,465.26 | $ 413,598.64 | $ 405,165.76 |
| **Total Bank Accounts** | $ 171,180.94 | $ 167,306.76 | $ 164,010.55 | $ 195,216.79 | $ 187,315.91 | $ 127,873.91 | $ 153,815.38 | $ 420,465.26 | $ 413,598.64 | $ 405,165.76 |
| **Other Current Assets** | | | | | | | | | | |
| 1500000 Prepaid Expenses | 2,997.35 | 3,234.49 | 3,043.49 | 3,843.49 | 3,847.98 | 3,843.49 | 3,843.49 | 3,844.09 | 3,843.68 | 3,856.56 |
| **Total Other Current Assets** | $ 2,997.35 | $ 3,234.49 | $ 3,043.49 | $ 3,843.49 | $ 3,847.98 | $ 3,843.49 | $ 3,843.49 | $ 3,844.09 | $ 3,843.68 | $ 3,856.56 |
| **Total Current Assets** | $ 174,178.29 | $ 170,541.25 | $ 167,054.04 | $ 199,060.28 | $ 191,163.89 | $ 131,717.40 | $ 157,658.87 | $ 424,309.35 | $ 417,442.32 | $ 409,022.32 |
| **Fixed Assets** | | | | | | | | | | |
| 1600000 Property & Equipment | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 | 1,617.53 |
| 1700000 Accumulated Depreciation | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -188.71 | -215.67 | -242.63 | -269.59 |
| **Total Fixed Assets** | $ 1,617.53 | $ 1,617.53 | $ 1,617.53 | $ 1,617.53 | $ 1,617.53 | $ 1,617.53 | $ 1,428.82 | $ 1,401.86 | $ 1,374.90 | $ 1,347.94 |
| **Other Assets** | | | | | | | | | | |
| 1800000 Deposits | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 | 5,423.58 |
| **Total Other Assets** | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 | $ 5,423.58 |
| **TOTAL ASSETS** | $ 181,219.40 | $ 177,582.36 | $ 174,095.15 | $ 206,101.39 | $ 198,205.00 | $ 138,758.51 | $ 164,511.27 | $ 431,134.79 | $ 424,240.80 | $ 415,793.84 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | |
| **Accounts Payable** | | | | | | | | | | |
| 2100000 Accounts Payable | 17,738.72 | 17,738.72 | 17,738.72 | 17,738.72 | 17,738.72 | 59,192.46 | 53,102.46 | 53,102.46 | 53,102.46 | 53,102.46 |
| **Total Accounts Payable** | $ 17,738.72 | $ 17,738.72 | $ 17,738.72 | $ 17,738.72 | $ 17,738.72 | $ 59,192.46 | $ 53,102.46 | $ 53,102.46 | $ 53,102.46 | $ 53,102.46 |
| **Other Current Liabilities** | | | | | | | | | | |
| 2300000 Other Payables | 1,000.00 | 2,000.00 | 3,000.00 | 76,198.00 | 113,297.00 | 108,297.00 | 181,525.00 | 218,654.00 | 255,783.00 | 292,912.00 |
| 2500000 Accrued Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,799.95 | 3,599.90 | 5,399.85 | 7,199.80 |
| 2500200 Accrued Payroll Expense | 0.00 | 0.00 | 0.00 | 0.00 | 21,732.61 | 21,732.61 | 24,732.61 | 0.00 | 0.00 | 2,000.00 |
| 2500300 Accrued payroll Tax | 0.00 | 0.00 | 0.00 | 41,052.46 | 17,414.96 | 287.00 | 42.00 | 288.00 | 329.00 | 133.83 |
| **Total Other Current Liabilities** | $ 1,000.00 | $ 2,000.00 | $ 3,000.00 | $ 117,250.46 | $ 152,444.57 | $ 130,316.61 | $ 208,099.56 | $ 222,541.90 | $ 261,511.85 | $ 302,245.63 |
| **Total Current Liabilities** | $ 18,738.72 | $ 19,738.72 | $ 20,738.72 | $ 134,989.18 | $ 170,183.29 | $ 189,509.07 | $ 261,202.02 | $ 275,644.36 | $ 314,614.31 | $ 355,348.09 |
| **Total Liabilities** | $ 18,738.72 | $ 19,738.72 | $ 20,738.72 | $ 134,989.18 | $ 170,183.29 | $ 189,509.07 | $ 261,202.02 | $ 275,644.36 | $ 314,614.31 | $ 355,348.09 |
| **Equity** | | | | | | | | | | |
| 300000 Owner's Investment | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 200,000.00 | 500,000.00 | 500,000.00 | 500,000.00 |
| 330000 Retained Earnings | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 | -26,567.99 |
| Net Income | -10,951.33 | -15,588.37 | -20,075.58 | -102,219.80 | -145,410.30 | -224,182.57 | -270,122.76 | -317,541.58 | -363,805.52 | -412,986.26 |
| **Total Equity** | $ 162,480.68 | $ 157,843.64 | $ 153,356.43 | $ 71,112.21 | $ 28,021.71 | -$ 50,750.56 | -$ 96,690.75 | $ 155,490.43 | $ 109,626.49 | $ 60,445.75 |
| **TOTAL LIABILITIES AND EQUITY** | $ 181,219.40 | $ 177,582.36 | $ 174,095.15 | $ 206,101.39 | $ 198,205.00 | $ 138,758.51 | $ 164,511.27 | $ 431,134.79 | $ 424,240.80 | $ 415,793.84 |



# Vland Inc
## Profit and Loss
### January - October, 2019

| | Jan 2019 | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | Jul 2019 | Aug 2019 | Sep 2019 | Oct 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | |
| Total Income | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Gross Profit** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Expenses** | | | | | | | | | | | |
| 6100000 HR | | | | | | | | | | | 0.00 |
| 6100010 Salary/Wages | | | | 72,198.00 | 36,099.00 | 36,099.00 | 39,099.00 | 39,099.00 | 39,099.00 | 42,314.41 | 304,007.41 |
| 6100020 Payroll Tax - Federal | | | | 5,565.15 | 2,761.57 | 2,048.82 | 523.44 | 1,018.43 | 758.94 | 853.20 | 13,529.55 |
| 6100030 Payroll Tax - State | | | | 245.00 | | | | 210.00 | 35.00 | 42.54 | 532.54 |
| 6100060 Health Insurance | | | | | | | 1,644.95 | 1,644.95 | 1,644.95 | 1,644.95 | 6,579.80 |
| 6100060 Continued Education | | | | | | 10,557.00 | | | | | 10,557.00 |
| **Total 6100000 HR** | $ 0.00 | $ 0.00 | $ 0.00 | $ 78,008.15 | $ 38,860.57 | $ 48,704.82 | $ 41,267.39 | $ 41,972.38 | $ 41,537.89 | $ 44,855.10 | $ 335,206.30 |
| 6200000 Outside Services | | | | | | | | | | | 0.00 |
| 6200020 Accounting/Tax Services | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 2,308.70 | 1,000.00 | 1,000.00 | 11,308.70 |
| 8200030 Legal & Professional Fees | 5,000.00 | | | | | 22,625.00 | | | | | 27,625.00 |
| **Total 6200000 Outside Services** | $ 6,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 23,625.00 | $ 1,000.00 | $ 2,308.70 | $ 1,000.00 | $ 1,000.00 | $ 38,933.70 |
| 6300000 Travel | | | | | | | | | | | 0.00 |
| 6300020 Local Transportation | 532.14 | 9.00 | 4.00 | | | 223.84 | | | | | 768.98 |
| 6300040 Travel Meals | 214.00 | | | | | 183.47 | | | | | 397.47 |
| **Total 6300000 Travel** | $ 746.14 | $ 9.00 | $ 4.00 | $ 0.00 | $ 0.00 | $ 407.31 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 1,166.45 |
| 6500000 Facilities | | | | | | | | | | | 0.00 |
| 6500010 Rent & Lease | 2,854.61 | 2,997.35 | 3,234.49 | 3,043.49 | 3,043.49 | 3,047.98 | 3,043.49 | 3,043.49 | 3,044.09 | 3,043.68 | 30,398.16 |
| 6500020 Phone/Internet | | | | | | 1,085.00 | 155.00 | 155.00 | 155.00 | 155.00 | 1,705.00 |
| 6500030 Repairs & Maintenance | | 50.00 | | | | | | | | | 50.00 |
| **Total 6500000 Facilities** | $ 2,854.61 | $ 3,047.35 | $ 3,234.49 | $ 3,043.49 | $ 3,043.49 | $ 4,132.98 | $ 3,198.49 | $ 3,198.49 | $ 3,199.09 | $ 3,198.68 | $ 32,151.16 |
| 6600000 Office & Corporate | | | | | | | | | | | 0.00 |
| 6600010 Bank Charges & Fees | 2.70 | | | | | | | | | | 2.70 |
| 6600020 Registration, License, Fees | 59.98 | | | | | | | | | | 59.98 |
| 6600040 Office Supplies & Software | 127.30 | | | 17.58 | | 150.01 | | | | | 303.23 |
| 6800045 Software/Business Tools Subscription | 44.99 | 30.00 | 60.00 | 60.00 | 60.00 | 127.85 | 100.00 | 100.00 | 100.00 | 100.00 | 605.00 |
| 6600050 Expensed Equipment/Fixture | | | | | | 516.98 | | | | | 516.98 |
| 6600060 Meals | 718.10 | 550.69 | 125.79 | 115.00 | 60.00 | 724.35 | | | | | 2,310.79 |
| 6800085 Team Building | 259.70 | | | | | | | | | | 259.70 |
| 6800070 Freight | 137.81 | | 62.93 | | 126.44 | 382.97 | | | | | 1,000.68 |
| **Total 6600000 Office & Corporate** | $ 1,350.58 | $ 580.69 | $ 248.72 | $ 192.58 | $ 186.44 | $ 1,902.16 | $ 285.60 | $ 312.29 | $ 100.00 | $ 100.00 | $ 5,259.06 |
| **Total Expenses** | $ 10,951.33 | $ 4,637.04 | $ 4,487.21 | $ 82,244.22 | $ 43,090.50 | $ 78,772.27 | $ 45,751.48 | $ 47,791.86 | $ 45,836.98 | $ 49,153.78 | $ 412,716.67 |
| **Net Operating Income** | -$ 10,951.33 | -$ 4,637.04 | -$ 4,487.21 | -$ 82,244.22 | -$ 43,090.50 | -$ 78,772.27 | -$ 45,751.48 | -$ 47,791.86 | -$ 45,836.98 | -$ 49,153.78 | -$ 412,716.67 |
| **Other Expenses** | | | | | | | | | | | |
| 6700000 Depreciation | | | | | | | 188.71 | 26.96 | 26.96 | 26.96 | 269.59 |
| **Total Other Expenses** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 188.71 | $ 26.96 | $ 26.96 | $ 26.96 | $ 269.59 |
| **Net Other Income** | -$ 0.00 | -$ 0.00 | -$ 0.00 | -$ 0.00 | -$ 0.00 | -$ 0.00 | -$ 188.71 | -$ 26.96 | -$ 26.96 | -$ 26.96 | -$ 269.59 |
| **Net Income** | -$ 10,951.33 | -$ 4,637.04 | -$ 4,487.21 | -$ 82,244.22 | -$ 43,090.50 | -$ 78,772.27 | -$ 45,940.19 | -$ 47,818.82 | -$ 45,863.94 | -$ 49,180.74 | -$ 412,986.26 |

Thursday, Nov 21, 2019 03:16:00 PM GMT-8 - Accrual Basis

000754

# Vland Inc
## Statement of Cash Flows
### January - October 2019

| | Jun-19 | Oct-19 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Net Income | -224,182.57 | -188,803.69 |
| Adjustments to reconcile Net Income to Net Cash provided by operations: | | |
| 1500000 Prepaid Expenses | -988.88 | -13.07 |
| 2100000 Accounts Payable | 41,453.74 | -6,090.00 |
| 2300000 Other Payables | 108,297.00 | 184,615.00 |
| 2500000 Accrued Expenses | -1,000.00 | 7,199.80 |
| 2500200 Accrued Payroll Expense | 21,732.61 | -19,732.61 |
| 2500300 Accrued payroll Tax | 287.00 | -153.17 |
| Total Adjustments to reconcile Net Income to Net Cash provided by operations: | $    169,781.47 | $    165,825.95 |
| Net cash provided by operating activities | -$    54,401.10 | -$    22,977.74 |
| **INVESTING ACTIVITIES** | | |
| 1600000 Property & Equipment | -1,617.53 | 269.59 |
| 300000 Owner's Investment | | 300,000.00 |
| Net cash provided by investing activities | -$    1,617.53 | $    300,269.59 |
| Net cash increase for period | -$    56,018.63 | $    277,291.85 |
| Cash at beginning of period | 183,892.54 | 127,873.91 |
| Cash at end of period | $    127,873.91 | $    405,165.76 |

000755

Agreement Date - November 7, 2 | Confirmation No : 32766-740461

## Business Center Details

**CA, Campbell - Pruneyard (HQ)**

| Address | 1999 S. Bascom Avenue |
| | Suite 700 |
| | Campbell |
| | California |
| | 95008 |
| | United States of America |

## Client Details

| Company Name | VLAND |
|---|---|
| Contact Name | Chun Wang |
| Address * | 998 crockett ave |
| | |
| | |
| Town/City * | Campbell |
| County/State/Province * | California |
| Post Code * | 95008 |
| Country * | United States of Americ |

## Office Payment Details (exc. tax and exc. services)

| Office Number | Price per Person per Day | Discount on Initial Term | Discounted Price per Person per Day | x People | Discounted Price per Office per Day |
|---|---|---|---|---|---|
| 753 | $ 22.15 | 15 % | $ 18.83 | 5 | $ 94.15 |

| | |
|---|---|
| Total Average Monthly Price per Person per Month | $ 564.91 |
| Total Monthly Price | $ 2,824.55 |

| Service Provision : | Start Date | December 5, 2018 | End Date | December 31, 2020 |
|---|---|---|---|---|

- Invoices/Fees are charged on a monthly basis which is calculated based on a 30-day month. i
- All agreements end on the last calendar day of the month. i
- A refundable service retainer equivalent to 2 x monthly office fee will be payable. i

## Terms and Conditions

We are Regus Management Group, LLC, the "Provider". This Agreement incorporates our terms of business set out on attached Terms and Conditions, attached House Rules and Service Price Guide (where available) which you confirm you have read and understood. We both agree to comply with those terms and our obligations as set out in them. This agreement is binding from the agreement date and may not be terminated once it is made, except in accordance with its terms. Note that the Agreement does not come to an end automatically. See "Cancellation" section of your terms and conditions

AGREEMENT TO ARBITRATE; CLASS ACTION WAIVER: Any dispute or claim relating in any way to this agreement shall be resolved by binding arbitration administered by the American Arbitration Association in accord with its Commercial Arbitration Rules (available at www.adr.org), except that you or the Provider may assert claims in small claims court and the Client and the Provider may pursue court actions to remove you, or prevent your removal, from the Center if you do not leave when this agreement terminates. The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this agreement. The arbitrator shall not conduct arbitration as a class or representative action. The Client and the Provider acknowledge that this agreement is a transaction in interstate commerce governed by the Federal Arbitration Act. The Client and the Provider agree to waive any right to pursue any dispute relating to this agreement in any class, private attorney general, or other representative action.

☑ I accept the terms and conditions          📄PDF  Download the terms and conditions

📄PDF  Download the house rules

Please enter your VAT number, so that we can process your order: [_____]
Not VAT Registered: ☐

## Confirm by typing your name in the box below

| Name : | Chun Wang | on behalf of VLAND | Signed on November 7, 2018 |
|---|---|---|---|

**I confirm these details are correct to the best of my knowledge**

This website is secure. Your personal details are protected at all times.          Print Agreement

HQ

000756

## 1. This Agreement

**1.1** Nature of this agreement: This agreement or the commercial equivalent of an agreement for accommodation(s) in a hotel ... the whole of the Center remains in the Provider's possession and control. THE CLIENT ACCEPTS THAT THIS AGREEMENT CREATES NO TENANCY INTEREST, LEASEHOLD ESTATE OR OTHER REAL PROPERTY INTEREST IN THE CLIENT'S FAVOUR WITH RESPECT TO THE ACCOMMODATION(S). The Provider is giving the Client the right to share with the Provider the use of the Center on these terms and conditions, as supplemented by the House Rules, so that the Provider can provide the services to the Client. This Agreement is personal to the Client and cannot be transferred to anyone else without prior consent from the Provider unless such transfer is required by law. The Provider will not unreasonably withhold its consent to assignment to a parent, subsidiary or affiliate of Client provided that Client and assignee execute the Provider's form of Assignment of License Agreement which will require assignee to assume all Client obligations and will not release the Client. This agreement is composed of the front page describing the accommodation(s), the present terms and conditions, the House Rules and the Service Price Guide (where available).

**1.2** Comply with House Rules: The Client must comply with any House Rules which the Provider imposes generally on users of the Center. The House Rules vary from country to country and from Center to Center and these can be requested locally.

**1.3** AUTOMATIC RENEWAL: THIS AGREEMENT LASTS FOR THE PERIOD STATED IN IT AND **THEN WILL BE EXTENDED AUTOMATICALLY FOR SUCCESSIVE PERIODS EQUAL TO THE CURRENT TERM BUT NO LESS THAN 3 MONTHS** (UNLESS LEGAL RENEWAL TERM LIMITS APPLY) UNTIL TERMINATED BY THE CLIENT OR BY THE PROVIDER PURSUANT TO SECTION 1.4. UNTIL BROUGHT TO AN END BY THE CLIENT OR BY THE PROVIDER. ALL PERIODS SHALL RUN TO THE LAST DAY OF THE MONTH IN WHICH THEY WOULD OTHERWISE EXPIRE. THE FEES ON ANY RENEWAL WILL BE AT THE THEN PREVAILING MARKET RATE. THIS CLAUSE DOES NOT APPLY TO MONTH TO MONTH AGREEMENTS.

**1.4 CANCELLATION:** EITHER THE PROVIDER OR THE CLIENT CAN TERMINATE THIS AGREEMENT AT THE END DATE STATED IN IT, OR AT THE END OF ANY EXTENSION OR RENEWAL PERIOD, BY GIVING AT LEAST THREE MONTHS WRITTEN NOTICE TO THE OTHER. HOWEVER, IF THIS AGREEMENT, EXTENSION OR RENEWAL IS FOR THREE MONTHS OR LESS AND EITHER THE PROVIDER OR THE CLIENT WISHES TO TERMINATE IT, THE NOTICE PERIOD IS TWO MONTHS IF THIS AGREEMENT, EXTENSION OR RENEWAL IS FOR TWO MONTHS OR LESS, NOTICE MUST BE GIVEN WITHIN ONE WEEK OF THE START DATE OF THE CURRENT TERM.IF THE CLIENT IS ON A MONTH TO MONTH AGREEMENT EITHER PARTY MAY TERMINATE THIS AGREEMENT BY GIVING NO LESS THAN ONE MONTHS' NOTICE TO THE OTHER (EFFECTIVE FROM THE START OF ANY CALENDAR MONTH).

**1.5** Ending this agreement immediately: To the maximum extent permitted by applicable law, the Provider may put an end to this agreement immediately by giving the Client notice and without need to follow any additional procedure if (a) the Client becomes insolvent, bankrupt, goes into liquidation or becomes unable to pay its debts as they fall due, or (b) the Client is in breach of one of its obligations which cannot be put right or which the Provider have given the Client notice to put right and which the Client has failed to put right within fourteen (14) days of that notice, or (c) its conduct, or that of someone at the Center with its permission or invitation, is incompatible with ordinary office use and (i) such conduct is repeated despite the Client having been given a warning or (ii) such conduct is material enough (in the Provider's opinion) to warrant immediate termination. If the Provider puts an end to this agreement for any of these reasons it does not put an end to any outstanding obligations, including additional services used, requested or required under the agreement and the monthly office fee for the remainder of the period for which this agreement would have lasted if the Provider had not ended it.

**1.6** If the Center is no longer available: In the event that the Provider is permanently unable to provide the services and accommodation(s) at the Center stated in this agreement then this agreement will end and the Client will only have to pay monthly office fees up to the date it ends and for the additional services the Client has used. The Provider will try to find suitable alternative accommodation(s) for the Client at another Provider Center.

**1.7** When this agreement ends the Client is to vacate the accommodation(s) immediately, leaving the accommodation(s) in the same condition as it was when the Client took it. Upon the Client's departure or if the Client, at its option, chooses to relocate to different rooms within the Center, the Provider will charge an Office Restoration Service fee to cover normal cleaning and testing and to return the accommodation(s) to its original state. This fee will

differ by country and is listed in the House Rules. The Provider reserves the right to charge an additional reasonable fee for any repairs needed above and beyond normal wear and tear. If the Client leaves any property in the Center the Provider may dispose of it at the Client's cost in any way the Provider chooses without owing the Client any responsibility for it or any proceeds of sale. If the Client continues to use the accommodation(s) when this agreement has ended the Client is responsible for any loss, claim or liability the Provider incurs as a result of the Client's failure to vacate on time. The Provider may, at its discretion, permit the Client an extension subject to a surcharge on the monthly office fee.

**1.8** Employees: While this agreement is in force and for a period of six months after it ends, neither the Provider nor the Client may knowingly solicit or offer employment to any of the other's staff employed in the Center. This obligation applies to any employee employed at the Center up to that employee's termination of employment, and for three months thereafter. It is stipulated that the breaching party shall pay the non-breaching party the equivalent of six months' salary for any employee concerned. Nothing in this clause shall prevent either party from employing an individual who responds in good faith and independently to an advertisement which is made to the public at large.

**1.9** Notices: All formal notices must be in writing, which may include by email, to the address first written above.

**1.10** Confidentiality: The terms of this agreement are confidential. Neither the Provider nor the Client must disclose them without the other's consent unless required to do so by law or an official authority. This obligation continues for a period of 3 years after this agreement ends.

**1.11** Applicable law: This agreement is interpreted and enforced in accordance with the law of the place where the relevant Center is located. All dispute resolution proceedings will be conducted in the country, state or province where the Center is located. If any provision of these terms and conditions is held void or unenforceable under the applicable law, the other provisions shall remain in force. In the case of Japan all agreements will be interpreted and enforced by the Tokyo District Court, and in the case of France, any dispute regarding this agreement will be settled by the relevant courts of the Paris jurisdiction.

## 2. Services and Obligations

**2.1** Office accommodation: The Provider is to provide the number of serviced office accommodation(s) for which the Client has agreed to pay in the Center stated in this agreement. This agreement lists the accommodation(s) the Provider has initially allocated for the Client's use. The Client will have a non-exclusive right to the rooms allocated to it. Occasionally the Provider may need to allocate different accommodation(s), but these accommodation(s) will be of reasonably equivalent size and the Provider will notify the Client with respect to such different accommodation(s) in advance.

**2.2** Office Services: The Provider is to provide during normal opening hours the services, if requested, described in the relevant service description (which is available on request). If the Provider decides that a request for any particular service is excessive, it reserves the right to charge an additional fee.

**2.3** THE PROVIDER'S IT: WHILST THE PROVIDER HAS INTERNET SECURITY PROTOCOLS, THE PROVIDER DOES NOT MAKE ANY REPRESENTATIONS AS TO THE SECURITY OF THE PROVIDER'S NETWORK (OR THE INTERNET) OR OF ANY INFORMATION THAT THE CLIENT PLACES ON IT. The Client should adopt whatever security measures (such as encryption) it believes are appropriate to its circumstances. The Provider cannot guarantee that a particular degree of availability will be attained in connection with the Client's use of the Provider's network (or the internet). The Client's sole and exclusive remedy shall be the remedy of such failure by the Provider within a reasonable time after written notice.

## 3. Providing the Services

**3.1** Access to the accommodation(s): The Provider may need to enter the Client's accommodation(s) and may do so at any time. However, unless there is an emergency or the Client has given notice to terminate, the Provider will attempt to notify the Client verbally or electronically in advance when the Provider needs access to carry out testing, repair or works other than routine inspection, cleaning and maintenance. The Provider will also endeavor to respect reasonable

security procedures to protect the confidentiality of the Client's business.

3.2 Availability at the start of this agreement: If for any reason the Provider cannot provide the accommodation(s) stated in this agreement by the date when this agreement is due to start it has no liability to the Client for any loss or damages but the Client may cancel this agreement without penalty. The Provider will not charge the Client the monthly office fee for accommodation(s) the Client cannot use until it becomes available. The Provider may delay the start date of this agreement provided it provides to the Client alternative accommodation(s) that shall be at least of equivalent size to the accommodation(s) stated in this agreement.

## 4. Accommodation(s)

4.1 The Client must not alter any part of its accommodation and must take good care of all parts of the Center, its equipment, fixtures, fittings and furnishings which the Client uses. The Client is liable for any damage caused by it or those in the Center with the Client's permission or at the Client's invitation whether express or implied, including but not limited to all employees, contractors, agents or other persons present on the premises.

4.2 Office equipment: The Client must not install any cabling, IT or telecom connections without the Provider's consent, which the Provider may refuse at its absolute discretion.

As a condition to the Provider's consent, the Client must permit the Provider to oversee any installations (for example IT or electrical systems) and to verify that such installations do not interfere with the use of the accommodation(s) by other Clients or the Provider or any landlord of the building.

4.3 Insurance: It is the Client's responsibility to arrange insurance for its own property which it brings in to the Center and for its own liability to its employees and to third parties. The Provider strongly recommends that the Client put such insurance in place.

## 5. Use

5.1 The Client must only use the accommodation(s) for office purposes. Office use of a "retail" or "medical" nature, involving frequent visits by members of the public, is not permitted.

5.2 The Client must not carry on a business that competes with the Provider's business of providing serviced office accommodation(s) or its ancillary services.

5.3 The Client's name and address: The Client may only carry on that business in its name or some other name that the Provider previously agrees.

5.4 Use of the Center Address: The Client may use the Center address as its business address. Any other uses are prohibited without the Provider's prior written consent.

## 6. Compliance

6.1 Comply with the law: The Client and the Provider must comply with all relevant laws and regulations in the conduct of its business in relation to this agreement. The Client must do nothing illegal in connection with its use of the Business Center. The Client must not do anything that may interfere with the use of the Center by the Provider or by others, (including but not limited to political campaigning or immoral activity), cause any nuisance or annoyance, increase the insurance premiums the Provider has to pay, or cause loss or damage to the Provider (including damage to reputation) or to the owner of any interest in the building which contains the Center the Client is using. Both the Client and the Provider shall comply at all times with all relevant anti-bribery and anti-corruption laws. The Provider confirms that in providing the services it has not employed or used any labor in contravention of the requirements of any anti-slavery laws.

6.2 If the Provider has been advised by any government authority or other legislative body that it has reasonable suspicion that the Client is conducting criminal activities from the Center then the Provider shall be entitled to terminate this agreement with immediate effect.

6.3 The Client acknowledges that (a) the terms of this clause are a material inducement in the Provider's execution of this agreement and (b) any violation by the Client of this clause shall constitute a material default by the Client hereunder, entitling the Provider to terminate this agreement, without further notice or procedure.

6.4 The Provider may collect and process personal data from and of the Client to administer contractual relationship, ensure compliance with applicable laws and regulations, and enable the Provider to provide its services and to manage its business. The Client acknowledges and accepts that such personal data may be transferred or made accessible to all entities

## 7. The Provider's Liability

7.1. The extent of the Provider's liability: To the maximum extent permitted by applicable law, the Provider is not liable to the Client in respect of any loss or damage the Client suffers in connection with this agreement, with the services or with the Client's accommodation(s) unless the Provider has acted deliberately or negligently in causing that loss or damage. The Provider is not liable for any loss as a result of the Provider's failure to provide a service as a result of mechanical breakdown, strike, termination of the Provider's interest in the building containing the Center or otherwise unless the Provider does so deliberately or is negligent. In no event shall the Provider be liable for any loss or damage until the Client provides the Provider written notice and gives the Provider a reasonable time to put it right. If the Provider is liable for failing to provide the Client with any service under this agreement then subject to the exclusions and limits set out immediately below the Provider will pay any actual and reasonable expenses the Client has incurred in obtaining that service from an alternative source. If the Client believes the Provider has failed to deliver a service consistent with these terms and conditions the Client shall provide the Provider written notice of such failure and give the Provider a reasonable period to put it right.

7.2. EXCLUSION OF CONSEQUENTIAL LOSSES, ETC.: <u>THE PROVIDER WILL NOT IN ANY CIRCUMSTANCES HAVE ANY LIABILITY FOR LOSS OF BUSINESS, LOSS OF PROFITS, LOSS OF ANTICIPATED SAVINGS, LOSS OF OR DAMAGE TO DATA, THIRD PARTY CLAIMS OR ANY CONSEQUENTIAL LOSS UNLESS THE PROVIDER OTHERWISE AGREES IN WRITING. THE PROVIDER STRONGLY ADVISES THE CLIENT TO INSURE AGAINST ALL SUCH POTENTIAL LOSS, DAMAGE, EXPENSE OR LIABILITY.</u>

7.3. Financial limits to the Provider's liability: In all cases, the Provider's liability to the Client is subject to the following limits:

- Without limit for personal injury or death;

- Up to a maximum of £1 million / USD$2 million / €1.3 million (or local equivalent) for any one event or series of connected events for damage to the Client's personal property;

- Up to a maximum equal to 125% of the total fees paid between the date the Client moved into its accommodation(s) and the date on which the claim in question arises or £50,000 / USD$100,000 / €66,000 (or local equivalent) whichever is the higher, in respect of any other loss or damage.

## 8. Fees

8.1 Taxes and duty charges: The Client agrees to pay promptly (i) all sales, use, excise, consumption and any other taxes and license fees which it is required to pay to any governmental authority (and, at the Provider's request, will provide to the Provider evidence of such payment) and (ii) any taxes paid by the Provider to any governmental authority that are attributable to the accommodation(s), including, without limitation, any gross receipts, rent and occupancy taxes, tangible personal property taxes, stamp tax or other documentary taxes and fees.

8.2 Service Retainer/Deposit: The Client will be required to pay a service retainer/deposit equivalent to two months' of the monthly office fee (plus VAT/Tax where applicable) upon entering into this agreement unless a different amount is specified on the front of this agreement. This will be held by the Provider without generating interest as security for performance of all the Client's obligations under this agreement. The service retainer/deposit or any balance will be returned to the Client when the Client has settled its account which includes deducting outstanding fees and other costs due to the Provider.

8.3 The Provider may require the Client to pay an increased retainer if outstanding fees exceed the service retainer/deposit held and/or the Client frequently fails to pay the Provider when due.

8.4 Payment: The Provider is continually striving to reduce its environmental impact and supports its clients in doing the same. Therefore the Provider will send all invoices electronically (where allowed by law) and the Client will make payments via an automated method such as Direct Debit or Credit Card, wherever local banking systems permit unless another form of payment is offered to the Client as a qualified and current Key Account. All amounts payable by the

Client under this agreement may be assigned to other members of the Provider's group.

8.5   Late payment:  If the Client does not pay        when due, a fee will be charged on all overdue balances.  This fee will differ by country and is listed in the House Rules.  If the Client disputes any part of an invoice the Client must pay the amount not in dispute by the due date or be subject to late fees.  The Provider also reserves the right to withhold services (including for the avoidance of doubt, denying the Client access to its accommodation(s)) while there are any outstanding fees and/or interest or the Client is in breach of this agreement.

8.6   Insufficient Funds:  The Client will pay a fee for any returned check or any other declined payments due to insufficient funds.  This fee will differ by country and is listed in the House Rules.

8.7 If this agreement is for a term of more than 12 months, the Provider will increase the monthly office fee on each anniversary of the start date.  This increase will be by the local Consumer Price Index or such other broadly equivalent index where a consumer price index is not available locally.  If there is a negative index rate, prices will not be decreased.  Renewals are calculated separately from annual indexation increases. Month to Month agreements will use the above stated index or the current month to month office price, whichever is the greater.

8.8   Standard services:  The monthly office fee and any recurring services requested by the Client are payable monthly in advance.  Unless otherwise agreed in writing, these recurring services will be provided by the Provider at the specified rates for the duration of this Agreement (including any renewal).  Specific due dates will differ by country and are listed in the House Rules.  Where a daily rate applies, the charge for any such month will be 30 times the daily fee.  For a period of less than a month the fee will be applied on a daily basis.

8.9   Pay-as-you-use and Additional Variable Services:  Fees for pay-as-you-use services, plus applicable taxes, in accordance with the Provider's published rates which may change from time to time, are invoiced in arrears and payable the month following the calendar month in which the additional services were provided.  Specific due dates will differ by country and are listed in the House Rules.

8.10   Discounts, Promotions and Offers:  If the Client benefited from a special discount, promotion or offer, the Provider may discontinue that discount, promotion or offer without notice if the Client breaches these terms and conditions or becomes past due on two or more occasions.

*Global Terms & Conditions, Iveber, Jan-17*

000759

 

Regus is happy to service Ms. Chun Wang's office needs.  To help clarify part of the terms of the office agreement:

-      Ms. Chun Wang's lease is capable of being extended at any time.

-      Space is capable of being upgraded to accommodate more staff as her company grows (based on office availability)

-      Any extension or upgrade is a quick and easy process

-      Changes in the lease will not affect the address of Vland, Inc. here at the Regus office (the address will remain the same)

I have also attached the Terms and Conditions of the Agreement and House Rules for your reference.


Thanks,



**Joan Bonagan**

Area Manager



Regus™

**3000 locations, 900 cities, 120 countries**


**1999 S Bascom Ave**

**Campbell, CA 95008**


**M (669) 278 4354**


**Connect with Regus**


  

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| **Account name:** | VLAND | Account number: | 9344073 |
| **Attn:** | Ms. Chun Wang | Invoice number: | 1012-25397 |
| | 998 crockett ave | Statement date: | 08 November 2019 |
| | Campbell, California 95008 | **Due date:** | **18 November 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 888-866-9799**
- You will be asked for your account number, which can be found at the top of this page.

---

**Center name:** **CA, Campbell - Pruneyard (HQ)**

---

| Account balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 09 October 2019 | | $ 3,056.56 |
| Payment received - 18 October 2019 | -$ 3,056.56 | |
| November 2019 invoice 1012-25397 | | $ 3,090.32 |
| **Total payment due** | | **$ 3,090.32** |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000761

# INVOICE

| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-25397 |
| | 998 crockett ave | Invoice date: | 08 November 2019 |
| | Campbell, California 95008 | **Due date:** | **18 November 2019** |
| | United States of America | | |

Center name:     CA, Campbell - Pruneyard (HQ)

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | December 2019 | $2,824.55 | $30.06 | $2,854.61 |
| Kitchen Amenities | October 2019 | $150.00 | $13.88 | $163.88 |
| Signage | December 2019 | $25.00 | $0.00 | $25.00 |
| Meeting Room | October 2019 | $39.00 | $0.00 | $39.00 |
| Telephone Calls | October 2019 | $7.81 | $0.02 | $7.83 |

| | |
|---|---|
| Total (excl. TAX) | $3,046.36 |
| TAX | $43.96 |
| **November invoice total (inc. TAX)** | **$3,090.32** |

See next page for details

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

**HQ**

000762

# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-25397 |
| | | Invoice date: | 08 November 2019 |
| | | Due date: | **18 November 2019** |

Center name: **CA, Campbell - Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (inc. TAX) |
|---|---|---|---|---|---|
| Office - Monthly Charge - Office 753 | 1 Dec 2019 | 31 Dec 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 Oct 2019 | 31 Oct 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage - Directory Board - Office 753 | 1 Dec 2019 | 31 Dec 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000763

ONE-OFF CHARGES INCURRED

| Item Description | From Date | To Date | Price | TAX | Total (inc. TAX) |
|---|---|---|---|---|---|
| Meeting Room Charge | | 4 Oct 2019 | $ 39.00 | $ 0.00 | $ 39.00 |
| Booked by: Mr. busheng Tang   Booking: 95239991 | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 2 Oct 2019 | $ 0.03 | $ 0.00 | $ 0.03 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 8 Oct 2019 | $ 0.49 | $ 0.01 | $ 0.50 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 10 Oct 2019 | $ 0.15 | $ 0.00 | $ 0.15 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 12 Oct 2019 | $ 0.11 | $ 0.00 | $ 0.11 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 2 Oct 2019 | $ 1.90 | $ 0.00 | $ 1.90 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 10 Oct 2019 | $ 0.19 | $ 0.00 | $ 0.19 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 12 Oct 2019 | $ 0.76 | $ 0.00 | $ 0.76 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 17 Oct 2019 | $ 0.57 | $ 0.00 | $ 0.57 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 20 Oct 2019 | $ 0.95 | $ 0.00 | $ 0.95 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 27 Oct 2019 | $ 2.66 | $ 0.00 | $ 2.66 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 46.81 | $ 0.02 | $ 46.83 |
| | | **Total Charges** | **$ 3,046.36** | **$ 43.96** | **$ 3,090.32** |



000764

# METHODS OF PAYMENT

Your current method of payment is:     **Direct Debit**
Bank account number ending **1489**

| You can update your payment method to Direct Debit or Credit Card via **www.MyRegus.com** |
|---|

### You may pay by Check:

Please mail to:          Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

**IMPORTANT INFORMATION:** Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

### You may pay by Bank Transfer to:

| | |
|---|---|
| Bank Name: | Bank of America, N.A. |
| Bank Address: | 901 Main St. |
| | Dallas, Texas 75002 |
| | United States of America |
| Account Name: | Regus Management Group, LLC |
| Account Number: | 488000406190 |
| BIC (Swift): | BOFAUS3N |
| Routing # 1: | 026009593 (Wire) |
| Routing # 2: | 111000025 (ACH) |

**IMPORTANT INFORMATION:**
Please provide your Invoice Number <1012-25397> as a payee reference on all payments made.

# UNDERSTANDING YOUR INVOICE

## INVOICE EXPLANATIONS

| | |
|---|---|
| Account adjustments/refunds | Any adjustments/refunds that were made to your account. |
| Account balance | The account balance shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The account statement can be found on **www.MyRegus.com**. The current invoice value is then added to produce the total payment due figure. |
| Credits | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| Invoice | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| Late payment fees | Fees levied against your account because payment was not received by the expected payment due date. |
| One-off charges incurred | Variable and/or one-off charges related to a specific invoicing period. |
| Payment due | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| Payments received | All payments received since your last invoice was raised. |

HQ

000765

## INVOICE EXPLANATIONS

| | |
|---|---|
| Recurring charges | These are fixed monthly charges, invoiced in arrear e. |
| Total payment due | The total payment due is the total current balance of monies owed on your account and includes any amounts that are overdue. |

## RECURRING CHARGES

| | |
|---|---|
| Kitchen Amenities | A Community Beverage Service which includes full use of a fully stocked kitchen complete with self-service premium coffee, a quality choice of teas, milk, sugar and sweeteners and includes the use of the cutlery, dishes, food storage and dishwasher. All maintained daily by your centre team. |
| Office | The office fee associated with your service agreement which provides a fully furnished, staffed and equipped office space. |
| Signage | Charges for company signage displayed in the lobby, parking lot, Audio visual display or outside the office location. |

## ONE-OFF CHARGES

| | |
|---|---|
| Meeting Room | Charges for use of Meeting Rooms including the room charge, extension fees, prepayments and cancellation charges. |
| Telephone Calls | Charges associated with calls made from your office phone. |



000766

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-25167 |
| | 998 crockett ave | Statement date: | 09 October 2019 |
| | Campbell, California 95008 | Due date: | **18 October 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

| Account balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 10 September 2019 | | $ 3,043.68 |
| Payment received -        20 September 2019 | -$ 3,043.68 | |
| October 2019 Invoice 1012-25167 | | $ 3,056.56 |

### Total payment due          **$ 3,056.56**

000767

# INVOICE

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-25167 |
| | 998 crockett ave | Invoice date: | 09 October 2019 |
| | Campbell, California 95008 | Due date: | **18 October 2019** |
| | United States of America | | |

**Center name:** **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | November 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | September 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Signage | November 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Postage and Franking | September 2019 | $ 1.92 | $ 0.00 | $ 1.92 |
| Telephone Calls | September 2019 | $ 11.15 | $ 0.00 | $ 11.15 |

| | |
|---|---|
| Total (excl. TAX) | $ 3,012.62 |
| TAX | $ 43.94 |
| **October invoice total (inc. TAX)** | **$ 3,056.56** |

See next page for details



# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-25167 |
| | | Invoice date: | 09 October 2019 |
| | | Due date: | **18 October 2019** |

Center name: **CA, Campbell – Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Office – Monthly Charge – Office 753 | 1 Nov 2019 | 30 Nov 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea – Office 753 | 1 Sep 2019 | 30 Sep 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage – Directory Board – Office 753 | 1 Nov 2019 | 30 Nov 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000769

# ONE-OFF CHARGES INCURRED

| Item Description | Date | To Date | Pric | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Postage | | 30 Sep 2019 | $1.92 | $0.00 | $1.92 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 12 Sep 2019 | $0.07 | $0.00 | $0.07 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 19 Sep 2019 | $0.03 | $0.00 | $0.03 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - Local Calls - Ext: 2305 | | 20 Sep 2019 | $0.03 | $0.00 | $0.03 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 15 Sep 2019 | $0.19 | $0.00 | $0.19 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 19 Sep 2019 | $5.32 | $0.00 | $5.32 |
| Booked by: Ms. Chun Wang | | | | | |
| Telephone Call - National Calls - Ext: 2305 | | 21 Sep 2019 | $5.51 | $0.00 | $5.51 |
| Booked by: Ms. Chun Wang | | | | | |
| | | **Subtotal** | **$13.07** | **$0.00** | **$13.07** |
| | | **Total Charges** | **$3,012.62** | **$43.94** | **$3,056.56** |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000770

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | VLAND | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24952 |
| | 998 crockett ave | Statement date: | 10 September 2019 |
| | Campbell, California 95008 | Due date: | **18 September 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

---

| Account balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 08 August 2019 | | $ 3,044.09 |
| Payment received –     21 August 2019 | -$ 3,044.09 | |

| | | |
|---|---|---|
| September 2019 Invoice 1012-24952 | | $ 3,043.68 |
| **Total payment due** | | **$ 3,043.68** |



Center Address: 1999 S. Bascom Avenue • Suite 700 • Campbell • CA • 95008 • USA

000771

# INVOICE

| Account name: | **VLAND** | | Account number: | 9344073 |
|---|---|---|---|---|
| Attn: | Ms. Chun Wang | | Invoice number: | 1012-24952 |
| | 998 crockett ave | | Invoice date: | 10 September 2019 |
| | Campbell, California 95008 | | Due date: | **18 September 2019** |
| | United States of America | | | |

Center name: **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | October 2019 | $2,824.55 | $30.06 | $2,854.61 |
| Kitchen Amenities | August 2019 | $150.00 | $13.88 | $163.88 |
| Signage | October 2019 | $25.00 | $0.00 | $25.00 |
| Telephone Calls | August 2019 | $0.19 | $0.00 | $0.19 |

| | |
|---|---|
| Total (excl. TAX) | $2,999.74 |
| TAX | $43.94 |
| **September invoice total (inc. TAX)** | **$3,043.68** |

See next page for details

Center Address: 1999 S. Bascom Avenue. · Suite 700 · Campbell· CA · 95008 · USA

# HQ

000772

# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24952 |
| | | Invoice date: | 10 September 2019 |
| | | Due date: | **18 September 2019** |

**Center name:** CA, Campbell - Pruneyard (HQ)

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Office - Monthly Charge - Office 753 | 1 Oct 2019 | 31 Oct 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 Aug 2019 | 31 Aug 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage - Directory Board - Office 753 | 1 Oct 2019 | 31 Oct 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

## ONE-OFF CHARGES INCURRED

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Telephone Call - National Calls - Ext: 2305 | | 13 Aug 2019 | $ 0.19 | $ 0.00 | $ 0.19 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 0.19 | $ 0.00 | $ 0.19 |
| | | Total Charges | $ 2,999.74 | $ 43.94 | $ 3,043.68 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

# HQ

000773

# METHODS OF PAYMENT

Your current method of payment is: **Direct Debit**
Bank account number ending **1489**

You can update your payment method to Direct Debit or Credit Card via **www.MyRegus.com**

## You may pay by Check:

Please mail to:
Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

## You may pay by Bank Transfer to:

| | |
|---|---|
| Bank Name: | Bank of America, N.A. |
| Bank Address: | 901 Main St.<br>Dallas, Texas 75002<br>United States of America |
| Account Name: | Regus Management Group, LLC |
| Account Number: | 488000406190 |
| BIC (Swift): | BOFAUS3N |
| Routing # 1: | 026009593 (Wire) |
| Routing # 2: | 111000025 (ACH) |

IMPORTANT INFORMATION:
Please provide your Invoice Number <1012-24952> as a payee reference on all payments made.

# UNDERSTANDING YOUR INVOICE

## INVOICE EXPLANATIONS

| | |
|---|---|
| Account adjustments/refunds | Any adjustments/refunds that were made to your account. |
| Account balance | The account balance shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The account statement can be found on **www.MyRegus.com**. The current invoice value is then added to produce the total payment due figure. |
| Credits | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| Invoice | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| Late payment fees | Fees levied against your account because payment was not received by the expected payment due date. |
| One-off charges incurred | Variable and/or one-off charges related to a specific invoicing period. |
| Payment due | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| Payments received | All payments received since your last invoice was raised. |

000774

## INVOICE EXPLANATIONS

Recurring charges        These are fixed monthly charges, invoiced in a          e.

Total payment due        The total payment due is the total current balance of monies owed on your account and includes any amounts that are overdue.


## RECURRING CHARGES

Kitchen Amenities        A Community Beverage Service which includes full use of a fully stocked kitchen complete with self-service premium coffee, a quality choice of teas, milk, sugar and sweeteners and includes the use of the cutlery, dishes, food storage and dishwasher. All maintained daily by your centre team.

Office        The office fee associated with your service agreement which provides a fully furnished, staffed and equipped office space.

Signage        Charges for company signage displayed in the lobby, parking lot, Audio visual display or outside the office location.


## ONE-OFF CHARGES

Telephone Calls        Charges associated with calls made from your office phone.



000775

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | VLAND | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24738 |
| | 998 crockett ave | Statement date: | 08 August 2019 |
| | Campbell, California 95008 | Due date: | **18 August 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

| Center name: | **CA, Campbell - Pruneyard (HQ)** |
|---|---|

| Account balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 09 July 2019 | | $ 3,043.49 |
| Payment received –    19 July 2019 | -$ 3,043.49 | |

| | | |
|---|---|---|
| August 2019 Invoice 1012-24738 | | $ 3,044.09 |
| **Total payment due** | | **$ 3,044.09** |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000776

# INVOICE

| | |
|---|---|
| Account name: | **VLAND** |
| Attn: | Ms. Chun Wang |
| | 998 crockett ave |
| | Campbell, California 95008 |
| | United States of America |

| | |
|---|---|
| Account number: | 9344073 |
| Invoice number: | 1012-24738 |
| Invoice date: | 08 August 2019 |
| Due date: | **18 August 2019** |

---

Center name:     **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | September 2019 | $2,824.55 | $30.06 | $2,854.61 |
| Kitchen Amenities | July 2019 | $150.00 | $13.88 | $163.88 |
| Signage | September 2019 | $25.00 | $0.00 | $25.00 |
| Postage and Franking | July 2019 | $0.60 | $0.00 | $0.60 |

| | |
|---|---|
| Total (excl. TAX) | $3,000.15 |
| TAX | $43.94 |
| **August invoice total (inc. TAX)** | **$3,044.09** |

See next page for details

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

# HQ

000777

# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24738 |
| | | Invoice date: | 08 August 2019 |
| | | Due date: | **18 August 2019** |

Center name: **CA, Campbell – Pruneyard (HQ)**

### RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Office – Monthly Charge – Office 753 | 1 Sep 2019 | 30 Sep 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea – Office 753 | 1 Jul 2019 | 31 Jul 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage – Directory Board – Office 753 | 1 Sep 2019 | 30 Sep 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

### ONE-OFF CHARGES INCURRED

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Postage | | 31 Jul 2019 | $ 0.60 | $ 0.00 | $ 0.60 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 0.60 | $ 0.00 | $ 0.60 |
| | | Total Charges | $ 3,000.15 | $ 43.94 | $ 3,044.09 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000778

# METHODS OF PAYMENT

Your current method of payment is:   **Direct Debit**
Bank account number ending **1489**

You can update your payment method to Direct Debit or Credit Card via **www.MyRegus.com**

**You may pay by Check:**

Please mail to:     Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

**You may pay by Bank Transfer to:**

| | |
|---|---|
| Bank Name: | Bank of America, N.A. |
| Bank Address: | 901 Main St.
Dallas, Texas 75002
United States of America |
| Account Name: | Regus Management Group, LLC |
| Account Number: | 488000406190 |
| BIC (Swift): | BOFAUS3N |
| Routing # 1: | 026009593 (Wire) |
| Routing # 2: | 111000025 (ACH) |

IMPORTANT INFORMATION:
Please provide your Invoice Number <1012-24738> as a payee reference on all payments made.

# UNDERSTANDING YOUR INVOICE

## INVOICE EXPLANATIONS

| | |
|---|---|
| Account adjustments/refunds | Any adjustments/refunds that were made to your account. |
| Account balance | The account balance shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The account statement can be found on **www.MyRegus.com**. The current invoice value is then added to produce the total payment due figure. |
| Credits | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| Invoice | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| Late payment fees | Fees levied against your account because payment was not received by the expected payment due date. |
| One-off charges incurred | Variable and/or one-off charges related to a specific invoicing period. |
| Payment due | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| Payments received | All payments received since your last invoice was raised. |

**HQ**

000779

## INVOICE EXPLANATIONS

Recurring charges | These are fixed monthly charges, invoiced in a⸻e.

Total payment due | The total payment due is the total current balance of monies owed on your account and includes any amounts that are overdue.

## RECURRING CHARGES

Kitchen Amenities | A Community Beverage Service which includes full use of a fully stocked kitchen complete with self-service premium coffee, a quality choice of teas, milk, sugar and sweeteners and includes the use of the cutlery, dishes, food storage and dishwasher. All maintained daily by your centre team.

Office | The office fee associated with your service agreement which provides a fully furnished, staffed and equipped office space.

Signage | Charges for company signage displayed in the lobby, parking lot, Audio visual display or outside the office location.

## ONE-OFF CHARGES

Postage and Franking | The total amount of postage and franking charges for routine mail services.



000780

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24538 |
| | 998 crockett ave | Statement date: | 09 July 2019 |
| | Campbell, California 95008 | Due date: | **18 July 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on  **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

| Account Balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 08 June 2019 | | $ 3,043.49 |
| Payment received –    **25 June 2019** | -$ 3,043.49 | |
| July 2019 invoice 1012-24538 | | $ 3,043.49 |
| **Total payment due** | | **$ 3,043.49** |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell • CA • 95008 • USA



000781

# INVOICE

| Account name: | **VLAND** | Account number: | 9344073 |
|---|---|---|---|
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24538 |
| | 998 crockett ave | Invoice date: | 09 July 2019 |
| | Campbell, California 95008 | Due date: | **18 July 2019** |
| | United States of America | | |

Center name: **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | August 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | June 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Signage | August 2019 | $ 25.00 | $ 0.00 | $ 25.00 |

| | |
|---|---|
| Total (excl. TAX) | $ 2,999.55 |
| TAX | $ 43.94 |
| **July invoice total (inc. TAX)** | **$ 3,043.49** |

See next page for details

**HQ**

000782

# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24538 |
| | | Invoice date: | 09 July 2019 |
| | | Due date: | **18 July 2019** |

Center name: **CA, Campbell - Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (inc. TAX) |
|---|---|---|---|---|---|
| Office - Monthly Charge - Office 753 | 1 Aug 2019 | 31 Aug 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 Jun 2019 | 30 Jun 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage - Directory Board - Office 753 | 1 Aug 2019 | 31 Aug 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

**Total Charges**   **$ 2,999.55**   **$ 43.94**   **$ 3,043.49**

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000783

# METHODS OF PAYMENT

Your current method of payment is:  **Direct Debit**
Bank account number ending **1489**

| You can update your payment method to Direct Debit or Credit Card via **www.MyRegus.com** |
| --- |

## You may pay by Check:

Please mail to:

Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

## You may pay by Bank Transfer to:

| | |
| --- | --- |
| Bank Name: | Bank of America, N.A. |
| Bank Address: | 901 Main St. |
| | Dallas, Texas 75002 |
| | United States of America |
| Account Name: | Regus Management Group, LLC |
| Account Number: | 488000406190 |
| BIC (Swift): | BOFAUS3N |
| Routing # 1: | 026009593 (Wire) |
| Routing # 2: | 111000025 (ACH) |

IMPORTANT INFORMATION:
Please provide your Invoice Number <1012-24538> as a payee reference on all payments made.

# UNDERSTANDING YOUR INVOICE

## INVOICE EXPLANATIONS

| | |
| --- | --- |
| Account adjustments/refunds | Any adjustments/refunds that were made to your account. |
| Account balance | The account balance shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The account statement can be found on **www.MyRegus.com**. The current invoice value is then added to produce the total payment due figure. |
| Credits | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| Invoice | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| Late payment fees | Fees levied against your account because payment was not received by the expected payment due date. |
| One-off charges incurred | Variable and/or one-off charges related to a specific invoicing period. |
| Payment due | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| Payments received | All payments received since your last invoice was raised. |
| Recurring charges | These are fixed monthly charges, invoiced in advance. |

HQ

000784

## INVOICE EXPLANATIONS

**Total payment due**  The total payment due is the total current ba        of monies owed on your account and includes any amounts that are overdue.

## RECURRING CHARGES

**Kitchen Amenities**  A Community Beverage Service which includes full use of a fully stocked kitchen complete with self-service premium coffee, a quality choice of teas, milk, sugar and sweeteners and includes the use of the cutlery, dishes, food storage and dishwasher. All maintained daily by your centre team.

**Office**  The office fee associated with your service agreement which provides a fully furnished, staffed and equipped office space.

**Signage**  Charges for company signage displayed in the lobby, parking lot, Audio visual display or outside the office location.



000795

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24344 |
| | 998 crockett ave. | Statement date: | 08 June 2019 |
| | Campbell, California 95008 | Due date: | **18 June 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

| Account Balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 08 May 2019 | | $ 6,091.47 |
| Payment received – 20 March 2019 | -$ 3,043.49 | |
| Payment received – 22 May 2019 | -$ 3,047.98 | |

| | | |
|---|---|---|
| June 2019 Invoice 1012-24344 | | $ 3,043.49 |

**Total payment due**     **$ 3,043.49**



Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000786

# INVOICE

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24344 |
| | 998 crockett ave | Invoice date: | 08 June 2019 |
| | Campbell, California 95008 | Due date: | **18 June 2019** |
| | United States of America | | |

**Center name:    CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | July 2019 | $2,824.55 | $30.06 | $2,854.61 |
| Kitchen Amenities | May 2019 | $150.00 | $13.88 | $163.88 |
| Signage | July 2019 | $25.00 | $0.00 | $25.00 |

| | |
|---|---|
| Total (excl. TAX) | $2,999.55 |
| TAX | $43.94 |
| **June invoice total (inc. TAX)** | **$3,043.49** |

See next page for details

**HQ**

enter Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000787

YOUR INVOICE DETAILS

| Account name: | **VLAND** | Account number: | 9344073 |
|---|---|---|---|
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24344 |
| | | Invoice date: | 08 June 2019 |
| | | Due date: | **18 June 2019** |

**Center name:** **CA, Campbell - Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Office - Monthly Charge - Office 753 | 1 Jul 2019 | 31 Jul 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 May 2019 | 31 May 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage - Directory Board - Office 753 | 1 Jul 2019 | 31 Jul 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

**Total Charges**    **$ 2,999.55**    **$ 43.94**    **$ 3,043.49**

enter Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell • CA • 95008 • USA



000789

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24151 |
| | 998 crockett ave | Statement date: | 08 May 2019 |
| | Campbell, California 95008 | Due date: | **18 May 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

| Account Balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 09 April 2019 | | $ 6,086.98 |
| Payment received – **23 April 2019** | -$ 3,043.49 | |
| May 2019 invoice 1012-24151 | | $ 3,047.98 |
| **Total payment due** | | **$ 6,091.47** |



Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000789

# INVOICE

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24151 |
| | 998 crockett ave | Invoice date: | 08 May 2019 |
| | Campbell, California 95008 | Due date: | **18 May 2019** |
| | United States of America | | |

Center name:  **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | June 2019 | $ 2,824.55 | $ 33.05 | $ 2,857.60 |
| Kitchen Amenities | April 2019 | $ 150.00 | $ 15.38 | $ 165.38 |
| Signage | June 2019 | $ 25.00 | $ 0.00 | $ 25.00 |

|  |  |
|---|---|
| Total (excl. TAX) | **$ 2,999.55** |
| TAX | **$ 48.43** |
| **May invoice total (inc. TAX)** | **$ 3,047.98** |

See next page for details

# YOUR INVOICE DETAILS

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-24151 |
| | | Invoice date: | 08 May 2019 |
| | | Due date: | **18 May 2019** |

**Center name:** **CA, Campbell - Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (inc. TAX) |
|---|---|---|---|---|---|
| Office – Monthly Charge - Office 753 | 1 Jun 2019 | 30 Jun 2019 | $ 2,824.55 | $ 33.05 | $ 2,857.60 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 Apr 2019 | 30 Apr 2019 | $ 150.00 | $ 15.38 | $ 165.38 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage – Directory Board – Office 753 | 1 Jun 2019 | 30 Jun 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 48.43 | $ 3,047.98 |

**Total Charges**    **$ 2,999.55**    **$ 48.43**    **$ 3,047.98**

enter Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA



000791

# METHODS OF PAYMENT

Your current method of payment is: **Direct Debit**
Bank account number ending **1489**

| You can update your payment method to Direct Debit or Credit Card via **www.MyRegus.com** |
|---|

### You may pay by Check:

Please mail to:

Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

### You may pay by Bank Transfer to:

Bank Name: Bank of America, N.A.

Bank Address: 901 Main St.
Dallas, Texas 75002
United States of America

Account Name: Regus Management Group, LLC

Account Number: 488000406190

BIC (Swift): BOFAUS3N

Routing # 1: 026009593 (Wire)

Routing # 2: 111000025 (ACH)

IMPORTANT INFORMATION:
Please provide your Invoice Number <1012-24151> as a payee reference on all payments made.

# UNDERSTANDING YOUR INVOICE

### INVOICE EXPLANATIONS

| | |
|---|---|
| Account adjustments/refunds | Any adjustments/refunds that were made to your account. |
| Account balance | The account balance shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The account statement can be found on **www.MyRegus.com**. The current invoice value is then added to produce the total payment due figure. |
| Credits | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| Invoice | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| Late payment fees | Fees levied against your account because payment was not received by the expected payment due date. |
| One-off charges incurred | Variable and/or one-off charges related to a specific invoicing period. |
| Payment due | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| Payments received | All payments received since your last invoice was raised. |
| Recurring charges | These are fixed monthly charges, invoiced in advance. |



000792

# STATEMENT OF ACCOUNT

| | | | |
|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-23956 |
| | 998 crockett ave | Statement date: | 09 April 2019 |
| | Campbell, California 95008 | Due date: | **18 April 2019** |
| | United States of America | | |

---

**USEFUL INFORMATION**

- You can update your details and check the current status of your account by logging into **www.MyRegus.com**
- If you have any questions about your statement or invoice, please contact your helpdesk via email: **Account.Helpdesk@regus.com** or call on **+1 8888669799**
- You will be asked for your account number, which can be found at the top of this page.

---

Center name: **CA, Campbell - Pruneyard (HQ)**

| Account Balance | Payments | Amount |
|---|---|---|
| Outstanding balance on 08 March 2019 | | $ 3,043.49 |
| April 2019 Invoice 1012-23956 | | $ 3,043.49 |
| **Total payment due** | | **$ 6,086.98** |



Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000793

# INVOICE

| | | | | |
|---|---|---|---|---|
| Account name: | **VLAND** | Account number: | 9344073 | |
| Attn: | Ms. Chun Wang | Invoice number: | 1012-23956 | |
| | | Invoice date: | 09 April 2019 | |
| | | Due date: | **18 April 2019** | |

Center name:   **CA, Campbell - Pruneyard (HQ)**

| Description of Charges | Month | Price | TAX | Total |
|---|---|---|---|---|
| Office | May 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | March 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Signage | May 2019 | $ 25.00 | $ 0.00 | $ 25.00 |

| | |
|---|---|
| Total (excl. TAX) | $ 2,999.55 |
| TAX | $ 43.94 |
| **April invoice total (inc. TAX)** | **$ 3,043.49** |

See next page for details

**HQ**

000704

| Account name: | **VLAND** | Account number: | 9344073 |
|---|---|---|---|
| Attn: | Ms. Chun Wang | Invoice number: | 1012-23956 |
| | | Invoice date: | 09 April 2019 |
| | | Due date: | **18 April 2019** |

**Center name:  CA, Campbell - Pruneyard (HQ)**

## RECURRING CHARGES

| Item Description | From Date | To Date | Price | TAX | Total (Inc. TAX) |
|---|---|---|---|---|---|
| Office - Monthly Charge - Office 753 | 1 May 2019 | 31 May 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Booked by: Ms. Chun Wang | | | | | |
| Unlimited Coffee/Tea - Office 753 | 1 Mar 2019 | 31 Mar 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Booked by: Ms. Chun Wang | | | | | |
| Signage - Directory Board - Office 753 | 1 May 2019 | 31 May 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Booked by: Ms. Chun Wang | | | | | |
| | | Subtotal | $ 2,999.55 | $ 43.94 | $ 3,043.49 |

**Total Charges    $ 2,999.55    $ 43.94    $ 3,043.49**



enter Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000795



# Account Statement

| | |
|---|---|
| Statement Date: | 08 March 2019 |
| Account Number: | 9344073 |
| Name Of Account: | VLAND |
| Center Name: | CA, Campbell - Pruneyard (HQ) |
| Payment Due: | Due Immediately |

**Amount**

| | |
|---|---|
| Outstanding Balance at 08 February 2019 | $3,234.49 |
| Payments Received | -$3,234.49 |
| March Invoice 1012-23763 | $3,043.49 |

| | | |
|---|---|---|
| Total Payment Due | (Quote Invoice 1012-23763) | $3,043.49 |

---

**IMPORTANT INFORMATION:**

- Recent payments may not yet be reflected in the above statement balance, please log into your account for the most up to date status.
- Please note that late payment fees will be applied to your account if payment is not received promptly.
- You can update your details by logging into your account.
- If you receive more than one invoice please pay them separately so that we can ensure payment is properly applied to your account.

If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.

Log into your account and simply go to the HELP section.
Or call us directly:                      888-866-9799

**VLAND**

Attention Of: Ms. Chun Wang

998 crockett ave
Campbell, California 95008
United States of America

| | |
|---|---|
| Invoice Date: | 08 March 2019 |
| Account Number: | 9344073 |
| Invoice Number: | 1012-23763 |
| Payment Due: | Due Immediately |

## Invoice

### Center Name: CA, Campbell - Pruneyard (HQ)

| Description of Charges | From Date | To Date | Qty | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
|---|---|---|---|---|---|---|
| **Standing Charges** | | | | | | |
| Office | 1 Apr 2019 | 30 Apr 2019 | 1.0000 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | 1 Feb 2019 | 28 Feb 2019 | 5.0000 | $ 150.00 | $ 13.88 | $ 163.88 |
| Signage | 1 Apr 2019 | 30 Apr 2019 | 1.0000 | $ 25.00 | $ 0.00 | $ 25.00 |
| **Total Standing Charges** | | | | | | **$ 3,043.49** |
| **Total Charges** | | | | | | **$ 3,043.49** |

| | |
|---|---|
| Total (exc. TAX) | $ 2,999.55 |
| TAX | $ 43.94 |
| Total (inc. TAX) | $ 3,043.49 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell • CA • 95008 • USA

000797

| Invoice Number: | 1012-23763 |
|---|---|
| Invoice Date: | 08 March 2019 |

## Invoice Detail

### Center Name: CA, Campbell - Pruneyard (HQ)

| Standing Charges | | | | |
|---|---|---|---|---|
| Item Description | Date | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
| **Office** | | | | |
| Office - Monthly Charge - Office 753 | Apr 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| **Kitchen Amenities** | | | | |
| Unlimited Coffee/Tea - Office 753 | Feb 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 150.00 | $ 13.88 | $ 163.88 |
| **Signage** | | | | |
| Signage - Directory Board - Office 753 | Apr 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 25.00 | $ 0.00 | $ 25.00 |

| Total Charges | $ 2,999.55 | $ 43.94 | $ 3,043.49 |
|---|---|---|---|

000798



# Account Statement

| | |
|---|---|
| Statement Date: | 08 February 2019 |
| Account Number: | 9344073 |
| Name Of Account: | VLAND |
| Center Name: | CA, Campbell - Pruneyard (HQ) |
| Payment Due: | Due Immediately |

| | Amount |
|---|---|
| Outstanding Balance at 08 January 2019 | $2,997.35 |
| Payments Received | -$2,997.35 |
| February Invoice 1012-23566 | $3,234.49 |

| | |
|---|---|
| Total Payment Due    (Quote Invoice 1012-23566) | $3,234.49 |

## IMPORTANT INFORMATION:

- Recent payments may not yet be reflected in the above statement balance, please log into your account for the most up to date status.

- Please note that late payment fees will be applied to your account if payment is not received promptly.

- You can update your details by logging into your account.

- If you receive more than one invoice please pay them separately so that we can ensure payment is properly applied to your account.

If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.

Log into your account and simply go to the HELP section.
Or call us directly:                                    888-866-9799



**VLAND**

Attention Of: Ms. Chun Wang

998 crockett ave
Campbell, California 95008
United States of America

| | |
|---|---|
| Invoice Date: | 08 February 2019 |
| Account Number: | 9344073 |
| Invoice Number: | 1012-23566 |
| Payment Due: | Due Immediately |

## Invoice

### Center Name: CA, Campbell - Pruneyard (HQ)

| Description of Charges | From Date | To Date | Qty | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
|---|---|---|---|---|---|---|
| **Standing Charges** | | | | | | |
| Office | 1 Mar 2019 | 31 Mar 2019 | 1.0000 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | 1 Jan 2019 | 31 Jan 2019 | 5.0000 | $ 150.00 | $ 13.88 | $ 163.88 |
| **Total Standing Charges** | | | | | | **$ 3,018.49** |
| **One-Off Charges Incurred** | | | | | | |
| Signage | 5 Dec 2018 | 31 Mar 2019 | 4.8710 | $ 195.77 | $ 0.00 | $ 195.77 |
| Telephone Calls | 8 Jan 2019 | 8 Jan 2019 | 1.0000 | $ 19.65 | $ 0.59 | $ 20.24 |
| **Total One-Off Charges** | | | | | | **$ 216.01** |
| **Total Charges** | | | | | | **$ 3,234.49** |

| | |
|---|---|
| Total (exc. TAX) | $ 3,189.97 |
| TAX | $ 44.52 |
| Total (inc. TAX) | $ 3,234.49 |

| Invoice Number: | 1012-23566 |
|---|---|
| Invoice Date: | 08 February 2019 |

## Invoice Detail

### Center Name: CA, Campbell - Pruneyard (HQ)

| Standing Charges | | | | |
|---|---|---|---|---|
| Item Description | Date | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
| **Office** | | | | |
| Office - Monthly Charge - Office 753 | Mar 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| **Kitchen Amenities** | | | | |
| Unlimited Coffee/Tea - Office 753 | Jan 2019 | $ 150.00 | $ 13.88 | $ 163.88 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 150.00 | $ 13.88 | $ 163.88 |

000801

| One-Off Charges Incurred | | | | |
|---|---|---|---|---|
| Item Description | Date | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
| **Signage** | | | | |
| Signage - Directory Board - Office 753 | 5 Dec 2018 | $ 21.77 | $ 0.00 | $ 21.77 |
| Sold To: Ms. Chun Wang | | | | |
| Signage - Directory Board - Office 753 | 1 Jan 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Sold To: Ms. Chun Wang | | | | |
| Signage - Directory Board - Office 753 | 1 Feb 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Sold To: Ms. Chun Wang | | | | |
| Signage - Directory Board - Office 753 | 1 Mar 2019 | $ 25.00 | $ 0.00 | $ 25.00 |
| Sold To: Ms. Chun Wang | | | | |
| Signage Set Up Fee | 5 Dec 2018 | $ 99.00 | $ 0.00 | $ 99.00 |
| Sold To: Ms. Chun Wang | | | | |
| (Total) | | $ 195.77 | $ 0.00 | $ 195.77 |
| **Telephone Calls** | | | | |
| Telephone Call - Local Calls - telephone charges for early move in. phone calls were made between dates nov16th-nov 30th | 8 Jan 2019 | $ 19.65 | $ 0.59 | $ 20.24 |
| (Total) | | $ 19.65 | $ 0.59 | $ 20.24 |

| Total Charges | | | $ 3,189.97 | $ 44.52 | $ 3,234.49 |
|---|---|---|---|---|---|

000802



**Ways to pay your Invoice**

| | |
|---|---|
| **By Direct Debit:** | The best way to pay your invoice because it is simple and convenient for you. Please log into your account, navigate to the Accounts section and set up a Direct Debit in Payment Methods |

| | |
|---|---|
| **By Credit Card:** | Please log into your account, navigate to the Accounts section and add your card details in Payment Methods |

**By Check:**

Please mail to:      Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

**IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.**

**By Bank Transfer:**

| | |
|---|---|
| **Bank Name:** | Bank of America, N.A. |
| **Bank Address:** | 901 Main St. |
| | Dallas, Texas 75002 |
| | United States of America |
| **Account Name:** | Regus Management Group, LLC |
| **Account Number:** | 488000406190 |
| **BIC (Swift):** | BOFAUS3N |
| **Routing # 1:** | 026009593 (Wire) |
| **Routing # 2:** | 111000025 (ACH) |

**IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments made.**

**If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.**

Log into your account and simply go to the HELP section.
Or call us directly:      888-866-9799



# Account Statement

| Statement Date: | 08 January 2019 |
|---|---|
| Account Number: | 9344073 |
| Name Of Account: | VLAND |
| Center Name: | CA, Campbell - Pruneyard (HQ) |
| Payment Due: | Due Immediately |

| | Amount |
|---|---|
| Outstanding Balance at 08 December 2018 | $2,854.61 |
| Payments Received | -$2,854.61 |
| January Invoice 1012-23364 | $2,997.35 |
| **Total Payment Due - (Quote Invoice 1012-23364)** | **$2,997.35** |

## IMPORTANT INFORMATION:

- Recent payments may not yet be reflected in the above statement balance, please log into your account for the most up to date status.
- Please note that late payment fees will be applied to your account if payment is not received promptly.
- You can update your details by logging into your account.
- If you receive more than one invoice please pay them separately so that we can ensure payment is properly applied to your account.

If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.

Log into your account and simply go to the HELP section.
Or call us directly:                    888-866-9799

000804



**VLAND**

Attention Of: Ms. Chun Wang

998 crockett ave
Campbell, California 95008
United States of America

| Invoice Date: | 08 January 2019 |
|---|---|
| Account Number: | 9344073 |
| Invoice Number: | 1012-23364 |
| Payment Due: | Due Immediately |

## Invoice

### Center Name: CA, Campbell - Pruneyard (HQ)

| Description of Charges | From Date | To Date | Qty | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
|---|---|---|---|---|---|---|
| **Standing Charges** | | | | | | |
| Office | 1 Feb 2019 | 28 Feb 2019 | 1.0000 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Kitchen Amenities | 5 Dec 2018 | 31 Dec 2018 | 4.3548 | $ 130.65 | $ 12.09 | $ 142.74 |
| **Total Standing Charges** | | | | | | **$ 2,997.35** |
| **Total Charges** | | | | | | **$ 2,997.35** |

| | |
|---|---|
| Total (exc. TAX) | $ 2,955.20 |
| TAX | $ 42.15 |
| Total (inc. TAX) | $ 2,997.35 |

Center Address: 1999 S. Bascom Avenue. • Suite 700 • Campbell• CA • 95008 • USA

000805

| Invoice Number: | 1012-23364 |
|---|---|
| Invoice Date: | 08 January 2019 |

## Invoice Detail

### Center Name: CA, Campbell - Pruneyard (HQ)

| Standing Charges | | | | |
|---|---|---|---|---|
| Item Description | Date | Price (exc. TAX) | TAX Amount | Total (inc. TAX) |
| **Office** | | | | |
| Office - Monthly Charge - Office 753 | Feb 2019 | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 2,824.55 | $ 30.06 | $ 2,854.61 |
| **Kitchen Amenities** | | | | |
| Unlimited Coffee/Tea - Office 753 | Dec 2018 | $ 130.65 | $ 12.09 | $ 142.74 |
| Sold To: Ms. Chun Wang | | | | |
| Total | | $ 130.65 | $ 12.09 | $ 142.74 |

| Total Charges | | $ 2,955.20 | $ 42.15 | $ 2,997.35 |
|---|---|---|---|---|



### Ways to pay your Invoice

**By Direct Debit:**

The best way to pay your invoice because it is simple and convenient for you. Please log into your account, navigate to the Accounts section and set up a Direct Debit in Payment Methods

**By Credit Card:**

Please log into your account, navigate to the Accounts section and add your card details in Payment Methods

**By Check:**

Please mail to:

Regus Management Group, LLC
P.O. Box 842456
Dallas, Texas 75284-2456
United States of America

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments and that you allow for a minimum of 7 days mail time prior to your due date.

**By Bank Transfer:**

| | |
|---|---|
| Bank Name: | Bank of America, N.A. |
| Bank Address: | 901 Main St.<br>Dallas, Texas 75002<br>United States of America |
| Account Name: | Regus Management Group, LLC |
| Account Number: | 488000406190 |
| BIC (Swift): | BOFAUS3N |
| Routing # 1: | 026009593 (Wire) |
| Routing # 2: | 111000025 (ACH) |

IMPORTANT INFORMATION: Please provide your Invoice Number as a payee reference on all payments made.

If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.

Log into your account and simply go to the HELP section.
Or call us directly:                                           888-866-9799



## Understanding your Invoice

| Invoice Terms | |
|---|---|
| **Account adjustments/refunds:** | Any adjustments/refunds that were made to your account. |
| **Account Statement:** | The account statement shows recent activity on your account in summary format. It shows the balance at the end of the previous summary date and any payments or adjustments that have been received since the last statement. The current invoice value is then added to produce the Total Payment Due figure. |
| **Credits:** | Credits that were issued against a particular charge for which you have been invoiced for in a previous period. |
| **Invoice:** | The invoice shows a summary of all charges (recurring and one-off) related to the invoice period. |
| **Late payment fees:** | Fees levied against your account because payment was not received by the expected payment due date. Please speak with your center team or refer to the House Rules for the date by which your account becomes overdue. |
| **One-Off Charges Incurred:** | Variable and/or one-off charges related to a specific invoicing period. |
| **Payment Due:** | The latest date on which the invoice needs to be paid. Please note that any outstanding balances shown in the account summary will be due for immediate payment. |
| **Payments Received:** | All payments received since your last invoice was raised. |
| **Standing Charges:** | These are fixed monthly charges, invoiced in advance. |
| **Total Payment Due:** | The total payment due is the total current balance of monies owed on your account and includes any amounts that are overdue. |

| Standing Charges | |
|---|---|
| **Kitchen Amenities** | A Community Beverage Service which includes full use of a fully stocked kitchen complete with self-service premium coffee, a quality choice of teas, milk, sugar and sweeteners and includes the use of the cutlery, dishes, food storage and dishwasher. All maintained daily by your centre team. |
| **Office** | The office fee associated with your service agreement which provides a fully furnished, staffed and equipped office space. |

If you have any questions, contact your Account Helpdesk: Account.Helpdesk@regus.com. We are here to help.

000808



**MT 律師事務所**

**MT LAW LLC**

Attorneys & Counselors at Law

2901 Tasman Drive, Suite 218
Santa Clara, CA 95054
Tel: (800) 345-1899  Fax: (888) 345-1388

**RETAINER AGREEMENT**
法律顾问聘用协议

**CLIENT: VLAND INC.**

客户：

This Retainer Agreement (the "Agreement") is entered into between Vland Inc. (the "Client")
and MT LAW PC at 2901 Tasman Drive, Suite 218, Santa Clara, CA 95054 and its affiliates (the
"Law Firm") on the 8th day of January, 2019.  The Client hereby retains and employs the Law
Firm as the attorneys in the legal matters with regard to its day-to-day operation in State of
California.  The Client has been informed of the steps that have to be taken to process this matter
and agrees to pay the Law Firm legal fee in the following manner:

Vland Inc.（以下称"客户"）与位于 2901 Tasman Drive, Suite 218, Santa Clara, CA 95054 的
MT 律师事务所以及其关联律师事务所（以下称"律师事务所"），于 2019 年 1 月 8 日签署
本聘用协议。客户特此聘用律师事务所作为其在加州的常年法律顾问，处理客户日常运营
中的法律问题。客户已被告知相关程序，并同意根据以下的方式支付律师费：

1. **SCOPE OF SERVICE（服务范围）**：The Law Firm shall provide the following legal
   services (the "Engagement Matter") to the Client upon receiving a fully executed Agreement
   and the first part Legal Fee deposited by the Client as required in this Agreement:

   当本聘用协议生效且律师事务所收到客户支付的法律顾问首付款后，律师事务所应按
   照客户需求，向客户提供以下法律服务（以下称"约定事项"）：

A. **Business Entity Maintenance 公司的日常运营**

   1) Business entity selection and formation with _____ CA _____ State Corporate
      Division (Optional);
      根据各项法律和程序要求设立公司，在州政府公司部门注册（可选）；

   2) Serve as or retain registered agent for the Company;
      根据法律要求，担任或者选择公司的注册代理

3)   Advise on equity Structure of the Company (including but not limited to): Issuance of LLC Membership Interest, Common Shares, Preferred Shares, Employee Incentive Option Equity, Convertible Note, Exercisable Stock Options and others

对公司的资本构成和股权结构设置提供法律意见，包括但不限于：发行有限责任公司股权、股份有限公司股份、如何设置普通股、优先股、员工激励股、可转换债券、可行使期权等

4)   Apply for Special Business Permits (if applicable)

申请特许经营证（如需要）

5)   Legal Advice on Compliance with Corporate Formalities and Preparation of Documents Required for Compliance (e.g. Shareholder or Director's Meeting Notice, Meeting Minutes, Resolution by the Board or Shareholder, Unanimous Written Consent by the Shareholders or Directors

对公司合规、董事职责、公司管理程序、公司决议等日常运营事务提供法律建议并起草相关文件

6)   Preparation of Company Annual Report

为公司在州政府部门提交年检报告。

**B.   Real Estate 不动产以及租约**

1)   Negotiate the Terms of Commercial Lease on behalf of Client

代表客户协商商业租约的条款

2)   Review and Comment on the Final Terms of the Written Commercial Lease

审阅并就书面商业合约的最终条款给予意见

3)   Legal Advice regarding Landlord/Tenant Obligations and Responsibilities

提供有关承租人/出租人义务和责任的法律意见

**C.   Tax Return 纳税申报**

1)   Corporate Tax Return

公司纳税申报

2)   Quick Book Training and quarterly account review

Quick Book 培训和季度账户检查

**D.   Employment Law 劳工法**

1)   Employment Offer Letter

起草录用函

000810

2)   Employment Agreement (at will or contractual employment)

起草员工雇佣协议或合同工协议

3)   Employee Confidentiality Agreement

起草保密协议

4)   Non-Solicitation Agreement; Trade Secret Protection as alternative to Non-Compete Agreement (if appropriate)

起草竞业避让协议，商业秘密保护协议等

5)   Legal Advice on Procedures for Disciplinary Actions or Employee Termination

为公司雇佣和员工事宜提供法律意见，包括但不限于雇佣、解聘、劳动争议（非诉讼）

6)   Customized Performance Review Templates, Warning Letters Drafted to Employees for Poor Performance and Termination Letters

根据公司具体需求起草雇员评估报告模板、警告知信、解聘通知等

E.   **The following matters are explicitly excluded from the Engagement Matter:** Immigration, litigation, due diligence, merger and acquisition.

以下事项不包括在约定事项中：移民、诉讼、尽职调查、公司的收购与兼并。

2.   **DUTIES（双方义务）:** The Law Firm shall represent the Client to the best of its ability, consistent with all professional standards of competence and integrity. The Law Firm has not made any warranties or given any guaranty regarding the ultimate success or outcome of its services. The Client shall be truthful with the Law Firm, cooperate with the Law Firm in the representation and keep the Law Firm informed of the developments.

律师事务所当以其依据法律作出的判断，尽最大努力维护客户利益，客户应当全面、客观和及时地向律师事务所提供与法律事务有关的各种情况。

3.   **LEGAL FEE（法律顾问费）:** The total legal fee is $5,000.00, payable upon the execution of this contract. The firm offers up to 17 hours of attorney's billable hour for the Term engaged ("Hour of Work"). For those legal services which are beyond the Engagement Matter or exceed the Hour of Work, the client may enter a separate retainer agreement with the Law Firm.

本法律合同客户同意支付律师事务所 5,000 美元的律师费作为上述约定事项的固定费用，律师事务所为客户提供不超过 17 小时的律师工作小时（"工作小时"）。对于约定事项以外的或者超过工作小时的法律事务，客户应与律师事务所签订另外单独的聘用协议

000811

4. **EFFECTIVE DATE**（合同生效日）: This Agreement shall become effective if both the Firm and Client sign it and upon Firm's receipt of the first part Legal Fee as listed in Clause 3 above.

本协议自双方签署，律师事务所确认收到客户支付的第一笔律师费用之后生效。

5. **MODIFICATIONS**（协议的更改）: Any modification of this Agreement must be in writing and signed by Client and Law Firm.

任何对此协议的更改应通过由客户和律师所共同签署的书面文件进行。

6. **WITHDRAWAL** (撤销): Attorney may withdraw at any time at Attorney's discretion. Client has been informed that among the events that should be expected to cause Attorney's withdrawal from this case are Client's breach of any portion of this Agreement (including its payment provisions), Client's refusal to cooperate with Attorney or any other fact or circumstance that would render Attorney's continuing representation unlawful, unethical, or impractical.

律师可以根据自己的裁量权随时撤销本协议。客户被告知，导致律师撤销本协议的情况一般包括以下情况：客户违反本协议的任何部分（包括付款条款），客户的拒绝与律师合作，或者任何其他事实或情况会使律师继续代表客户是非法的、不道德的、或者是不切实际的。

7. **TERMINATION** (终止). When Attorney's services are terminated by the Client, no legal fee will be refunded unless the service is withdrawn by the Attorney pursuant to Section 9. After payment of all sums due and upon Client's request, Attorney will deliver legal documents produced according to this Agreement to Client, along with any "Client funds owned or property in Attorney's possession. If Attorney is not instructed otherwise, Client's documents will be kept in Attorney's office for a limited time after completion of this Agreement.

如果本协议终止，除非是律师根据本协议第九条提出的终止，律师费不予退还。在客户支付所有未支付费用并根据客户的要求后，律师将提供客户所有因本协议所产生的法律文件，以及在律师保管下的所有客户的资金或财产。如果律师没有收到任何客户的指示，所有客户的文件将会被保存在律师办公室的一段有限的时间。

8. **PRIOR AGREEMENTS**（前期协议）: This Agreement incorporates all prior agreements and understandings between Client and Law Firm.

此协议包括了客户和律师事务所之前的所有意向和协议。

000812

9. **GUARANTEE OF PROFESSIONAL COMPETENCE**（专业能力的担保）: Law Firm agrees to use due diligence in furthering Client's and/or Beneficiary's best interests under the laws. However, Law Firm makes no guarantee of the outcome of the case.

律师事务所同意尽力在法律允许的范围内为客户和/或客户的收益人争取最大的利益，但律师事务所不对案件或项目的结果有任何担保。

10. **GOVERNNING LAW** （管辖法律）: This Agreement shall be governed by, and construed in accordance with, the law of the State of California, without giving effect to the conflict of law principles thereof.

本协议应受加利福尼亚州法律法规管辖。

The Client has read the above retainer, understands the meaning of its terms and has received a copy of the same.

客户已经阅读了本协议，理解其意义，并已收到了一份原件。

*[以下无正文，为签字页]*

Client: VLAND INC.

/s/: _____

By: _____    01/08/2019

MT LAW PC
MT 律师事务所

/s/: _____

By: Shengxi "Tina" Tian, Esq. on behalf of MT Law PC
田胜昔，MT 律师事务所主管

000813

 **MT LAW**

# INVOICE

**2901 Tasman Drive, Suite 218**
**Santa Clara, CA 95054**
HQ Toll-free: 1 (800) 345-1899
Office: 1 (650)241-3760
Fax: 1 (888) 345-1388
Email: info@mtlawllc.com
Website: www.mtlawllc.com

**BILL TO**
**Company: VLAND INC.**

| DATE: | 1/22/2019 |
|---|---|
| **INVOICE#** | 377 |

| Item | Description | Hours | Amount |
|---|---|---|---|
| Legal Service | Legal Fee (deposit) | | $5,000.00 |
| | | | |

| | |
|---|---|
| Subtotal | $5,000.00 |
| Payment/Credits | $5,000.00 |
| Other | $0.00 |
| **TOTAL Due** | $0.00 |

**OTHER COMMENTS**
1. Please make all checks payable to
*California IOLTA Trust Accounts MT Law PC TRTEE.*

2. Total payment due in 30 days

3. Please include the invoice number on your check

If you have any questions or comments about our services or have any other legal needs, please do not hesitate to contact us at 1 (800) 345-1899 or email to
tian@mtlawllc.com.

*It is our pleasure and honor to provide legal services to you. Thank You For Your Business!*

000814



**SOPHELEUS ASSOCIATES & CO**

This agreement, which is effective as of December 18, 2018, is made by Sopheleus Associates & Co. ("We" or "Sopheleus") and Vland Inc. ("You" or "Client").

**Scope of Accounting Services**
Our services (Services) include:

- Providing full accounting services which include performing AP and AR functions, recording accounting transactions and General Ledger maintenance, including month end close and preparing reporting package as required by Management;
- Processing payroll at the frequency required by state of California and Client;
- Preparing and submitting state and federal reporting such as payroll, sales and use tax reporting;
- Setting up employee benefits as required by state of California and Client;
- Preparing quarterly and annual payroll reporting, annual W2/1099 filing, and working with Tax CPA to file Client's state and federal income tax.

**Client's Responsibilities**
You shall provide the information and access to records we reasonably require to perform the Services. To your knowledge, all information provided by you or on your behalf will be accurate and complete in all material respects.

**Fees and expenses**
Client shall pay Sopheleus a monthly fixed fee of $1,000/month. At this time, we agree to re-evaluate in three (3) months if this monthly fee is appropriate based on the company's level of activities.

The monthly fee is subject to change, if we observe there is consistent overrun in billable hours.

In addition, there is $30 payroll system usage fee. This fee is subject to change if the vendor increases its charge.

Other out of pocket expenses advanced paid by Sopheleus will be reimbursed by Client as long as approval from Client's management team is obtained. Such expenses may include postage, mileage, copy and other miscellaneous costs paid by Sopheleus on behalf of Client.

000815

 **SOPHELEUS ASSOCIATES & CO.**

**Termination.** This agreement shall remain effective until termination. Either of us may terminate it upon 30 days' advance written notice to the other.  In addition, we may terminate this agreement immediately upon written notice to you if we reasonably determine that we can no longer provide the Services in accordance with applicable law or professional obligation. Likewise, Client may terminate this agreement immediately upon written notice to Sopheleus if service rendered to Client is not acceptable within the scope of reasonable judge.

We appreciate the opportunity to be of service to you. Please indicate Client's acceptance of these terms and conditions by executing this agreement in the space provided below.

Vland Inc.

By: _____   Date: 06/25/2018
Chun Wang, CEO


Sopheleus Associates & Co.

By: _____   Date: 12/20/2018
Ilia Tsai

000816

**Sopheleus Associates & Co.**
3431 Cork Oak Way
Palo Alto, CA  94303 US
650-2650710
ilia.tsai@sopheleus.com

# Invoice



BILL TO
Vland Inc

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 736220 | 06/30/2019 | $6,090.00 | 07/10/2019 | Net 10 | |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| 06/30/2019 | Accounting Service Fees for January - June | 6 | 1,000.00 | 6,000.00 |
| 06/30/2019 | Payroll Process Fee- Per payroll process April - June | 3 | 30.00 | 90.00 |

Wire Instruction
Bank Name: Wells Fargo Bank
Beneficiary: Sopheleus Associates & Co.
Bank Account #: 5739538899
Bank ABA #: 121042882

BALANCE DUE          **$6,090.00**

000817

**Sopheleus Associates & Co.**
3431 Cork Oak Way
Palo Alto, CA  94303 US
650-2650710
ilia.tsai@sopheleus.com

# Invoice



| BILL TO |
|---------|
| Vland Inc |

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|-----------|------|-----------|----------|-------|----------|
| 736156 | 01/04/2019 | $0.00 | 01/14/2019 | Net 10 | |

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| 12/31/2018 | Accounting Service Fee for December | 1 | 1,000.00 | 1,000.00 |

Wire Instruction
Bank Name: Wells Fargo Bank
Beneficiary: Sopheleus Associates & Co.
Bank Account #: 5739538899
Bank ABA #: 121042882

PAYMENT                          1,000.00
BALANCE DUE                      **$0.00**

PAID

000818

**CHINA BRIEFING** (//www.china-brief...j.com/)
From Dezan Shira & Associates

# The US-China Trade War: A Timeline

☐ November 28, 2019    Posted by **China Briefing** (https://www.china-briefing.com/news/author/china-briefing/)   Written by **Dorcas Wong** and **Alexander Chipman Koty**   Reading Time: **26 minutes**

*This article is continually updated as new developments occur. It was last updated on November 28, 2019.*

Last July, US President Donald Trump followed through on months of threats to impose sweeping tariffs on China for its alleged unfair trade practices.

So far, the US has slapped tariffs on US$550 billion worth of Chinese products. China, in turn, has set tariffs on US$185 billion worth of US goods.

Both sides have also threatened qualitative measures (https://www.scmp.com/news/china/diplomacy-defence/article/2151502/donald-trump-can-outgun-china-trade-tariffs-beijing-has) that affect US businesses operating in China.

With neither Trump nor China's President Xi Jinping willing to back down, US-China trade tensions have erupted into a full-blown trade war (https://www.china-briefing.com/news/us-china-trade-war-imagining-scenarios/).

Here, we present a timeline of the major events in the trade conflict and what led up to it. The timeline will be continually updated as events of note occur.

## US-China trade war

**Total US tariffs applied exclusively to Chinese goods:** US$550 billion

**Total Chinese tariffs applied exclusively to US goods:** US$185 billion

**Day 509: November 26, 2019 – US releases new regulatory guidelines for its telecom networks procedure to protect telecom networks from national security threats**

The US Commerce Department has issued a notice (https://www.commerce.gov/news/press-releases/2019/11/us-department-commerce-proposes-rule-securing-nations-information-and) introducing a new procedure for identifying, assessing, and addressing transactions that pose a national security risk to its telecommunications network and service supply chain.

The procedure will give the US government power to restrict US companies from importing and using foreign technology in their domestic supply chain infrastructure. According to Secretary Wilbur Ross, whether a transaction will be prohibited or mitigated will be considered on a "case-by-case, fact-specific basis."

While the document makes no mention of Huawei or ZTE equipment, it might impact the two Chinese companies as they were placed on the US entity "blacklist," earlier in May, and on Friday, November 22, were voted unanimously as national security risks by the US Federal Communications Commissions.

**Day 493-494: November 7-8, 2019 – US and China Talk Tariff Rollback**

The US and China have, in principle, agreed to discussing rolling back tariffs on each other's goods in phases. This will be done in the same proportion and simultaneously, once the two sides sign a "phase one" deal, according to China's Ministry of Commerce.

Commerce ministry spokesman Gao Feng said (http://finance.people.com.cn/n1/2019/1107/c1004-31443700.html) on Thursday, November 7, that top negotiators on both sides (https://www.washingtonpost.com/business/economy/in-latest-china-pivot-trump-says-partial-trade-deal-might-not-be-completed-this-year/2019/11/08/b3d65bd4-024d-11ea-9518-1e76abc088b6_story.html) had held "serious and constructive discussions on solving issues of core concerns" in the past two weeks. No further details were released, such as when such an agreement would be signed, and the tariff rollback begin.

000819

Case 5:20-cv-09254-SVK   Document 17-14   Filed 03/31/21   Page 186 of 210

The same day, US National Economic Council Director, Larry Kudlow, confirmed the Chinese claim that a tariff accord would look like, telling news media that: "If there's a Phase 1 trade deal, there are going to be tariff agreements and concessions."

However, on Friday, November 8, US President Donald Trump appeared to contradict his own trade representatives. He told reporters, "China would like to get somewhat of a rollback, not a complete rollback because they know I won't do it." This makes unclear any chances of a trade accord getting signed this year.

**Day 487: November 1, 2019 – China wins WTO case, able to sanction US$3.6 billion worth US imports**

The World Trade Organization (WTO) said Friday that China can impose compensatory sanctions (https://www.wto.org/english/news_e/news19_e/471arb_e.htm) on US imports worth US$3.6 billion for the US failure to abide by anti-dumping rules on Chinese products. The announcement centers on a WTO case that originated nearly six years ago, long before the trade war.

According to news sources (https://www.reuters.com/article/us-china-trade-usa-reaction/us-disappointed-by-wto-decision-allowing-china-to-slap-trade-sanctions-on-us-goods-idUSKBN1XB4TW), the US is disappointed in the decision and a US official responded by saying that the arbitration panel "overstates the amount of the impact on China" and that the WTO's approach had "no foundation in economic analysis."

**Day 487: November 1, 2019 – US, China negotiators talk over phone, agree on trade points "in principle"**

China's Vice Premier Liu He, US Trade Representative Wright Heze, and US Treasury Secretary Steven Mnuchin engaged in "serious and constructive discussions" over the phone on core trade concerns on Friday and reached a "consensus on principle" for the next round of trade talks, according to an announcement (http://www.mofcom.gov.cn/article/ae/ldhd/201911/20191102909641.shtml) by the Chinese Ministry of Commerce.

The White House, on its part, stated (https://asia.nikkei.com/Economy/Trade-war/US-China-trade-talks-virtually-done-on-agriculture-and-finance) that "progress was made in a variety of areas" and that "discussions will continue at a deputy level."

**Day 470: October 18, 2019 – US tariff exclusion process for US$300 billion of Chinese imports**

The Office of the US Trade Representative (USTR) recently announced it is launching (https://ustr.gov/issue-areas/enforcement/section-301-investigations/section-301-china/china-section-301-tariff) a new round of tariff exclusion for certain Chinese products starting October 31, 2019 through to January 31, 2020.

The exclusion process will apply to Chinese products that were subject to an additional 15 percent tariff through the August 2019 action under Section 301, in effect since September 1, 2019 (List 4A (https://ustr.gov/sites/default/files/enforcement/301Investigations/Notice_of_Modification_%28List_4A_and_List_4B%29.pdf)).

US interested parties can request for the exemption of these products through the USTR website (https://exclusions.ustr.gov) when the portal opens on October 31, 2019 at noon EDT. (For more details see here (https://www.china-briefing.com/news/us-tariff-exclusion-china-imports-eligibility-application-process/)).

**Day 463: October 11, 2019 – US announces "Phase 1" deal, delays tariff increase for Chinese goods**

Following a two day meeting on October 10-11 in Washington DC, US President Donald Trump announced that negotiators from the US and China had reached a "Phase 1 (https://www.reuters.com/article/us-usa-trade-china/us-outlines-phase-1-trade-deal-with-china-suspends-october-tariff-hike-idUSKBN1WQ10X)" agreement that will take several weeks to finalize. As part of the Phase 1 agreement, China will reportedly purchase US$40-50 billion in US agricultural products annually, strengthen intellectual property provisions (https://www.china-briefing.com/news/china-ip-protections-trademarks-trade-secrets/), and issue new guidelines on how it manages its currency.

President Trump also announced that the US would delay a tariff increase (https://www.theguardian.com/business/2019/oct/11/us-delays-china-tariff-increase-as-trump-cites-warmer-feelings-in-talks) scheduled to go into effect on October 15. The delay will apply to tariffs that were scheduled to increase to 30 percent on US$250 billion of Chinese goods. The delay appears to be an extension of a previous tariff increase delay – from October 1 to October 15 – for tariffs that were scheduled to increase from 25 to 30 percent.

**Day 442: September 20, 2019 – US releases new tariff exemption lists, which exempt over 400 Chinese goods from tariffs**

The USTR announced (https://ustr.gov/issue-areas/enforcement/section-301-investigations/tariff-actions) three notifications that collectively exempt (https://www.china-briefing.com/news/us-tariff-exclusion-china-imports-eligibility-application-process/) 437 Chinese goods from US tariffs.

The excluded items mainly consist of types of equipment or material, such as organic synthetic materials, daily necessities, chemicals, textiles, mechanical and electrical equipment, chemical products, and steel products.

000820

Case 5:20-cv-09254-SVK   Document 17-14   Filed 03/31/21   Page 187 of 210

**Day 441-442: September 19-20, 2019 – US and China hold mid-level trade talks in Washington**

US and China held mid-level trade talks in Washington ahead of the high-level trade talks scheduled for October.

The two countries agreed to keep communicating on related trade issues and discussed the details of the 13th round of bilateral high-level economic and trade consultations scheduled for October as reported by state media (http://www.xinhuanet.com/english/2019-09/21/c_138409773.htm).

**Day 435: September 13, 2019 – China exempts various agricultural products from additional tariffs**

In response to the US delaying the anticipated tariffs hikes to October 15, Xinhua News Agency announced (http://www.xinhuanet.com/english/2019-09/13/c_138389505.htm) that China's National Development and Reform Commission and Ministry of Commerce will exclude imports of US soybeans, pork, and other farm goods from additional trade war tariffs.

**Day 433: September 11, 2019 – China unveils tariff exemption list for US imports**

China's Tariff Commission of the State Council announced (http://m.mof.gov.cn/czxw/201909/t20190911_3384638.htm) that it will exempt 16 types of US imports from additional tariffs, which include products, such as pesticides, animal feeds, lubricants, and cancer drugs. The two lists will be effective for a year, from September 17, 2019 through to September 16, 2020.

Exemption List 1 (http://m.mof.gov.cn/czxw/201909/P020190911467873521723.pdf) cover US products, such as shrimp and prawn seedlings, lubricants, and alfalfa meal while, Exemption List 2 (http://m.mof.gov.cn/czxw/201909/P020190911467873838893.pdf) affect products, such release agent, whey for fodder, iso-alkane solvent, and lubricating base oil. Enterprises importing goods from list 1 may apply to Customs for refund of the duties already paid, but must do so within six months from the date of the promulgation of the list.

Separately, President Trump tweeted that United States have agreed (https://www.cnbc.com/2019/09/11/trump-delays-tariff-hikes-by-two-weeks-in-good-will-gesture-to-china.html) to delay increasing tariffs on $250 billion worth of Chinese imports from Oct. 1 to Oct. 15, out of respect for the People's Republic of China's 70th Anniversary, and "as a gesture of good will."

**Day 427: September 5, 2019 – China and US agree to 13th round of trade talks**

China and the US have agreed to hold high-level trade talks in Washington DC in early October, announced (http://www.gov.cn/guowuyuan/2019-09/05/content_5427413.htm) China's Ministry of Commerce. Trade teams from both countries will begin consultations mid-September in preparation for these high-level talks. "The two sides agreed that they should work together and take practical actions to create favorable conditions for consultations," the announcement stated.

**Day 424: September 2, 2019 – China lodges WTO tariff case against the US**

China has lodged a complaint against the US over import tariffs affecting US$300 billion of Chinese exports, according to an announcement (http://www.mofcom.gov.cn/article/ae/ag/201909/20190902895699.shtml)made by China's Ministry of Commerce. This is the third lawsuit that China has brought to the WTO challenging US tariffs against Chinese imports.

Under WTO rules, Washington DC has 60 days to try to settle the latest dispute. The US previously published a written defense for the first of the three legal cases brought by China, asserting that the current set of tariffs should not be judged at the WTO.

**Day 423: September 1, 2019 – Tariffs come in force as scheduled**

As announced, the US began implementing tariffs on more than US$125 billion (https://www.reuters.com/article/us-usa-trade-china/china-us-kick-off-new-round-of-tariffs-in-trade-war-idUSKCN1VM0V9) worth of Chinese imports (list 4A (https://ustr.gov/sites/default/files/enforcement/301Investigations/List_4A_%28Effective_September_1%2C_2019%29.pdf)) starting Sunday; goods affected range from footwear, diapers, and food products to smart watches, dishwashers, and flat-panel televisions. Beijing, in turn, began imposing additional tariffs on some of the goods on a US$75 billion (list 1 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201908/P020190823604938915640.pdf)). This includes a five percent tariff on US crude oil.

**Day 417: August 26, 2019 – Liu calls for calm, Trump says talks will proceed**

According to *Caixin (https://www.caixinglobal.com/2019-08-26/liu-he-urges-calm-as-trade-war-escalates-101454960.html)*, China's top trade negotiator Vice Premier Liu He called for calm amid the recent escalation of trade war threats. Liu reportedly told an audience that China "firmly opposes" the recent escalation of the trade war. Liu also said the escalation of the trade war was "against the interest of China, the US, and the entire world". US President Donald Trump later told the media, "China called last night our trade people and said, 'let's get back to the table', so we'll be getting back to the table, and I think they want to do something".

000821

**Day 416: August 25, 2019 – Trump, White House make contradictory statements**

US President Donald Trump told the media he was having "second thoughts (https://www.theguardian.com/us-news/video/2019/aug/25/sure-why-not-trump-admits-second-thoughts-on-china-trade-war-video)" about the tariffs he had levied against China. Later, a White House spokesperson said that the only regret Trump had was that he had not imposed higher tariffs on China.

**Day 414: August 23, 2019 – China announces US$75 billion in tariffs on US goods, Trump threatens tariff increases on Chinese goods**

The Customs Tariff Commission of China's State Council announced (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201908/t20190823_3372928.html) US$75 billion in tariffs on US goods. Five and 10 percent tariffs will be imposed on 5,078 US goods in two batches, from September 1 (list 1 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201908/P020190823604938915640.pdf)) and December 15, 2019 (list 2 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201908/P020190823604939266141.pdf)), respectively. Later on the same day, the State Council approved (http://gss.mof.gov.cn/zhengwuxinxi/gongzuodongtai/201908/t20190823_3372945.html) to reinstate Chinese tariffs on US automotive and auto parts starting December 15, 2019. The five and 25 percent Chinese tariffs on US automotive and auto parts had been exempted since January 1, 2019. The first batch of US goods that will be affected from September 1 are organized in four parts:

- Part 1 includes 270 agriculture products that will be subject to a 10 percent tariff;
- Part 2 includes 646 agriculture products and some industrial products that will be subject to a 10 percent tariff;
- Part 3 includes 64 agriculture products that will be subject to a five percent tariff; and
- Part 4 includes 737 agriculture products, ores, chemicals, and some industrial products that will be subject to a five percent tariff.

The second batch of US goods that will be affected from December 15 are also organized in four parts:

- Part 1 includes 749 agriculture products, as well as chemicals, woods, stones and industrial products, that will be subject to a ten percent tariff;
- Part 2 includes 163 automotive products and some other industrial products that will be subject to a ten percent tariff;
- Part 3 includes 634 agriculture products, chemicals, some pharmaceutical products, and some industrial products, which will be subject to a five percent tariff; and
- Part 4 includes 1815 agriculture products, wood products, paper products, textile products, industrial products, and auto parts that will be subject to a five percent tariff.

China's retaliatory tariff on US$75 billion worth of US goods was released after the USTR announcement (https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-announces-next-steps-proposed) of tariffs on August 13 on US$300 billion worth of Chinese goods – scheduled to begin on September 1 (list 4A (https://ustr.gov/sites/default/files/enforcement/301Investigations/List_4A_%28Effective_September_1%2C_2019%29.pdf)) and December 15 (list 4B (https://ustr.gov/sites/default/files/enforcement/301Investigations/List_4B_%28Effective_December_15%2C_2019%29.pdf)). US President Trump reacted to the August 23 announcement on Twitter, stating, "American companies are hereby ordered to immediately start looking for an alternative to China". Subsequent reports indicated that this threat was based on a controversial interpretation of the US' *International Emergency Powers Economic Act* (IEPA) from 1977. Later, Trump tweeted (https://twitter.com/realDonaldTrump/status/1165005929831702529) that the US would increase tariffs on US$300 billion worth of Chinese imports that was being tariffed from September 1. And from October 1, 2019, US tariffs on the remaining US$250 billion of Chinese goods would be increased from 25 to 30 percent.

**Day 404: August 13, 2019 – US and China agree to talk again in two weeks**

China's Commerce Ministry states that US and China have agreed to restart talks on the phone in two weeks. This is expected to happen just days before September 1 – when the additional tariff is to come into force. The statement (http://www.mofcom.gov.cn/article/ae/ldhd/201908/20190802890389.shtml) was made after Chinese Vice Premier Liu He spoke with US Trade Representative Robert Lighthizer and Secretary of the Treasury Steven Mnuchin over the phone on August 13. China's Commerce Minister Zhong Shan, Central Bank governor Yi Gang, and Deputy Director of the NDRC Ning Jizhe are confirmed to attend the next scheduled call.

**Day 404: August 13, 2019 – US delays tariffs on certain products and removes items from the list**

The USTR announced (https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/august/ustr-announces-next-steps-proposed) it is delaying the imposition of additional tariffs on certain Chinese imports to December 15. A 10 percent tariff on a host of Chinese products (https://qz.com/1687449/the-new-lists-of-chinese-products-being-hit-with-us-tariffs/) is still to come into effect on September 1. The delayed tariffs would have affected the cost of items of mass consumption, including cell phones, laptops, video game consoles, computer monitors, certain

Case 5:20-cv-09254-SVK   Document 17-14   Filed 03/31/21   Page 189 of 210

items of footwear and clothing, and certain    Besides delaying tariffs on some goods, the USTR     'oving certain products from the scope of additional tariffs, citing "health, safety, na      security" factors. An exclusion process (https://ww........a-briefing.com/news/us-tariff-exemption-process-chinese-imports-faqs/) for these products will be conducted, according to the USTR.

### Day 397: August 6, 2019 – Chinese companies suspend new US agricultural product purchases

According to a statement issued (http://www.mofcom.gov.cn/article/ae/ag/201908/20190802887951.shtml) by the Ministry of Commerce on August 6, certain Chinese companies have suspended purchasing US agricultural products. The statement also makes clear that the Customs Tariff Commission of the State Council will not rule out import tariffs on newly purchased US agricultural products after August 3. As a result, some Chinese companies have decided to suspend such imports.

### Day 397: August 6, 2019 – US declares China is a currency manipulator

The US Treasury declares (https://home.treasury.gov/news/press-releases/sm751) China to be a currency manipulator, after the yuan sunk to 7 against the US dollar – its lowest level in 11 years – in apparent retaliation to the new punitive tariffs threatened to apply on the remainder of Chinese imports. The declaration accuses China of manipulating its currency "to gain unfair competitive advantage in international trade," and states that the US Treasury Secretary will engage with the International Monetary Fund to eliminate the advantages created by China's latest actions Not surprisingly, the People's Bank of China has refuted these claims in a strongly worded statement (http://www.pbc.gov.cn/en/3688110/3688172/3870480/index.html), maintaining that "China has never used and will not use the RMB exchange rate as a tool to deal with the trade frictions" and that "changes to the RMB exchange rate is determined by market supply and demand."

### Day 392: August 1, 2019 – Trump says US will impose 10 percent tariffs on another US$300 billion of Chinese goods starting September 1

"The U.S. will start, on September 1st, putting a small additional Tariff of 10% on the remaining 300 Billion Dollars of goods and products coming from China into our Country," said Trump in a tweet. The surprise tariff announcement comes after the US and China ended trade talks in Shanghai just the day before. Following the meeting, the White House described the discussions as "constructive," adding that China confirmed their commitment to increase purchases of US agricultural exports.

If imposed, this round tariffs will affect nearly all China's imports to the US, including electronic and clothing consumer goods. Trump also threatened to raise tariffs to as much as 25 percent on US$250 billion worth of goods if China fails to move more quickly to reach a trade deal.

### Day 390-391: July 30-31, 2019 – Shanghai trade talks end with little progress being made

US Trade Representative Robert Lighthizer, Treasury Secretary Steven Mnuchin and Chinese Vice Premier Liu He met in Shanghai for two-day trade talks. This is the first face-to-face interaction since Xi and Trump met at the G20 Summit in June, and the first official high-level negotiation since May, this year. As most analysts predicted, the talks ended with little progress. Both sides agreed to keep talking and will meet again in September.

The talks centered around goodwill gestures, such as Chinese commitments to purchase US soybeans, pork, ethanol, and other agricultural commodities, and the US' promise to ease sanctions on Chinese telecoms equipment giant Huawei Technologies Co Ltd. The White House released a statement (https://www.whitehouse.gov/briefings-statements/statement-press-secretary-71/) confirming China's commitment to increase purchases of US agricultural exports, though no details were provided. China, also confirmed (http://www.mofcom.gov.cn/article/ae/ldhd/201907/20190702886457.shtml) the discussion of procuring US agricultural products, but did not specify as to whether an agreement was made.

### Day 376: July 16, 2019 – Trump threatens tariffs on US$325 billion of Chinese goods, new member on China's negotiating team

President Trump once again threatens to slap tariffs on another US$325 billion of Chinese goods, despite promises not to following the truce after the G20 Summit, only two weeks prior. Meanwhile, China suddenly adds a new member to its negotiating team — commerce minister, Zhong Shan — viewed as a hardliner by many officials in Washington. Zhong was present at last month's G20 summit and took part in a telephone conversation with US representatives last week.

### Day 369: July 9, 2019 – US exempts 110 Chinese products from 25 percent tariffs, issues licenses to American Huawei suppliers

The Trump Administration announces (https://www.federalregister.gov/documents/2019/07/09/2019-14562/notice-of-product-exclusions-chinas-acts-policies-and-practices-related-to-technology-transfer) that it will exempt 110 Chinese products, including medical equipment for cancer, from the 25 percent tariffs that were added on July 6, 2018. The exemption will be valid for a year from July 9, 2019. Further, Commerce Secretary Wilbur Ross said (https://www.reuters.com/article/us-usa-china-huawei-tech/us-to-approve-sales-it-deems-safe-to-blacklisted-huawei-

000823

Case 5:20-cv-09254-SVK   Document 17-14   Filed 03/31/21   Page 190 of 210

idUSKCN1U41GP) that the US government ssue licenses to companies seeking to sell goods t wei where there is no security threat. Ross confirmed that Huawei would remain e Entity List, meaning winning licenses would requir rcoming a presumption of denial, and said the scope of items requiring licenses would not change.

### Day 359: June 29, 2019 – Trade talks to restart, ban on Huawei relaxed

The US and China agreed to restart trade talks, following the tentative truce reached earlier in the week. No deadline has been imposed for the talks unlike the 90-day ceasefire agreed to last year at the G20 Summit in Buenos Aires. This means that a new round of tit-for-tat tariffs will remain on hold for the foreseeable future.

More interestingly, President Trump also suggested relaxing the ban on US exports to China's Huawei Technologies.

Both announcements bring immediate relief to Chinese trade negotiators who will now be keenly following the 2020 US elections. During his press conference, Trump appeared short on specifics besides clarifying, "We're holding back on tariffs" and stating that US companies were "not exactly happy" about being unable to sell to the Chinese smartphone maker. Previously, the US had blacklisted the company by placing it on its 'entity list' and banned the sale of high-tech components and software to Huawei.

### Day 356: June 26, 2019 – Tentative truce reached days before G20 Summit

The US and China have agree to a tentative truce in the lead up to their resumed trade talks in Osaka this weekend. Details of the agreement are being drawn up and are expected to be released prior to the meeting. The US has threatened 25 percent tariffs on a further US$300 billion of Chinese imports, which is expected to be halted. Sources quoted by the media (https://www.scmp.com/economy/china-economy/article/3016255/trade-war-us-and-china-agree-tentative-truce-g20-summit) suggest that Trump might propose a deadline of six months for the talks to reach an agreement. If this does culminate, it would mean the US would hold off on implementing further tariffs until the end of the year.

### Day 351: June 21, 2019 – US adds another five Chinese entities to its 'entity list'

US Commerce Department announces (https://www.federalregister.gov/documents/2019/06/24/2019-13245/addition-of-entities-to-the-entity-list-and-revision-of-an-entry-on-the-entity-list)the addition of five new Chinese entities (including a state-owned enterprise) to its entity list, barring them from buying US parts and components without prior government approval. The new entities targeted are: Sugon, the Wuxi Jiangnan Institute of Computing Technology, Higon, Chengdu Haiguang Integrated Circuit, and Chengdu Haiguang Microelectronics Technology.

### Day 349: June 19, 2019 – US Tariff Exemption Process for Chinese Imports

The Office of the US Trade Representative (USTR) announces a process by which US interested parties could request the exclusion of certain Chinese products – subject to additional tariffs – as per the September 2018 list (List 3 (https://ustr.gov/sites/default/files/enforcement/301Investigations/Tariff%20List%20%2883%20FR%2047974%2C%20as%20amended%20and%20modified electronic portal for the submission of exclusion requests for products covered by the September 2018 list will open on **June 30, 2019**. (For more details see here (https://www.china-briefing.com/news/us-tariff-exclusion-process-chinese-imports/)).

### Day 348: June 18, 2019 – Xi and Trump rekindle trade talks ahead of G20 meeting

Xi and Trump reignite trade talks over the phone, less than two weeks before the much anticipated G20 Summit in Osaka, June 28 and 29. Both sides have confirmed that they will meet in person to discuss the ongoing trade dispute, on the sidelines of the Summit. Previously, Trump threatened to slap tariffs on the remaining US$300 billion of untariffed Chinese imports (https://www.scmp.com/news/china/politics/article/3013484/donald-trump-probably-planning-tariffs-all-chinese-goods-after), depending on the outcome of the trade talks. This will effect an array of consumer products, such as cellphones, computers, and clothing. These new tariffs have now been proposed in a bill, (https://www.regulations.gov/document?D=USTR-2019-0004-0001) with public consultation set to end on July 2.

### Day 332: June 2, 2019 – China issues white paper on US-China economic relations

China announces (http://english.gov.cn/news/top_news/2019/06/02/content_281476694861508.htm) the release of a white paper titled, 'China's Position on the China-US Economic and Trade Consultations' (full text can be found here (http://www.xinhuanet.com/english/2019-06/02/c_138110404.htm)).

The white paper denounces US unilateral and protectionist measures, criticizes its backtracking on Sino-US trade talks, and demonstrates China's stance on trade consultations and the pursuit of reasonable solutions.

### Day 331: June 1, 2019 – China increases tariffs on US$60 billion worth of products

000824

Case 5:20-cv-09254-SVK Document 17-14 Filed 03/31/21 Page 191 of 210

Tariffs of 25 percent, 20 percent, and 10 pe (http://english.gov.cn/news/top_news/2019/06/01/c_2814?893525636.htm), which were first announced on May 13, 2019 are now in ct on US$60 billion worth of American goods export China. The specific changes are as follows:

- Products in list 1 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/P020190513719203602248.pdf) will be subject to a tariff of 25 percent, up from 10 percent;

- Products in list 2 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/P020190513719204287788.pdf) will be subject to a tariff of 20 percent, up from 10 percent;

- Products in list 3 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/P020190513719204715521.pdf) will be subject to a tariff of 10 percent, up from five percent; and

- Products in list 4 (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/P020190513719205123756.pdf) will still be subject to a 5 percent tariff.

Separately, China announces that it has opened an official investigation into US shipping company FedEx for diverting packages from Japan, bound for China – to the US.

### Day 330: May 31, 2019 – China establishes its very own 'unreliable entities' list

China announces (http://www.mofcom.gov.cn/xwfbh/20190531.shtml?) that it will establish its very own unreliable entities list in retaliation to the US' entity list. The unreliable list will include foreign enterprises, organizations, and individuals that do not obey market rules, violate contracts, and block, cut off supply for non-commercial reasons, or severely damage the legitimate interests of Chinese companies.

### Day 316: May 16, 2019 – US places Huawei on its 'entity list', banning it from purchasing from US companies

The US Department of Commerce announces (https://www.commerce.gov/news/press-releases/2019/05/department-commerce-announces-addition-huawei-technologies-co-ltd) the addition of Huawei Technologies Co. Ltd and its affiliates on its "entity list", which effectively bans US companies from selling to the Chinese telecommunications company without US government approval.

### Day 313: May 13, 2019 – China announces tariff hikes on US products, China launches tariff exemption system

China announces (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/t20190513_3256788.html) that it will increase tariffs on US$60 billion worth of US goods from June 1, 2019, in response to the tariff increases imposed by the US on May 10. The tariffs will apply to products originally released in Announcement 6, (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201808/t20180803_2980950.html) which amends the tariffs announced last Septembe (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201809/t20180918_3022592.html)r (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201809/t20180918_3022592.html). Products affected include beef, lamb, pork, vegetables, juice, cooking oil, tea, coffee, refrigerators, and furniture, among many others.

Alongside tariff increases, the State Council Customs Tariff Committee have also launched a tariff exemption system for certain eligible products. (See full Chinese announcement here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201905/t20190513_3256786.html) and unofficial English version here (https://www.uschina.org/sites/default/files/tariff_commission_notice_2019_no._2.pdf?utm_campaign=Marketing_Cloud&utm_medium=email&utm_source=Standalone+-+China+announces+tariff+retaliation+and+exclusion+process+-+May+13&%20utm_content=https%3a%2f%2fwww.uschina.org%2fsites%2fdefault%2ffiles%2ftariff_commission_notice_2019_no._2.pdf)). On a trial basis, the document allows imported US products to be temporarily exempted (https://www.china-briefing.com/news/china-tariff-exclusion-process-us-imports/) from additional tariffs; tariffs can be refunded for the eligible products that have already been taxed. The USTR also announces (https://www.reuters.com/article/us-usa-trade-china-hearing/cellphones-and-laptops-on-latest-ustr-china-tariff-list-drugs-excluded-idUSKCN1SJ2AZ) that they will hold a public hearing on June 17, 2019 on the possibility of imposing 25 percent tariffs on a further US$300 billion worth of Chinese imports, including cellphones and laptops.

### Day 310: May 10, 2019 – US increases tariff from 10 percent to 25 percent

US increases tariffs on US$200 billion worth of Chinese goods (List 3) from 10 percent to 25 percent (https://csms.cbp.gov/viewmssg.asp?Recid=24227&page=&srch_argv=301&srchtype=&btype=&sortby=&by=), as the US and China fail to reach a deal following the end of the first day of the eleventh round of high-level trade talks. The tariff increase will be effective from May 10, 2019 at 12:01 am (EST), with goods leaving from China to the US before midnight still taxed at the previous 10 percent rate. (See full notice here (https://csms.cbp.gov/viewmssg.asp?Recid=24227&page=&srch_argv=301&srchtype=&btype=&sortby=&by=)). In response, China's Ministry of Commerce releases a statement (http://www.mofcom.gov.cn/article/ae/ag/201905/20190502861691.shtml) announcing that it "deeply regrets" the tariffs and that "necessary countermeasures" will be taken.

### Day 305: May 5, 2019 – Trump threatens to raise tariffs on China

000825

Case 5:20-cv-09254-SVK   Document 17-14   Filed 03/31/21   Page 192 of 210

Trump says (https://www.reuters.com/articl ⬚ isa-trade-china/trump-ratchets-up-pressure-on-chir ⬚ atens-tariff-hikes-idUSKCN1SB0KP) that the US will increase tariffs on US$200 ⬚ worth of Chinese products from 10 percent to 25 p ⬚ it, effective Friday, May 10. The tariffs would apply to the products included on **List 3**, which have been subject to 10 percent tariffs since September 24, 2018. The tariffs on **List 3** were initially scheduled to increase to 25 percent on January 1, 2019, until the US and China agreed to delay the increase until March 1, 2019 and then later agreed to delay them indefinitely.

Trump also says that he would come up with new tariffs of 25 percent on an additional US$325 billion worth of Chinese goods, which would cover essentially all remaining Chinese products. Trump says that the tariff increase is being done because the Chinese side is attempting to "renegotiate" the trade deal and is backsliding on commitments.

### Day 299-300: April 30-May 1, 2019 – US and China hold trade talks in Beijing

US and Chinese negotiators continue trade talks in Beijing on Tuesday, April 30 and Wednesday, May 1. Mnuchin calls (https://www.cbc.ca/news/business/u-s-china-productive-trade-talks-beijing-1.5118278) the talks "productive" and confirms that the two sides will continue negotiations in Washington the next week.

### Day 279: April 10, 2019 – US and China agree to establish trade deal enforcement offices

US Treasury Secretary Steve Mnuchin says that the US and China have agreed to establish "enforcement offices" to monitor the enforcement of the trade deal, which has yet to be finalized. According to media reports (https://www.reuters.com/article/us-usa-trade-china/u-s-china-agree-to-establish-trade-deal-enforcement-offices-mnuchin-idUSKCN1RM2FV), other issues relating to enforcement have yet to be agreed upon, such as whether the US will have the right to unilaterally re-implement tariffs if China is deemed to have reneged on its commitments.

### Day 272-274: April 3-5, 2019 – US and China hold trade talks in Washington

US and Chinese negotiators continue trade talks in Washington from Wednesday, April 3 to Friday, April 5, a week after holding negotiations in Beijing. On Thursday, April 4, Trump meets with Liu He, and says (https://www.scmp.com/economy/china-economy/article/3004961/us-says-theres-still-significant-work-be-done-trade-talks) that the two sides will know "over the next four weeks" whether they can strike a deal. US and Chinese negotiators agree to continue talks the following week.

### Day 270: April 1, 2019 – China bans all types of fentanyl

China announces (https://www.nytimes.com/2019/04/01/world/asia/china-bans-fentanyl-trump.html) that it will ban all variants of the synthetic opioid·fentanyl, effective May 1, 2019, in what is considered a concession to the US amid trade talks. China previously banned some strains of fentanyl, but only banned other strains on a case-by-case basis rather than as a class of drug. Because of the opioid crisis in the US, China's treatment of fentanyl production and distribution had been a source of tension in bilateral relations.

### Day 269: March 31, 2019 – China extends the suspension of additional tariffs on US autos and auto parts

China extends the suspension of additional tariffs on US autos and auto parts, which were set to go back into force on April 1, 2019. China previously placed retaliatory tariffs of 25 percent on such products in reaction to US tariffs, but suspended them in December 2018, effective January 1 to April 1, 2019. The announcement (http://gss.mof.gov.cn/zhengwuxinxi/gongzuodongtai/201903/t20190331_3209704.html?flyarg=1&amp;flyarg=2) did not state when the suspension would expire. US autos are still subject to China's standard tariff rate of 15 percent.

### Day 266-267: March 28-29, 2019 – US and China hold trade talks in Beijing after one month break

US and Chinese negotiators resume trade talks in Beijing on Thursday, March 28 and Friday, March 29 after not meeting face-to-face for nearly one month. The month-long break was partly due to the Two Sessions (https://www.china-briefing.com/news/chinas-two-sessions-2019-what-to-expect/) meetings held in early March, which were China's biggest political meetings of the year. Officials call the trade talks constructive, with an enforcement mechanism to monitor China's commitment to trade concessions reportedly (https://www.scmp.com/news/china/diplomacy/article/3003787/pleasure-see-you-again-much-work-do-us-china-trade-talks) a sticking point.

### Day 231-234: February 21-24, 2019 – US and China hold trade talks in Washington; Trump extends tariff deadline

On Thursday, February 21, US and Chinese negotiators resume trade talks (https://asia.nikkei.com/Editor-s-Picks/China-up-close/All-the-President-s-men-Xi-s-allies-dominate-US-talks) in Washington. The day after, on Friday, February 22, Trump meets with Liu He (https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-vice-premier-liu-peoples-republic-china-2/) in front of the media, expressing optimism about a trade deal. On Sunday, February 24, Trump announces (https://www.nytimes.com/2019/02/24/us/politics/us-china-trade-truce.html) that he will extend the March 1 trade deal truce deadline, citing progress in trade talks. Trump does not give a concrete date for a new deadline, but expresses hope that Xi will visit Trump's Mar-a-Lago resort in Florida in March to finalize a trade deal.

Case 5:20-cv-09254-SVK    Document 17-14    Filed 03/31/21    Page 193 of 210

**Day 221-225: February 11-15, 2019 – US – China hold trade talks in Beijing**

The US and China hold trade talks in Beijing. On Friday, February 15, Xi meets with the top negotiators from the US (http://www.globaltimes.cn/content/1138995.shtml), in what is widely interpreted as a goodwill gesture. At the end of negotiations, the US and China continue to have differences (https://www.bloomberg.com/news/articles/2019-02-15/u-s-china-trade-talks-side-by-side-comparison-of-statements), but agree to keep talking in Washington the following week.

**Day 217: February 7, 2019 – Trump says he will not meet with Xi before trade deal deadline**

Trump says (https://www.nytimes.com/2019/02/07/us/politics/trump-xi-jinping-china-trade.html) that he will not meet with Xi in-person before the tariff ceasefire expires on March 1, 2019. Previously, on January 31, Trump said that he would meet with Xi in-person in February.

**Day 209-210: January 30-31, 2019 – US and China hold 2-day trade talks in Washington D.C.**

The US and China hold in-person talks (https://www.nytimes.com/2019/01/31/business/trump-china-trade-tariffs.html) in Washington D.C., with Liu He leading China's trade delegation. During the negotiations, China offers to buy five million tons of US soybeans. Trump announces that he will meet with Xi in-person in February.

**Day 201: January 22, 2019 – US cancels preparatory talks with China**

The US White House reportedly (https://www.cnbc.com/2019/01/22/us-cancels-trade-planning-meeting-with-china-source-says.html) cancel a trade planning meeting with two Chinese vice ministers ahead of trade talks to be held in Washington D.C. US officials cited disagreements over the enforcement of IP rules as the reason for the cancellation.

**Day 186-188: January 7-9, 2019 – US and China engage in 3-day trade talks in Beijing**

On January 7, official delegations from US and China began trade talks, which were held in Beijing – the first face-to-face meeting since agreeing to a 90-day truce (https://www.china-briefing.com/news/us-china-trade-truce-90-days-g20-summit/), which ends March 1.

Originally scheduled to take place over two days, the discussions extended a day further after many issues remained unresolved. China's top economic adviser Liu He also made a surprise appearance at the talks, which were intended to be at a vice-ministerial level only. The discussions were divided into two areas – 'trade issues', which included trade imbalances in certain sectors and 'structural issues', such as forced technology transfers, intellectual property protection, and non-tariff barriers.

After the talks, China's Commerce Ministry issued a statement that the talks were "extensive and established a foundation for the resolution of each other's concerns." The USTR issued a statement announcing China's pledge to purchase a "substantial amount of agricultural, energy, manufactured goods, and other products and services from the US", but noted that several outstanding issues remain. The official statement can be found here (https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/january/statement-united-states-trade). Both sides have agreed to continue to keep in close contact.

**Day 162: December 14, 2018 – China to temporarily lower tariffs on US autos; resumes buying US soybean exports**

China's Ministry of Finance announces that it will temporarily remove additional 25 percent tariffs on US autos and five percent tariffs on certain US auto parts for three months, beginning on January 1, 2019. During this period, US auto imports will be subject to China's standard 15 percent tariff rate on foreign autos. The suspension of these tariffs will affect 144 auto products as well as 67 auto-parts and marks the first concrete concession since the 90-day trade war truce made at the G20 Buenos Aires Leaders' Summit. The official announcement can be found here (http://gss.mof.gov.cn/zhengwuxinxi/gongzuodongtai/201812/t20181214_3093440.html). China also resumes its purchase of US-soybeans, with reports showing that a large purchase of 1.5 million tons of beans was made. In July 2018, China stopped purchasing US-produced soybeans in retaliation to US-tariffs on Chinese imports, marking the beginnings of the trade war as we know it.

**Day 150: December 2, 2018 – US and China agree to temporary truce**

The US and China agree to a temporary truce to de-escalate trade tensions, following a working dinner at the G20 Summit in Buenos Aires on December 1, 2018. According to the agreement, both the US and China will refrain from increasing tariffs or imposing new tariffs for 90 days (until March 1, 2019), as the two sides work towards a larger trade deal. More specifically, the US will refrain from increasing the tariffs described in **List 3** that were slated to increase from 10 percent to 25 percent on January 1, 2019, and will not impose previously threatened tariffs on an additional US$267 billion worth of Chinese goods.

For its part, China will purchase more US products – especially agricultural and energy products – and will crack down on the production and distribution of Fentanyl, a synthetic opioid produced primarily in China. The official US statement can be found here (https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-presidents-working-dinner-china/). The official Chinese

000827

statement can be found here (https://www.____.gov.cn/web/wjbzhdi/t618091.shtml).

**Day 137: November 19, 2018 – US releases list of proposed export controls on emerging technologies**

The US Bureau of Industry and Security (BIS) publishes (https://www.federalregister.gov/documents/2018/11/19/2018-25221/review-of-controls-for-certain-emerging-technologies) proposed export control rules on emerging technologies for public comment. According to the proposed rules, emerging technologies such as artificial intelligence (AI), robotics, and quantum computing could be subject to export controls because they are dual-use technologies that could be used for military purposes. The rules do not specify China, but are widely considered (https://www.washingtonpost.com/technology/2018/11/19/trump-administration-proposal-could-target-exports-tech-behind-siri-self-driving-cars-supercomputers/?utm_term=.f46ff535e3e2) by observers to be related to US efforts to prevent China from acquiring sensitive technologies.

**Day 127: November 9, 2018 – US and China resume trade talks**

The US and China reportedly (https://www.wsj.com/articles/u-s-china-resume-talks-to-cool-trade-tensions-1542064355) resume trade talks, via a phone call between US Treasury Secretary Steve Mnuchin and Chinese Vice Premier Liu He. According to the report, the two sides discussed a framework for a trade deal, or at least a "ceasefire" to reduce tensions.

**Day 117: October 30, 2018 – US reportedly prepared to announce tariffs on remaining Chinese products**

The US is reportedly (https://www.bloomberg.com/news/articles/2018-10-29/u-s-said-to-plan-more-china-tariffs-if-trump-xi-meeting-fails) prepared to announce tariffs on all remaining Chinese products by early December if talks between Trump and Xi at the G20 in Argentina are not successful. Based off trade figures from 2017, that would mean new tariffs on about US$257 worth of Chinese goods. If announced in early December, the tariffs would likely take effect in February 2019.

**Day 112: October 25, 2018 – US and China officials resume contact**

US and China working-level officials reportedly (https://www.scmp.com/news/china/diplomacy/article/2170231/us-and-china-officials-meet-ahead-possible-talks-between-xi) resume contact after weeks of silence. The officials are reportedly preparing for Trump and Xi to meet on the sidelines of November's G20 meetings in Argentina.

**Day 81: September 24, 2018 – US and China implement third round of tariffs US**

The US implements tariffs on US$200 billion worth of Chinese goods (**List 3**), bringing the total amount to US$250 billion. The tariffs carry an initial rate of 10 percent, and will be increased to 25 percent by January 1, 2019. The full and finalized **List 3** can be found here (https://www.dezshira.com/library/article/latest-chinese-tariffs-on-us-goods-list-3-7800.html). **CN:** China responds to US tariffs by implementing tariffs on US$60 billion worth of US goods (**List 3**). **List 3**, originally published on August 3, can be found here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201808/t20180803_2980950.html), but with updated tariff rates of either five percent or 10 percent, as announced here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201809/t20180918_3022592.html). China also released a White Paper, laying out the government's official position on the US-China trade relationship. The White Paper can be accessed here (http://www.xinhuanet.com/english/2018-09/24/c_137490176.htm).

**Day 79: September 22, 2018 – China cancels trade talks with US**

China cancels (https://www.wsj.com/articles/china-cancels-trade-talks-with-u-s-amid-escalation-of-tariff-threats-1537581226) trade talks planned with the US ahead of the impending implementation of US tariffs on US$200 billion worth of Chinese goods (**List 3**).

**Day 75: September 18, 2018 – China announces retaliation for US tariffs**

China announces that it will implement tariffs on US$60 billion worth of US goods (**List 3**) after the latest round of tariffs from the US (worth US$200 billion) go into effect on September 24.

**Day 74: September 17, 2018 – US finalizes tariffs on US$200 billion of Chinese goods**

The USTR announces (https://ustr.gov/about-us/policy-offices/press-office/press-releases/2018/september/ustr-finalizes-tariffs-200) the finalized list of tariffs on US$200 billion worth of Chinese goods (**List 3**). The US says (https://www.reuters.com/article/us-usa-trade-china-tariffs/trump-slaps-tariffs-on-200-billion-in-chinese-goods-spares-some-consumer-tech-idUSKCN1LX2M3) that the tariffs will go into effect on September 24 at an initial rate of 10 percent, to be increased to 25 percent by January 1, 2019. The full and finalized **List 3** can be found here (https://ustr.gov/sites/default/files/enforcement/301Investigations/Tariff%20List_09.17.18.pdf).

**Day 69: September 12, 2018 – US invites China to re-open negotiations**

000828

The White House's top economic advisor, Larry Kudlow, says (https://www.reuters.com/article/us-usa-trade-china/us-invites-china-to-trade-talks-as-tariffs-loom-white-house-adviser-idUSKCN1LM2YU) that the US has invited China to restart trade negotiations before tariffs on US$200 billion worth of Chinese goods (**List 3**) go into effect.

### Day 64: September 7, 2018 – Trump threatens new tariffs

After the public comment period for **List 3** of US tariffs on Chinese products ended on September 6, 2018, Trump threatens (https://www.reuters.com/article/us-usa-trade-china/trump-ups-ante-on-china-threatens-duties-on-nearly-all-its-imports-idUSKCN1LN1TH) to impose tariffs on US$267 billion more. That would bring the total amount of tariffs threatened or imposed by the US on China to US$517 billion, accounting for essentially all Chinese exports to the US. In 2017, the US imported US$505 billion worth of products from China.

### Day 49: August 23, 2018 – US and China implement second round of tariffs, China files second WTO complaint US

US implements a 25 percent tariff on 279 goods originating from China (worth US$16 billion). Goods targeted include: semiconductors, chemicals, plastics, motorbikes and electric scooters. The full and finalized **List 2** can be found here (https://ustr.gov/sites/default/files/enforcement/301Investigations/Final%20Second%20Tranche.pdf).

**CN:** China implements retaliatory 25 percent tariffs on 333 goods originating from the US (worth US$16 billion), including commodities such as: coal, copper scrap, fuel, buses and medical equipment. The full and finalized **List 2** can be found here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201808/t20180808_2983770.html). China also files a new WTO complaint against the United States' Section 301 tariffs on Chinese goods issued on August 23 under **List 2** (25 percent tariffs on US$16 billion).

### Day 48-49: August 22-23, 2018 – US-China dialogue

US and Chinese mid-level representatives meet for the first time since early in the trade war. US Treasury Under Secretary David Malpass and Chinese Commerce Vice Minister Wang Shouwen met in Washington DC to discuss ways to resolve the deepening trade conflict and escalating tariffs. Discussions end with no major breakthroughs.

### Day 40 : August 14, 2018 – China files WTO claim against US

The Chinese Ministry of Commerce announces (http://www.mofcom.gov.cn/article/ae/ag/201808/20180802775695.shtml) that a formal case has been lodged at the WTO against the US for its tariffs on solar panels, alleging that US tariffs have damaged China's trade interests.

### Day 33: August 7, 2018 – Second round of tariffs finalized and released US

US releases a revised version of tariffs on a final list of US$16 billion worth of imports from China (**List 2**). Set to take effect August 23, **List 2** announces that the US$16 billion of imports will now be subject to a 25 percent tariff rather than previously announced 10 percent. Five of the 284 items in the original list published on June 15 were removed, these being: alginic acid, splitting machines, containers, floating docks, and microtomes (collectively worth US$400 million in 2017). **CN:** China's Ministry of Commerce announces a reciprocal 25 percent additional tariff on US$16 billion of US exports to China, effective August 23, 2018. The tentative **List 2** can be found here (http://images.mofcom.gov.cn/www/201808/20180808201049842.pdf).

### Day 29: August 3, 2018 – China announces second round of tariffs on US products

In response to potential US tariffs on US$200 billion worth of products announced on August 1, 2018 (**List 3**), China's Ministry of Commerce proposes a range of additional tariffs on 5,207 products originating from the US (worth US$60 billion), including the following:

- 25 percent on 2,493 products (agricultural, products, foods, textiles and products, chemicals, metal products, machinery);
- 20 percent on 1,078 products (foods, paperboard, chemicals works of art);
- 10 percent on 974 products (agricultural products, chemicals, glassware); and
- 5 percent on 662 products (chemicals, machinery, medical equipment).

The tentative **List 3** can be found here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201808/t20180803_2980950.html).

### Day 28: August 2, 2018 – US tariffs revisions (US$200 billion)

The USTR, at the direction of Trump, considers a 25 percent tariff rather than a 10 percent one on **List 3**, which was originally announced on July 10, 2018. The list targets approximately US$200 billion worth of goods and includes categories such as: consumer products, chemical and construction materials, textiles, tools, food and agricultural products, commercial electronic equipment and vehicle/automotive parts. The US Department of Commerce also adds 44 Chinese entities to its export control list that pose a "significant risk" to US national security.

000829

Case 5:20-cv-09254-SVK    Document 17-14    Filed 03/31/21    Page 196 of 210

The USTR releases a third list of tariffs (https://ustr.gov/sites/default/files/301/2018-0026%20China%20FRN%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_0.pdf) **(List 3)** of over 6,000 commodities originating in China (worth US$200 billion), which will be subject to a 10 percent tariff.

**Day 1: July 6, 2018 – US implements first China-specific tariffs US**

The US Customs and Border Protection (CBP) begins collecting a 25 percent tariff on 818 imported Chinese products **(List 1)** valued at US$34 billion – giving effect to the first round of tariffs, which were revised and announced on June 15, 2018.

Meanwhile, the second round of tariffs discussed in **List 2** is under review, which proposes implementing a 25 percent tariff on 284 Chinese products (worth US$16 billion). Commodities targeted in this round of tariffs include: iron or steel products, electrical machinery, railway products, instruments and apparatus. **CN:** China takes retaliatory measures by imposing a 25 percent tariff on 545 goods originating from the US (worth US$34 billion), including agricultural products, automobiles and aquatic products. The full and finalized **List 1** can be found here (http://gss.mof.gov.cn/zhengwuxinxi/zhengcefabu/201806/t20180616_2930325.html).

## Events leading up to the US-China trade war

**June 16, 2018:** China revises its initial tariff list (25 percent on 106 products) to now include a 25 percent tariff on 545 products (valued at US$34 billion). This tariff will take effect July 6, 2018. China also proposes a second round of 25 percent tariffs on a further 114 products (valued at US$16 billion).

**June 15, 2018:** Initial list of products reduced and finalized. List 1 now implements a 25 percent tariff on a reduced 818 products (from 1,334) and is set to take effect on July 6, 2018. List 2 of 284 new products is also announced and under consideration.

**June 7, 2018:** US and ZTE agree to deal (https://www.commerce.gov/news/press-releases/2018/06/secretary-ross-announces-14-billion-zte-settlement-zte-board-management) that will allow ZTE to resume business.

**June 4-5, 2018:** Two days of trade talks between US and China held in Beijing.

**May 29, 2018:** US reinstates tariff plans (https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-confronting-chinas-unfair-trade-policies/) after brief truce. **May 20, 2018:** US and China agree to put the trade war on hold (https://www.china-briefing.com/news/2018/05/23/china-us-suspend-trade-war.html) after China reportedly agrees to buy more US goods.

**May 18, 2018:** China's Commerce Ministry announces that it will stop tariffs on US sorghum at negotiations.

**May 13, 2018:** Trump promises to help ZTE in a tweet.

**May 3-7, 2018:** US-China engage in trade talks in Beijing, where the US demands that China reduce the trade gap by US$200 billion within two years. Talks end with no resolution.

**April 17, 2018:** China announces antidumping duties of 178.6 percent on imports of sorghum from the US.

**April 16, 2018:** US Department of Commerce concludes that Chinese telecom company ZTE violated US sanctions. US companies are banned from doing business with ZTE for seven years.

**April 4, 2018:** China reacts to USTR's initial list, and proposes 25 percent tariffs to be applied on 106 products (worth US$50 billion) on goods such as soybeans, automobile, chemicals (list revised on June 16).

**April 3, 2018:** The USTR releases an initial list of 1,334 proposed products (worth US$50 billion) subject to a potential 25 percent tariff (list revised June 15).

**April 2, 2018:** China imposes tariffs (https://www.china-briefing.com/news/2018/04/03/us-china-trade-war-us-products-affected.html) (ranging 15-25 percent) on 128 products (worth US$3 billion) including fruit, wine, seamless steel pipes, pork and recycled aluminium in retaliation to the US' steel and aluminium tariffs.

**March 23, 2018:** US imposes a 25 percent tariff on all steel imports (except from Argentina, Australia, Brazil, and South Korea) and a 10 percent tariff on all aluminium imports (except from Argentina and Australia).

**March 22, 2018:** Trump signs a memorandum directing the following acts:

000830

Case 5:20-cv-09254-SVK Document 17-14 Filed 03/31/21 Page 197 of 210

- To file a WTO case against China for discriminatory licensing practices;

- To restrict investment in key technology sectors; and

- To impose tariffs on Chinese products (such as aerospace, information communication technology and machinery).

**February 7, 2018:** The US implements 'global safeguard tariffs' – placing a 30 percent tariff on all solar panel imports, except for those from Canada, (worth US$8.5 billion) and a 20 percent tariff on washing machine imports (worth US$1.8 billion).

**November 8-10, 2017:** Trump pays a "state visit plus" to China (https://www.china-briefing.com/news/2017/11/07/trumps-china-visit-expect.html), where relations were considered to have warmed.

**August 18, 2017:** The USTR initiates an investigation into certain acts, policies and practices of the Chinese government relating to technology transfer, intellectual property and innovation.

**May 22, 2017:** US and China agree to a trade deal (https://www.china-briefing.com/news/2017/05/25/china-us-trade-deal-open-access-us-beef-financial-services.html) that would give US firms greater access to China's agriculture, energy, and financial markets, while China gains access to sell cooked poultry to the US.

**April 28, 2017:** The USTR is authorized to investigate whether steel/aluminium imports pose a threat to national security.

**April 6-7, 2017:** Xi visits Trump's Mar-a-Lago estate in Florida (https://www.china-briefing.com/news/2017/04/14/what-the-xi-trump-summit-left-unanswered-for-china-us-relations.html), where they agree to set up a 100 Day Action Plan to resolve trade differences.

**May 2, 2016:** While campaigning for the Republican Party's presidential nomination, Trump says "We can't continue to allow China to rape our country and that's what they're doing. It's the greatest theft in the history of the world." The statement is one of many that Trump makes on the campaign trail about China's trade practices.

**September 21, 2011:** Before running for president, Trump tweets "China is neither an ally or a friend — they want to beat us and own our country." The tweet is among several statements he makes criticizing China's trade practices before running for president.

---

*About Us* China Briefing (https://www.china-briefing.com/) is produced by Dezan Shira & Associates (https://www.dezshira.com/). The firm assists foreign investors throughout Asia and maintains offices in China (https://www.dezshira.com/office/china), Hong Kong (https://www.dezshira.com/office/hong-kong.html), Indonesia (https://www.dezshira.com/office/indonesia.html), Singapore (https://www.dezshira.com/office/singapore.html), Russia (https://www.dezshira.com/office/russia), and Vietnam (https://www.dezshira.com/office/vietnam). Please contact info@dezshira.com (mailto:info@dezshira.com) or visit our website at www.dezshira.com (https://www.dezshira.com/).

000831

# Vland, Inc.

## TRAILBLAZING A DIGITAL FUTURE





DIRECTOR & PRESIDENT

1     Executive Summary .................................................................................................. 2
1.1   Company Overview.................................................................................................. 2
1.2   Business Activities .................................................................................................. 2
1.3   Summary and Future .............................................................................................. 3

2     V1 Group Limited – The Parent Company............................................................ 4
2.1   History..................................................................................................................... 4
2.2   Corporate Philosophy and Social Responsibility ............................................... 4
2.3   Business Model and Market Strategy .................................................................... 5
2.4   Growth Strategy and Future................................................................................... 5

3     Vland, Inc. – The U.S. Company ........................................................................... 6
3.1   Mission Statement .................................................................................................. 6
3.2   Strategically Located .............................................................................................. 6
3.3   Management and Staff ............................................................................................ 6
3.4   Products and Services ............................................................................................ 6
3.5   Market Analysis....................................................................................................... 7
3.6   Competitive Analysis.............................................................................................. 9
3.7   Growth Strategy and Implementation..................................................................10
3.8   Financial Projections .............................................................................................11

000833

## 1.1 Company Overv

Vland, Inc. ("the Company" or "Vland") is an American Information Technology company established in October 2018, in the state of California. The Company is headquartered at 1999 South Bascom Avenue, Suite 700, in Campbell, California.

Vland seeks to bring the offline world into the digital age in order to promote connectivity and make everyday life simpler. The Company is founded as a vehicle to provide digital access to products and services and distribute media via digital platforms. Consumers of both public and private sector services and products are increasingly reliant on, and coming to expect, internet based interactive platforms to access and interface with providers. Whether a consumer is making a dinner reservation or a financial transaction they are increasingly doing so via mobile phone applications or personal computers. The Company intends to develop and optimize value added digital platforms and secure and distribute media content via mobile technology.

Initially, the company intends to penetrate the United States marketplace and secure distribution rights from content creators while also providing a multifunctional media hosting and distribution platform. This interactive digital platform will allow content producers to showcase their work and give them the opportunity to interact directly with consumers. Ultimately, the Company will use this initial consumer base as springboard to introduce industry and consumer tailored internet and mobile applications already developed by the Parent Company.

Vland is funded with an initial $200,000.00 contribution and is supported in this endeavor by its parent company, V1 Group Limited ("the Parent Company" or "V1 Group"), a Hong Kong-based company.

## 1.2 Business Activities

The purpose of Vland is to establish a US market presence and allow it to connect content creators, service providers, and consumers directly.

Initially, Vland will focus on three primary activities, securing content, popularizing the platform, and developing a US consumer base. First, the company will focus on sourcing media content and developing relationships with content creators. Second, the company will focus on optimizing its web platform to encourage content creators and consumers to consider the platform as a primary media source. Third, the Company will nurture the US market to deliver preferred content and encourage widespread use of its digital platform for consumption and distribution of content.

Vland's initial target market will focus on producers and consumers of sports broadcasts and mobile gaming applications. This strategy will allow the company to focus on establishing its position and perfecting its offerings without over-extending itself.

Accordingly, Vland will focus primarily on two narrow market segments to establish both internal operational efficiency and brand awareness and adoption:

A. Sportscasting and interactive platform hosting: will see the Company secure the broadcast rights to US based athletic teams, with a focus on Major League Soccer. The Company will broadcast athletic events and provide commentary via a digital mobile application, allowing fans to watch and comment upon events as they unfold. The Company will encourage athletic teams to use the online digital platform to post content including highlights, team blogs, live-streamed events, and fan forums; and

B. Mobile Game Applications and interactive platform: will allow the Company to distribute licensed mobile gaming applications in the US and provide a digital platform for consumers and

promote special events, discounts, and upcoming releases directly to the fans without the need for traditional marketing or consumer feedback. The company will procure international licensing rights from US developers and distribute nationally developed games to US consumers.

## 1.3 Summary and Future

Vland is well poised to bring products to market and to serve as an effective content distribution partner. By leveraging the Parent Company's existing technology and international market presence, Vland can concentrate on securing and distributing media content, optimizing the distribution platform, and establishing itself as a provider of effective reliable digital tools.

By the end of the second year of operation, the Company expects to have solidified its market position in the initial market niches and will seek to expand its product and service offerings. The Company will then focus of bringing to market products developed and fielded by the Parent Company and tailored to the US market by Vland. Depending on market conditions and opportunities, Vland can leverage the Parent Company's experience with financial services, mobile gaming applications, education, media, and healthcare services.



000835

## 2.1   History

Founded in 2005, V1 Group Limited is a Hong Kong-based Chinese Information Technology and Media company that specializes in the core areas of:

- Healthcare Services;

- Financial Sector Services;

- Media Content Development;

- Educational Services;

- Mobile Gaming Applications; and

- Digital Transformation and Modernization Architecture.

The Parent Company focuses on developing and implementing digital and mobile application solutions for industry and consumer needs. V1 Group began operations by pioneering mobile and internet video distribution services and is now among the top 100 Chinese internet companies. The Parent Company provides a range of services which promote connectivity and interactivity between the online and offline worlds. V1 Group is affiliated with ventures in the following areas:

- Financial Services Consulting and Modernization;

- Internet and Cloud Based Banking;

- AI and IT focused Investment Funds;

- Licensing and Distributing Mobile Gaming Applications;

- Broadcast and Internet Based Media;

- Healthcare Provision; and

- Modernization and Management of Consumer-Facing Systems.

## 2.2   Corporate Philosophy and Social Responsibility

Vland takes its corporate philosophy directly from the Parent Company. The pillars of the Parent Company's corporate philosophy are innovation, persistence, integrity, and cooperation. Ultimately, the goal of both companies is to use the internet and digital technology to improve the lives and welfare of the public.

The Parent Company also takes seriously its obligation to conduct itself in a socially responsible manner. By helping companies and consumers transition to digital platforms and paperless transactions users don't just save time and money, they use fewer resources and minimize environmental waste.

Additionally, the Parent Company's provision of healthcare related services carries with it the obligation to ensure that patients have access to the care that they need and that the digital network is secure and robust enough to protect their privacy and grant them uninterrupted access to their healthcare providers.

Aside from reducing environmental waste and ensuring patients are properly cared for, V1 Group is dedicated to protecting the rights of the disenfranchised and highlighting social issues to provoke positive change. In 2013, the Parent Company ran an expose on a price gouging scheme which

000836

## 2.3  Business Model    I Market Strategy

Digital modernization and transition services are disrupting traditional economic ecosystems and the Parent Company has been at the forefront of the tech revolution since its inception in 2005. The Parent Company's current focus is acquiring, developing, and investing in a diverse portfolio of IT focused and digital modernization companies. It believes that digitizing services and content and connecting producers with consumers allows for greater efficiency, minimizes transactional friction, and ultimately provides for a superior user experience.

The Parent Company's goal is to eliminate middlemen, empower consumers, and provide value added services to producers and content creators. To accomplish this goal, the Parent Company has focused not just on distributing its existing technology but on developing and optimizing digital systems across a diverse array of industries and service providers. Already these efforts have borne fruit and demonstrated advantages to both providers of content and services and consumers. By way of example, elderly patients and their caretakers can schedule healthcare visits from certified professionals with the click of a button and at a fraction of the cost of traditional services. On the supply side, healthcare providers can streamline their scheduling and logistical efforts, interface with clients remotely, and improve afterhours care and response times, all while minimizing overhead.

## 2.4  Growth Strategy and Future

The Parent Company expects to achieve significant growth in coming years from three core areas; healthcare services, educational services, and digital content distribution.

Healthcare Services: The Parent Company has seen marked success with its healthcare initiative, Medical Care in Families. This service connects patients, healthcare providers, and medical professionals via a secure digital platform. Traditionally, these services would have been performed by a dedicated logistics and scheduling staff. Medical Care in Families allows patients and providers to connect and communicate directly.

Educational Services: The Parent Company has focused on the growing education services market in China and elsewhere. As admission into preferred schools becomes increasingly competitive, consumers are looking to after school programs or supplemental tutoring to develop necessary academic skills in students. The Parent Company is developing mobile and internet applications to connect students to after school programs and tutors via a digital application. With this application students can interface directly with tutors, access educational and practice resources, and discover nearby programs to supplement their in-school education.

Digital Content Distribution: The Parent Company has significant experience developing, licensing, and distributing digital media across 80 international markets. Such content includes media broadcasts, live-streamed events, sporting events, and mobile and internet-based games. This field has proved to be more and more profitable as the more of the world's population relies on mobile devices.

To facilitate future growth, the Parent Company has acquired Information Technology focused companies and established subsidiaries in local markets to expand its market presence and secure local partners. Vland will help the Parent Company establish a foothold in the US market, allowing it to secure content for international markets and offer its products and services directly to US consumers.

000837

## 3.1 Mission Stateme

Vland's mission is to provide value added digital modernization and transition services to firms and a simplified, effective interface for consumers. The Company also seeks to digitize media content and make it available direct to consumers via their smart devices. Essentially, the Company's ultimate goal is streamline connectivity and bring analog services into the digital age.

## 3.2 Strategically Located

The Company has selected a strategic location in Campbell, California, near the heart of Silicon Valley. This location was selected for its proximity to potential tech partners, content contributors, and a tech savvy labor pool. The area also provides room for growth should the company need to expand. Campbell, California is home to many office parks developed and maintained with tech companies in mind.

## 3.3 Management and Staff

The Company will be headed by Director and President/CEO Ms. Chun Wang who will perform executive functions including setting company goals and procedures, developing partnerships, and ensuring that staff has the resources and capacity to realize the Company's ambitions.

As Chief Operating Officer for V1 Group, Ms. Wang brings with her the support and institutional capacity of the Parent Company, a significant accelerator for Vland. Additionally, Ms. Wang will rely on her more than a decade of professional experience in the Information Technology sector to establish and guide the Company in the US.

Ms. Wang will be assisted in these efforts by an office administrator and two business development specialists. The office administrator will be responsible for human resources issues, payroll, scheduling, and office management. The office administrator will report directly to Ms. Wang.

Within four months of operating, the Company will onboard a business development specialist to scout potential markets, liaise with media and tech partners, and promote products and services to the US market. Soon after the first business development specialist is hired and trained, Vland will hire a second business development specialist to expand the Company's reach and better promote its offerings.

Upon conclusion of the first year of operations, Vland will hire additional support staff depending on the economic climate and the ability of existing staff to effectively process the workload.

## 3.4 Products and Services

### 3.4.1 Licensing and Distribution

The Company will source content for two primary audiences; foreign audiences in one of the Parent Company's more than 80 international markets, and domestic US consumers. By securing distribution rights for US produced content, the Company can secure an initial and reliable revenue to stream to fund future growth. By sourcing and distributing content for US audiences, the Company can better understand its target market and bring internationally produced content to US consumers. Given the diversity of the US market the Company believes there is ample demand for internationally produced content.

### 3.4.2 Digital Sportscasting

The Company will initially focus on forming relationships with athletic clubs and professional teams based in the US. The end goal is to secure distribution rights to sports broadcasts and encourage adoption of

for two reasons. First, there is an international appetite for soccer broadcasts which can be leveraged by the Parent Company's YM network. This strategy allows the streams to be broadcast to a target audience stream with little maintenance or di    ution costs. Second, Major League Soccer    he US is a growing industry in the US and attracts a younger, more tech savvy audience. This audience is more likely to use the mobile platform to consume sportscasts and interact using the mobile application.

### 3.4.3    Interactive Mobile Platforms

The Company intends to build on the Parent Company's experience with interactive mobile platforms. These mobile applications have already shown significant competitive success abroad and the technology can be laterally applied to US market-based applications.

Digital interactive platforms allow organizations to host content and interface with consumers. They also allow companies to facilitate secure digital and paperless transactions, digital scheduling and logistics, and provide services and digital products without needing to resort to third-party services.

### 3.4.4    Mobile Gaming Development and Distribution

The Parent Company achieved significant success in 2011 when it licensed the distribution rights to the mobile gaming application Angry Birds for the Chinese market from the Finnish company Rokio. Since then it has expanded its operations in this area and acquired China Mobile Games Group. This acquisition has helped the company to secure distribution agreements in more than 80 international markets. Because the Parent Company owns these rights, the Company can distribute these games in the US market after modifying them to suit domestic audiences.

## 3.5   Market Analysis

### 3.5.1    Market Summary

Overall market trends demonstrate that the world is shifting from analog transactions to a digital ecosystem. As commerce becomes increasingly digital, consumers have also demonstrated a shift towards mobile applications and away from desktop and wired internet access. As more people acquire and use smartphones their overall preference shifts to a wireless

*% of U.S. adults who own the following devices*

|  | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| Total | 95% | 77% | 17% |
| Men | 95% | 80% | 16% |
| Women | 94% | 75% | 19% |
| Ages 18-29 | 100% | 94% | 6% |
| 30-49 | 98% | 89% | 9% |
| 50-64 | 94% | 73% | 21% |
| 65+ | 65% | 40% | 40% |

lifestyle. Indeed, as Americans adopt a mobile lifestyle they are increasingly dropping traditional broadband services in the home and relying exclusively on mobile devices and applications to access services, purchase products, and consume media.

At least 77% of Americans own a smartphone and can access internet-based content on their mobile device. Of Americans aged 18-49, over 90% own a smartphone. As smartphone adoption increases so too does time spent on the internet. At the same time, a concomitant decrease in home broadband service is observed.

### 3.5.2    Market Trends

As Americans adopt to an online lifestyle several trends have emerged which suggest that they are abandoning traditional media and transactions for internet-based services. Three important trends which will directly impact Viand's activities and success are highlighted below.

### 3.5.2.1 Americans are increasingly mobile

In the last five years Americans have increasingly abandoned traditional home broadband services, relying instead on smart devices such as mobile phones and tablets to connect to the internet. This trend supports a need for modernization and digital transition solutions for firms offering services direct to consumers. As wireless coverage improves this trend is expected to continue. Consumers are thus more likely to take advantage of services via mobile applications and conduct transaction digitally.



### 3.5.2.2 Americans are turning away from traditional media sources

Between 2016 and 2017, a significant portion of Americans turned from television broadcasts as a primary source of news and instead began to rely on internet-based digital resources. In 2016, 57% of Americans received their news primarily through network television broadcasts and 38% relied on the internet. Within a single year those numbers changed to 50% and 43% respectively. Vland expects this trend to continue, particularly considering other observed trends like fewer home broadband connections, greater smartphone adoption, and increased time spent online.



### 3.5.2.3 Americans are spending more time on the internet

Over a quarter of US adults report that they are constantly on the internet. If the analysis is confined to Americans between the ages of 18-49 that number increases to almost 38% who say they are online "almost constantly." This suggests that more than 130 million Americans are connected to, and comfortable with navigating the internet and mobile applications. This figure has wide ranging implications for how Americans will interact with service providers and consume content in the future. When coupled with increased adoption of smart devices and decreased consumption via traditional media channels, it is clear that this trend will continue to disrupt traditional service models.



As firms realize the need to transition to a digital platform, the Company intends to service that need by offering its digital platforms and modernization services. Vland has access to a range of developed products through its Parent Company allowing it to quickly pivot across industries.

000840

The Company faces a competitive but fast-growing market segment. Vland believes it can outperform competitors both in terms of internal efficiency and the ability to deliver a superior customer experience. Further, the Company believes that due to the Parent Company's existing technology portfolio it can bring relevant products and services to the US market with minimal overhead and transactional friction.

The Company's main challenge is promoting brand awareness and establishing itself as a reliable and effective licensing partner. This hurdle presents itself only because Vland is an unknown entity in the US marketplace. However, given the Company's pedigree and the support of its Parent Company, Vland does not expect this challenge to present a serious obstacle to success.

Another Challenge is understanding the domestic marketplace. The US market is unique in several ways. US consumers are not a single unitary group, rather they exhibit a diversity of tastes and expectations. The challenge is understanding how to appeal within and across sub-markets of consumers. The Company expects to confront this challenge through detailed market research and by hiring professionals with intimate knowledge of US consumer behavior.

### 3.6.2    Competitive Advantage

Vland has significant competitive advantages which will allow it to capture US market share, including:

- **Detailed Knowledge of Market and Consumer Trends:** Vland has the benefit of the Parent Company's intimate understanding of international marketplaces. V1 Group has content distribution rights across 80 international markets and 13 years of experience developing and optimizing consumer facing mobile and internet application for a diverse array of industries. The diversity of international market and industry experience allows the Parent Company to capture trends both particular to markets or industries and trends which manifest across markets and industries.

- **Focused Market Objective and Institutional Capacity:** Initially, Vland will focus on servicing two related market niches, sportscasting and mobile gaming applications. By narrowing the scope of our initial market targets, The Company can concentrate on developing relationships with US-based content creators and distributors while optimizing the digital platform for US consumers. Once established, subsequent activities will focus on areas which maximize institutional capacity and allow for lateral application of technology, i.e. those fields where the Parent Company has experience and success. This strategy reduces overhead, maximizes competitive advantage, and prevents the Company from overextending its market position.

- **Unique Interactive Media Platforms:** Vland is developing and optimizing a unique interactive platform where US content creators, service providers, and vendors can connect directly to the US consumer with minimal transactional friction. The initial platforms will focus on narrow market niches to allow familiarity with US consumer habits and expectations. Once these platforms are reliably established the Company intends to introduce the platform to other industries like healthcare and educational services.

- **A Portfolio of Successful Products:** Vland can take advantage of the Parent Company's extensive portfolio of successful products. The Parent Company has fielded digital solutions across an array of industries. With minimal resources, Vland can modify the product to suit American market needs and field it in a fraction of the time a rival developer could. This is strong advantage both in terms of revenue generation and outcompeting rival firms.

000841

operating with a minimal staff and budget. Due to the Parent Company's existing portfolio of products, Vland will also benefit from significant staffing redundancies and development costs. A smaller staff also allows for rapid information exchange and more efficient decision making.

- Focus, agility and institutional capacity: Vland's small footprint always the Company to grow with its market share, avoiding inefficient use of resources. By focusing on an identifiable and serviceable market niche Vland is capable of devoting resources more efficiently and making decisions without consulting multiple stakeholders. Vland can rely on its Parent Company for guidance, support, and its wealth of knowledge working in international markets.

These strengths will allow the Company to maximize efficiency and deliver competitive value-added products and services which benefit both producers and consumers. By eliminating the need for third party services, firms can capture more revenue as profit and consumers can interface directly with the company for a superior consumer experience.

## 3.7 Growth Strategy and Implementation

### 3.7.1 Overview

Vland's growth strategy seeks to leverage the Parent Company's extensive experience and institutional knowledge to competitively service the U.S. market. The Company's significant accelerators will allow it to efficiently and profitably deliver value added services to consumers and providers.

### 3.7.2 Year 1

As mentioned previously, the Company's initial growth strategy will focus on introducing our platform and digitization services to a narrow target market segment. This strategy will allow us to focus on cultivating relationships with content contributors, securing licensing and distribution agreements, and optimizing our distribution content and platform for the domestic market.

To accomplish this goal the Company will onboard three staff members in addition to the Director and CEO, one office administrator and two business development specialists. Working closely with Ms. Wang, the business development specialists will identify potential content contributors and work to understand their consumer market. The Company will then secure broadcast rights and encourage adoption of the mobile platform. Revenue from the digital platform and licensing revenue from content distribution will allow the company to maintain fiscal stability.

### 3.7.3 Year 2

In the second year of operation, Vland anticipates strengthening its relative market position and expanding sales efforts to increase adoption of digital platforms and media content. As part of this effort the Company will need to increase staff to support and augment the efforts of its business development specialists. As staff increase the Company will need to reassess its office needs and expand appropriately. The Company expects to have fully established itself in both the sportscasting and mobile games market via its digital platform.

### 3.7.4 Year 3

In our third year Vland expects to introduce several of the Parent Company's digital platforms tailored to servicing the US market. Promising products for the US market include an on-call medical services platform similar to Medical Care in Families and educational platforms which facilitate remote learning and allow students to practice their schoolwork afterhours and on the go. Vland expects to be a known entity in the United States by this point and hopes to have cultivated a network of partners with which to pursue future market opportunities.

000842

### 3.8.1    Sales Forecast by Month and Year





Initially, sales of digital solutio    e expected to be limited while the Company    its footing in the marketplace. However, Vland expects to be fully established and profitable by the second year of operation.

### 3.8.2    First Year Cash Flow

Projected first year cash flow will allow Vland to begin operations and secure future revenue pathways. The Company expects to be productive in its first year of operation but does not expect to be profitable until year two. The Company has adequate startup funding to see it through year one and can seek additional funding from the Parent Company, if neccesary. Initial sales will provide some cash flow while licensing revenue will cushion company operations before becoming a major source of profit in subsequent years.



### 3.8.3    First Year Balance Sheet

| Financials | | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Balance** | | | | | | | | | | | | | |
| Opening Balance Cash & Checking | $0 | $200,000 | $179,500 | $173,999 | $173,878 | $173,483 | $174,536 | $168,179 | $162,570 | $160,852 | $160,304 | $152,046 | $166,337 |
| | | | | | | | | | | | | | |
| **Plus Money Received** | | | | | | | | | | | | | |
| New Investment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Loans | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales | $0 | $0 | $10,000 | $12,100 | $13,310 | $14,641 | $16,105 | $17,716 | $19,488 | $21,437 | $23,581 | $25,939 | $28,533 |
| Licensing Revenue | $0 | $0 | $13,750 | $15,125 | $16,638 | $18,302 | $20,132 | $22,145 | $24,360 | $26,796 | $29,476 | $32,424 | $35,666 |
| Subtotal Money Received | $0 | $0 | $23,750 | $27,225 | $29,948 | $32,943 | $36,237 | $39,861 | $43,848 | $48,233 | $53,057 | $58,363 | $64,199 |
| | | | | | | | | | | | | | |
| **Less Money Spent** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Direct Costs** | | | | | | | | | | | | | |
| Direct Cost of Sales | $0 | $3,000 | $3,300 | $3,630 | $3,993 | $4,392 | $4,831 | $5,314 | $5,845 | $6,430 | $7,073 | $7,780 | $8,558 |
| Licensing and Distribution Costs | $0 | $7,500 | $8,250 | $9,075 | $9,982 | $10,980 | $12,078 | $13,286 | $14,615 | $16,077 | $17,685 | $19,454 | $21,399 |
| | | | | | | | | | | | | | |
| **Normal Operating Expenses** | | | | | | | | | | | | | |
| Payroll and Payroll Taxes, Benefits, Etc. | $0 | $5,000 | $8,000 | $8,000 | $14,000 | $14,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Rent and Utilities | $0 | $3,000 | $3,000 | $3,600 | $3,000 | $3,000 | $3,000 | $3,000 | $2,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Sales and Marketing Expenses | $0 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Misc. Operating Expenses | $0 | $1,000 | $1,110 | $1,232 | $1,368 | $1,518 | $1,685 | $1,870 | $2,076 | $2,304 | $2,557 | $2,838 | $3,150 |
| | | | | | | | | | | | | | |
| **Other Outlays** | | | | | | | | | | | | | |
| Payments of Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Debt Payments | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Purchase of Assets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Subtotal Money Spent | $0 | $20,500 | $24,690 | $25,537 | $31,343 | $34,396 | $42,584 | $44,470 | $44,536 | $48,811 | $51,315 | $54,072 | $57,107 |
| | | | | | | | | | | | | | |
| **Ending Balance** | | | | | | | | | | | | | |
| Ending Balance Cash and Checking | $0 | $179,500 | $178,530 | $173,878 | $173,483 | $174,536 | $168,179 | $163,570 | $160,852 | $160,304 | $162,046 | $166,337 | $173,429 |
| | | | | | | | | | | | | | |
| **Profit Before Interest and Taxes** | | | | | | | | | | | | | |
| Sales | | $0 | $10,000 | $12,100 | $13,316 | $14,641 | $16,105 | $17,716 | $19,468 | $21,437 | $23,581 | $25,939 | $28,533 |
| Less Cost of Sales | | ($10,500) | ($11,550) | ($12,705) | ($13,376) | ($15,372) | ($16,909) | ($18,600) | ($20,460) | ($22,507) | ($24,764) | ($27,234) | ($29,957) |
| Gross Margin | | ($10,500) | ($1,550) | ($605) | ($60) | ($751) | ($804) | ($884) | ($972) | ($1,070) | ($51,172) | ($1,295) | ($1,424) |
| Less Operating Expenses | | ($10,000) | ($13,110) | ($13,232) | ($15,368) | ($19,518) | ($25,685) | ($25,870) | ($26,076) | ($26,304) | ($26,557) | ($26,838) | ($27,150) |
| Profit Before Interest and Taxes | | ($20,503) | ($14,660) | ($13,037) | ($20,033) | ($20,249) | ($26,429) | ($26,764) | ($27,048) | ($27,374) | ($27,734) | ($28,133) | ($28,574) |

000843

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| **Beginning Balance** | | | |
| Opening Balance Cash & Checking | $200,000 | $173,429 | $2,333,429 |
| | | | |
| **Plus Money Received** | | | |
| New Investment | $0 | $0 | $0 |
| New Loans | $0 | $0 | $0 |
| Sales | $202,850 | $1,250,000 | $2,500,000 |
| Licensing Revenue | $254,814 | $2,000,000 | $5,000,000 |
| Subtotal Money Received | $457,664 | $3,250,000 | $7,500,000 |
| | | | |
| **Less Money Spent** | | | |
| | | | |
| Direct Costs | | | |
| Direct Cost of Sales | $64,146 | $250,000 | $500,000 |
| Licensing and Distribution Costs | $160,381 | $500,000 | $1,000,000 |
| | | | |
| Normal Operating Expenses | | | |
| Payroll and Payroll Taxes, Benefits, Etc. | $189,000 | $250,000 | $300,000 |
| Rent and Utilities | $36,000 | $40,000 | $50,000 |
| Sales and Marketing Expenses | $12,000 | $20,000 | $35,000 |
| Misc. Operating Expenses | $22,708 | $30,000 | $50,000 |
| | | | |
| Other Outflows | | | |
| Payments of Taxes | $0 | $0 | $0 |
| Debt Payments | $0 | $0 | $0 |
| Purchase of Assets | $0 | $0 | $0 |
| Other | $0 | $0 | $0 |
| Subtotal Money Spent | $484,235 | $1,090,000 | $1,935,000 |
| | | | |
| **Ending Balance** | | | |
| Ending Balance Cash and Checking | $173,429 | $2,333,429 | $7,898,429 |
| | | | |
| **Profit Before Interest and Taxes** | | | |
| Sales | $202,850 | $1,250,000 | $2,500,000 |
| Less Cost of Sales | ($224,527) | ($750,000) | ($1,500,000) |
| Gross Margin | ($21,677) | $500,000 | $1,000,000 |
| Less Operating Expenses | ($259,708) | ($340,000) | ($435,000) |
| Profit Before Interest and Taxes | ($281,385) | $160,000 | $565,000 |
| | | | |
| Net Cash Flow | ($26,571) | $2,160,000 | $5,565,000 |

000844